KAARAN E. THOMAS (NV Bar No. 7193)
RYAN WORKS (NV Bar No. 9224)
McDONALD CARANO WILSON LLP
2300 West Sahara Avenue, Suite 1000
Las Vegas, Nevada  89102
Telephone:    (702) 873-4100
Facsimile:    (702) 873-9966
Counsel for Debtor and Debtor in Possession

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| In re: | **Case No. BK-S-10-27855-BAM** |
| **AMERICAN PACIFIC FINANCIAL CORPORATION** | **Chapter 11** |
| **Debtor In Possession.** | **DISCLOSURE STATEMENT DESCRIBING CHAPTER 11 PLAN OF REORGANIZATION PROPOSED BY AMERICAN PACIFIC FINANCIAL CORPORATION (DATED NOVEMBER 1, 2010)** |
| | **Hearing Date:**    **December 7, 2010** |
| | **Hearing Time:**    **10:00 a.m.** |
| | **Hearing Time: Foley Federal Building 300 Las Vegas Blvd. South, Las Vegas, Nevada 89101, 3rd Floor, Courtroom 3** |

<u>LIST OF EXHIBITS</u>

| EXHIBIT NO. | DESCRIPTION |
| --- | --- |
| 1 | Chapter 11 Plan of Reorganization Proposed by American Pacific Financial Corporation (Dated, 2010) |
| 2 | Pre Petition Assets |
| 3 | Unsecured Creditors |
| 4 | Cure Claims  [to be filed by Exhibit Filing Date] |
| 5 | Trust Agreement  [to be filed by Exhibit Filing Date] |
| 6 | Participation Agreement |
| 7 | 18-Month Post-Confirmation Budget & Assumptions |
| 8 | Liquidation Analysis & Assumptions |

## <u>DISCLOSURE STATEMENT DESCRIBING CHAPTER 11 PLAN OF REORGANIZATION PROPOSED BY AMERICAN PACIFIC FINANCIAL CORPORATION (DATED November 1, 2010)[1]</u>

THIS DISCLOSURE STATEMENT HAS NOT YET BEEN APPROVED UNDER BANKRUPTCY CODE SECTION 1125(b) FOR USE IN THE SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THE PLAN OF REORGANIZATION DESCRIBED HEREIN.  THE FILING AND DISTRIBUTION OF THIS DISCLOSURE STATEMENT IS NOT INTENDED, AND SHOULD NOT BE CONSTRUED, AS A SOLICITATION OF ACCEPTANCES OR REJECTIONS OF SUCH PLAN OF REORGANIZATION.  THE INFORMATION CONTAINED HEREIN SHOULD NOT BE RELIED UPON FOR ANY PURPOSE BEFORE A DETERMINATION BY THE COURT THAT THIS DISCLOSURE STATEMENT CONTAINS "ADEQUATE INFORMATION" WITHIN THE MEANING OF SECTION 1125(a) OF THE BANKRUPTCY CODE.

### <u>PURPOSE OF DISCLOSURE STATEMENT</u>

THE PURPOSE OF THIS DISCLOSURE STATEMENT IS TO PROVIDE ADEQUATE INFORMATION TO ENABLE A HYPOTHETICAL REASONABLE INVESTOR TYPICAL OF THE HOLDERS OF CLAIMS OR INTERESTS IN THE CASE TO MAKE AN INFORMED JUDGMENT ABOUT THE PROPOSED PLAN.  THE SOURCE OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS THE DEBTOR'S MANAGEMENT.

### <u>SUMMARY INFORMATION</u>

Debtor:     American Pacific Financial Corporation

Recommendation:     The Debtor recommends that you vote in favor of the Plan.

---

[1]     Capitalized terms not otherwise defined in this Disclosure Statement have the meanings ascribed to them in the Plan.  The Plan, once confirmed, is the legally binding document regarding the treatment of Claims and Interests and the terms and conditions of the Debtor's reorganization.  Accordingly, to the extent that there is any inconsistency between the terms contained herein and those contained in the Plan, the terms of the Plan will govern.

| | |
|---|---|
| Vote Required to Accept the Plan: | Acceptance of the Plan by a Class of creditors requires the affirmative vote of two-thirds in amount and a majority in number of the Allowed Claims actually voted in such Class. |
| | Generally, only entities that hold Allowed Claims in the Classes designated as impaired under the Plan and that are to receive or retain assets under the Plan on account of their Allowed Claims are entitled to vote. |
| | If any impaired Class votes to reject the Plan, the Court nevertheless may confirm the Plan if the "cramdown" requirements of Bankruptcy Code section 1129(b) are satisfied with respect to such Class, provided that the other requirements for confirmation under Bankruptcy Code section 1129 have been satisfied. |
| Voting Information: | If you are entitled to vote, you should have received a Ballot with this Disclosure Statement.  After completing and signing your Ballot, you should return it to: |

> American Pacific Financial Corporation Ballot
> c/o Kaaran Thomas, Esq.
> McDonald Carano Wilson LLP
> P.O. Box 2670
> Reno, NV 89505-2670

| | |
|---|---|
| | For your Ballot to be counted, McDonald Carano Wilson LLP must receive it no later than 12:00 p.m. Pacific Time on [date]. |
| Confirmation Hearing: | The Confirmation Hearing will be held on [date], at [time] (Pacific time). The Confirmation Hearing may be continued from time to time without further notice. |
| Treatment of Claims and Interests: | The treatment that creditors and shareholders will receive if the Court confirms the Plan is set forth in the Plan and summarized in Section X.B of this Disclosure Statement.  The terms of the Plan are controlling, and all creditors, shareholders and interested parties are urged to read the Plan in its entirety. |
| The Effective Date: | The Plan's Effective Date will be the first Business Day on which all of the conditions set forth in Section IV.P of the Plan have been satisfied or waived in accordance with the Plan. |
| Questions: | All inquiries about the Plan and Disclosure Statement should be in writing and should be sent to: Kaaran Thomas, McDonald Carano Wilson LLP, PO Box 2670, Reno, NV 89505-2670; Telephone: 775-788-2000; Email:  kthomas@mcdonaldcarano.com |

IMPORTANT NOTICE: THE PLAN, DISCLOSURE STATEMENT, AND BALLOTS CONTAIN IMPORTANT INFORMATION THAT IS NOT INCLUDED IN THIS SUMMARY.  THAT INFORMATION COULD MATERIALLY AFFECT YOUR RIGHTS.  YOU SHOULD THEREFORE READ THE PLAN, DISCLOSURE STATEMENT, AND BALLOTS IN THEIR ENTIRETY.  YOU ALSO SHOULD CONSULT WITH YOUR LEGAL AND FINANCIAL ADVISORS BEFORE VOTING ON THE PLAN.

## I.

## INTRODUCTION AND PLAN OVERVIEW

When this bankruptcy case (the "Case") commenced on September 21, 2010, American Pacific Financial Corporation (the "Debtor" or "APFC") faced a series of challenges to the continued development and viability of its business (the "Business").  This summary describes these challenges, how the Debtor has addressed them during the pendency of the Case and, most importantly, how the Plan proposed by the Debtor will overcome these challenges and set the groundwork for continuing the development of the Business.  This summary should be read in conjunction with the remainder of the Disclosure Statement, which provides further detail regarding the Plan.  This summary is qualified by the express terms of the Plan.

    A.    <u>Benefits of the Plan of Reorganization</u>:

- Cash payments to all general unsecured creditors with Allowed Claims, either out of cash (as to the Class 2 ("Priority") and 4 "Administrative Convenience Claims") or out of Net Operating Proceeds" through their interest in the Participation Agreement.

- Return or liquidation of collateral securing Secured Claims in Class 1.

    B.    <u>Detriments of a conversion to Chapter 7</u>:

Absent confirmation of a plan, the likely alternative is the dismissal or conversion of the Debtor's case to one under chapter 7 of the Bankruptcy Code.  In chapter 7, the Debtor's case would be administered by a trustee, and the Debtor's assets would be liquidated.  The conversion to chapter 7 would be detrimental to the Business and virtually all of the Debtor's creditors.  A conversion would cut off any source of funding to manage and carefully liquidate the Debtor's assets.  Since these

assets are interests in distressed businesses the likely result would be a sale of the assets at distressed prices, generating little recovery for creditors.

      C.    <u>Challenges Faced by the Debtor and the Business</u>

          1.    <u>Description of the Business</u>.

The Business of APFC is working to protect, manage, and add value to debt and equity investments. APFC's assets include loans and investments in distressed properties, development projects, real estate, and other types of operating companies in various industries.

APFC added value to its acquisitions by actively managing the assets to maximize the return on investment, however, because of the nature of its assets, APFC has been heavily impacted by this recession and lack of liquidity in the economy.

Before the Case commenced, the Debtor's primary business was asset management, consulting, and development of assets for equity growth and mezzanine financing.

By the time the Case commenced, the Debtor had experienced losses from many of the assets and was unable to liquidate and/or further develop the assets.

          2.    <u>Debtor's Obligations to Creditors</u>.

Before and after the commencement of the Case, the Debtor continued its efforts to resolve each of the above problems. Shortly after the filing of the Case, the Debtor obtained a line of credit for up to $50,000.00. The lender is American Pacific Management Corporation. This unsecured line of credit provided the Debtor with funds to pay the administrative expenses of the estate, thereby avoiding irreparable harm to the Business.

          3.    <u>Reasons for Financial Difficulties</u>.

Debtor's business, investment in distressed assets, was severely impacted by the recession. Lack of liquidity, decreased consumer spending and increased risk of business failure affected Debtor's ability to reorganize and turnaround its investments.

In short, Debtor's cash flow shortage impacted its ability to pay its creditors.

- Many assets became non-performing and did not contribute to cash flow.

- Assets scheduled to be sold became non-liquid because of the economic downturn and unavailability of purchaser funding.

The Plan is the culmination of the Debtor's efforts to provide for a fair resolution of the various problems facing the Debtor and the Business. By its terms, the Plan transfers all unsecured creditors' claims in excess of $5,000.00 to a trust which will in turn execute a participation agreement with the Reorganized Debtor, secured by the Reorganized Debtor's assets (the "Participation Assets"). The Participation Assets consist of all of the Reorganized Debtor's assets on the Effective Date with the possible exception of the assets securing the Secured Claims. The agreement will permit the Trust to share in Net Operating Profits of the Debtor for 84 months following the Effective Date. The term can be extended by a vote of the Trust beneficiaries. At the end of the participation period the remaining Participation Assets will be liquidated.

The Plan is also the product of negotiation among the Debtor and its largest creditors. The Debtor believes that the Plan provides creditors with the most value that can reasonably be obtained under the circumstances.

      D.    <u>Resolution of Problems Under the Plan</u>.

The Plan provides for the restructure of Debtor's obligations in a way that permits the Debtor to to maximize the value of its assets, including its tax losses. Debtor's current shareholder, Larry Polhill is retaining his stock in the Debtor to avoid any change of ownership that might impair or destroy the Debtor's net operating losses. As of the Petition date, these losses are estimated at least $144 million dollars. After deducting the gains attributable to any discharge of debt under the Plan the Debtor expects to have a remaining loss of at least $40 million dollars for use in its operations. The Plan permits the losses to be preserved to offset future gains realized from Debtor's assets.

      E.    <u>The Post-Confirmation Balance Sheet</u>.

Presently, the Debtor has substantial unsecured indebtedness, including the $50,000.00 debtor in possession ("DIP") credit facility and approximately $160 million dollars in unsecured claims. All of these claims will be removed from the Post-Confirmation balance sheet. The obligations will either be paid in cash or replaced with the obligation to the Creditor Trust.

    F.  <u>The Post-Confirmation Business Plan</u>.

  The Plan contemplates that the Reorganized Debtor will be primarily involved in managing Debtor's existing assets.

    G.  <u>The Treatment of Creditors</u>.

  *Secured Creditors*.  Secured creditors may also receive treatment, at the Debtor's election, that does not impair the rights of such secured creditors.  This could include the turnover of the secured creditors' collateral.

  *Priority Creditors*. Priority Creditors will be paid in cash, or equivalents, as otherwise agreed, on the Effective Date.

  *General Unsecured Creditors*.  General unsecured creditors are divided into two classes.  Class 4 is an "administrative claims" class, consisting of small claims ($5,000.00 or less).  Class 4 will receive a cash payment of fifty per cent (50%) of their claims within six months after the Effective Date.

  The remaining creditors (Class 3) will receive beneficial interests in a Creditor's Trust which will receive a "Participation Agreement" granting a lien on Debtor's assets to secure payment of Debtor's "Net Operating Proceeds" from Debtor's assets.  The obligation will be secured by a lien on Reorganized Debtor's assets. The Participation Agreement permits Reorganized Debtor to manage and liquidate assets for eighty-four (84) months, unless such period is extended by vote of the holders of fifty five per cent (55% ) of the dollar amount of Beneficiaries' claims.  The Reorganized Debtor will continue to own and manage the assets in consultation with the Class 3 Trustee, and will be responsible for funding the costs and expenses of the APFC Class 3 Trust.  The Class 3 Trustee will be compensated out of the funds generated from the Class 3 Participation Agreement.  The terms and method of such funding will be set forth in the APFC Class 3 Trust Agreement.

The following chart summarizes the treatment of claims under the Plan and in a hypothetical liquidation if the parties are unable to reach a settlement of their respective claims:

| Type of Creditors<br>Total claims | What Creditors Can Expect to<br>Receive Under the Plan | What Creditors Will Likely<br>Receive In a Liquidation |
|---|---|---|
| Holders of Secured Claims in Class 1<br>$1,395,283.47 | • Collateral or the value thereof | • Return of collateral or the value thereof |
| Holders of Priority Claims<br>$73,212.40 | • Payment in full | • Payment in full |
| Holders of Claims $5,000 or less<br>$37,315.16 | • Payment of 50% of claim in cash within six months of Effective Date | • A Pro Rata share of:<br>Liquidation of Debtor's assets after payment of Trustee's fees and expenses |
| Holders of General Unsecured Claims<br>$159,508,939.65 | • Beneficial Interest in Creditor Trust Secured Participation Agreement payable over 84 months unless extended by agreement. | • A Pro Rata share of:<br>Assets sold at liquidation prices |

The Debtor urges you to read this document carefully, and to support the Plan.

## II.

## INFORMATION REGARDING THE CHAPTER 11 CASE

The Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") on September 21, 2010 (the "Petition Date"), thereby commencing the Case.    The Case is pending before the United States Bankruptcy Court, District of Nevada (the "Court") under case number 10-27855.   Pursuant to Bankruptcy Code Sections 1107 and 1108, the Debtor is operating its businesses and managing its affairs as a Debtor and Debtor in Possession.

The Debtor is a proponent of the "Chapter 11 Plan of Reorganization Proposed by American Pacific Financial Corporation (Dated November 1, 2010)" (the "Plan") that is attached to this

Disclosure Statement as <u>Exhibit 1</u>.   THE DOCUMENT THAT YOU ARE READING IS THE DISCLOSURE STATEMENT FOR THE ACCOMPANYING PLAN.   The Plan sets forth the manner in which the Claims against, and Interests in, the Debtor will be treated following the Debtor's emergence from chapter 11.   This Disclosure Statement describes certain aspects of the Plan, the Debtor's current and future business operations, including, but not limited to, the proposed reorganization of the Debtor, and other related matters.   Under the Plan, APFC will continue to operate as a going concern on and after the Effective Date.   The Plan is intended to be a reorganization within the meaning of Section 368(a) of the Internal Revenue Code of 1986, as amended (the "<u>Tax Code</u>"). The Creditor Trust is a Liquidating Trust within the meaning of the Tax Code.

FOR A COMPLETE UNDERSTANDING OF THE PLAN, YOU SHOULD READ THIS DISCLOSURE STATEMENT, THE PLAN, AND THE EXHIBITS TO BOTH DOCUMENTS IN THEIR ENTIRETY.

This Disclosure Statement sets forth the assumptions underlying the Plan, describes the process that the Court will follow when determining whether to confirm the Plan, and describes how the Plan will be implemented if it is confirmed by the Court.   Bankruptcy Code section 1125 requires that a disclosure statement contain "adequate information" concerning a plan of reorganization.   11 U.S.C. § 1125(a).   The Court has [not] approved the form of this document as an adequate Disclosure Statement that contains adequate information to enable entities affected by the Plan to make an informed judgment when deciding whether to vote to accept or to reject the Plan.   The Court's approval of the adequacy of this Disclosure Statement, however, does not constitute a determination by the Court with respect to the fairness or the merits of the Plan or the accuracy or completeness of the information contained in the Plan or Disclosure Statement.

THE COURT HAS NOT YET CONFIRMED THE PLAN DESCRIBED IN THIS DISCLOSURE STATEMENT.   THEREFORE, THE PLAN'S TERMS ARE NOT YET BINDING ON ANYONE.   IF THE COURT LATER CONFIRMS THE PLAN AND THE EFFECTIVE DATE OCCURS, THEN THE PLAN WILL BE BINDING ON THE DEBTOR AND ON ALL PARTIES IN INTEREST IN THESE CASES, INCLUDING CREDITORS AND INTEREST HOLDERS OF THE

DEBTOR.

The Debtor believes that the Plan provides, under the circumstances, the best possible recoveries to creditors and that acceptance of the Plan is in the best interests of all parties in interest. They therefore recommend that all eligible creditors entitled to vote to accept or reject the Plan cast their Ballots to accept the Plan.

### III.

### GENERAL DISCLAIMERS AND INFORMATION

Please carefully read this document and the exhibits to this document.  These documents explain who is entitled to vote to accept or reject the Plan, who may object to confirmation of the Plan, and the treatment that creditors and shareholders can expect to receive if the Court confirms the Plan. The Disclosure Statement also describes the history of the Debtor, the events precipitating the Case, events in the Case, the effect of Plan confirmation, and some of the issues the Court may consider in deciding whether to confirm the Plan.  It also analyzes the Plan's feasibility and how your treatment under the Plan compares to your hypothetical treatment under a chapter 7 liquidation.  The statements and information contained in the Plan and Disclosure Statement, however, do not constitute financial or legal advice.  You should therefore consult your own advisors if you have questions about the impact of the Plan on your Claims.

The financial information contained in the Plan and Disclosure Statement was prepared by the Debtor from information in their books and records and is the sole responsibility of the Debtor.  The Debtor's professionals prepared the Plan and Disclosure Statement at the direction of, and with the review, input, and assistance of, the Debtor's management.  The Debtor's professionals have not independently verified this information.

The statements and information that concern the Debtor set forth in this document constitute the only statements and information that the Court has approved for the purpose of soliciting votes to accept or reject the Plan.  Therefore, no statements or information that are inconsistent with anything contained in this Disclosure Statement are authorized for the purpose of soliciting votes to accept or reject the Plan unless otherwise ordered by the Court.

You may not rely on the Plan and Disclosure Statement for any purpose other than to determine whether to vote to accept or reject the Plan.  Nothing contained in the Plan or Disclosure Statement constitutes an admission of any fact or liability by any party, or may be deemed to constitute evidence of, the tax or other legal effects that the reorganization set forth in the Plan may have on entities holding Claims or Interests.

Unless another time is expressly specified in this Disclosure Statement, all statements contained in this document are made as of July 31, 2010, Debtor's fiscal year end.  Under no circumstances will the delivery of this Disclosure Statement, or the exchange of any rights made in connection with the Plan, create an implication or representation that there has been no subsequent change in the information included in this document.  The Debtor assumes no duty to update or supplement any of the information contained in this document, and they do not intend to undertake any such update or supplement.

CAUTIONARY STATEMENT:  Some statements in this document may constitute forward-looking statements within the meaning of the Securities Act of 1933 (as amended, the "Securities Act") and the Securities Exchange Act of 1934 (as amended, the "Exchange Act").  Such statements are based upon information available when the statements were made and are subject to risks and uncertainties that could cause actual results materially to differ from those expressed in the statements.  Neither the Securities and Exchange Commission (the "SEC") nor any state securities commission has approved or disapproved the Disclosure Statement, the Plan, or any Exhibits to either document.

## IV.

## WHO MAY VOTE TO ACCEPT OR REJECT THE PLAN

What follows in this Section IV[2] is a general discussion of the rules governing the treatment and satisfaction of claims and equity interests under a plan of reorganization proposed under the Bankruptcy Code.  Where a particular word (such as "Debtor") or term (such as "Allowed Claim") is capitalized in this Disclosure Statement, and not otherwise defined herein, that word or phrase has the

---

[2]    Unless otherwise indicated, "Section" references are to sections of this Disclosure Statement.

meaning provided in Section I (Definitions) of the Plan.  Where, however, a particular word (such as "debtor") or phrase (such as "allowed claim") is not capitalized in this Disclosure Statement, that word or phrase is not intended to refer to the definitions provided in Section I of the Plan, but rather, the word or phrase is intended to have the general meaning ascribed to it.

Generally, to vote to accept or reject the Plan, your Claim must be: (a) an impaired Claim; (b) neither a Disputed Claim nor a Disallowed Claim; and (c) entitled to receive or retain some value under the Plan.  Holders of unimpaired Claims are deemed to have accepted the Plan and do not vote, though they may object to Plan confirmation to the extent they otherwise have standing to do so. Holders of Claims and/or Interests that do not receive or retain any value under the Plan are deemed to reject the Plan.  As defined by the Bankruptcy Code, a claim generally includes all rights to payment from a debtor, as opposed to an interest which generally represents an ownership stake in a debtor.

A.   <u>Allowed Claims</u>.

With the exceptions explained below, under the Bankruptcy Code, a claim generally is allowed only if a proof of the claim is properly filed before any applicable bar date, and either no party in interest has objected to, or the Court has entered an order allowing, the claim.[3]  Under certain circumstances a creditor may have an allowed claim even if a proof of claim was not filed and the applicable bar date for filing a proof of claim has passed.  For example, a claim may be deemed allowed if the claim is listed on a debtor's schedules of liabilities and is not scheduled as disputed, contingent, or unliquidated.

A Claim must be an Allowed Claim for purposes of voting for the holder of such Claim to have the right to vote to accept or reject the Plan.  Generally, for voting purposes, a Claim is deemed Allowed to the extent that:  (a) either (1) a proof of Claim was timely filed; or (2) a proof of Claim is deemed timely filed either under Bankruptcy Rule 3003(b) or by a Final Order; and (b) either (1) the Claim is neither a Disputed Claim nor a Disallowed Claim, or (2) the Claim is allowed either by a Final Order or under the Plan.

---

[3]    *See* the Notice of Approval of Disclosure Statement and Deadlines Relating to Plan for specific information regarding the bar dates established in these Cases.

Under the Plan, an entity whose Claim is subject to an objection is not eligible to vote to accept or reject the Plan unless that objection has been resolved in the entity's favor prior to the Ballot Deadline, or, after notice and a hearing under Bankruptcy Rule 3018(a), the Court temporarily allows the entity's Claim for the purpose of voting to accept or reject the Plan.  Any entity that seeks temporary allowance of its Claim for voting purposes must promptly file an appropriate motion and take the steps necessary to arrange an appropriate and timely hearing with the Court no later than seven (7) days prior to the Ballot Deadline (i.e., no later than [date]).

       B.    <u>Impaired Claims and Interests</u>.

Generally speaking, under the Bankruptcy Code, a class of claims or interests is impaired if the plan alters the legal, equitable, or contractual rights of the members of the class, even if the alteration is beneficial to the creditors or interest holders.  A plan's failure to provide a creditor with an accelerated payment pursuant to a contract provision that entitles a creditor to accelerated payment upon default, however, does not necessarily render such creditor's claim impaired, even if the debtor defaulted.  Instead, the claim is deemed unimpaired if, for example, the plan cures the default, reinstates the maturity of the claim as it existed before the default, and compensates the creditor for any damages incurred as a result of reasonable reliance upon the acceleration provision.  Section X.B of this Disclosure Statement and Section II.C of the Plan set forth a summary of the classification of all Claims and Interests under the Plan and whether or not they are impaired.

<strong>V.</strong>

<strong>VOTES NECESSARY TO CONFIRM THE PLAN</strong>

Under the Bankruptcy Code, impaired claims or interests are placed in classes under a plan, and each class must accept (or reject) that plan as a class.  Certain types of claims are considered unimpaired and are not classified because the Bankruptcy Code requires that they be treated a specific way.

Under the Bankruptcy Code, a Court may confirm a plan if at least one class of impaired claims has voted to accept that plan (for this purpose, without counting the votes of any insiders whose claims are classified within that class) and if certain statutory requirements are met both as to any non-

consenting members within a consenting class and as to any dissenting classes. A class of claims has accepted the plan only when at least a majority in number and at least two-thirds in amount of the allowed claims actually voting in that class vote to accept the plan. A class of interests has accepted the plan only when at least two-thirds in amount of the allowed interests actually voting in that class vote to accept the plan.

Even if the Debtor receives the requisite number of votes to confirm the proposed Plan, the Plan will not become binding unless and until, among other things, the Court makes an independent determination that confirmation is appropriate. This determination will be the subject of the Confirmation Hearing. Also, even if only one Class of the Debtor's creditors votes to accept the Plan, the Plan nonetheless may be confirmed if the dissenting Classes (and non-consenting members within a consenting Class) are treated in a manner prescribed by the Bankruptcy Code. The Plan contains mechanisms providing alternative treatment to certain Classes in the event that certain Classes reject the Plan in order to ensure that the Plan may nevertheless be confirmed.

## VI.

### INFORMATION REGARDING VOTING IN THE CASE

The Debtor believes that the Classes designated as "impaired" in Section II.C of the Plan are impaired pursuant to Bankruptcy Code section 1124. If the holders of Claims in these Classes are to receive or retain assets under the Plan on account of their Claims, then the holders of such Claims are entitled to vote to accept or reject the Plan except to the extent such holders hold Disputed Claims (unless their Claims are temporarily allowed for voting), or Disallowed Claims. If the holders of Claims in these Classes are not entitled to receive or retain assets under the Plan on account of their claims, then the holders of such Claims are not entitled to vote as a matter of law.

The Debtor believes that the Classes designated as "unimpaired" in the Plan are unimpaired pursuant to Bankruptcy Code section 1124. The holders of Claims and Interests in these Classes are not entitled to vote.

In addition to the foregoing Classes, entities holding Administrative Claims and Priority Tax Claims are not classified and are not entitled to vote to accept or reject the Plan.

Any party that disputes the Debtor's characterization of its Claim as unimpaired may request a finding of impairment from the Court to obtain the right to vote, but such party must promptly take action to request such a finding and arrange for the Court to hold a hearing and adjudicate such request no later than seven (7) days prior to the Ballot Deadline (i.e., no later than [date]).

In voting to accept or reject the Plan, use only the Ballot sent to you with this Disclosure Statement, and carefully read the voting instructions on the Ballot for an explanation of the applicable voting procedures and deadlines.  If, after reviewing this Disclosure Statement, you believe that you hold an impaired Claim or Interest and that you are entitled to vote to accept or reject the Plan but you did not receive a Ballot, you did not receive the correct Ballot, or your Ballot is damaged or lost, please send a written request for a Ballot to the Ballot Tabulator at the following address:

> Kaaran Thomas, Esq.
> McDonald Carano Wilson LLP
> PO Box 2670
> Reno NV 89505

If you wish to vote to accept or reject the Plan, your Ballot must be received by the Ballot Tabulator, at the address listed above, no later than [time] Pacific Time, on [date].  If your Ballot is not timely received by the Ballot Tabulator, it will not be counted.  Ballots must be provided to the Ballot Tabulator by mail, overnight delivery or messenger.  Ballots sent by e-mail or facsimile will not be accepted by the Ballot Tabulator and will not be counted in tabulating votes accepting or rejecting the Plan.

If your Claim is a Disputed Claim and you wish to vote to accept or reject the Plan, you will be required to move the Court to temporarily allow your Claim or Interest for voting purposes and take the steps necessary to arrange an appropriate and timely hearing with the Court no later than seven (7) days prior to the Ballot Deadline.

Any interested party desiring further information with respect to the Plan, or seeking additional copies of this document, should contact in writing the following:

> Kaaran Thomas, Esq.
> McDonald Carano Wilson LLP
> PO Box 2670
> Reno NV 89505

Email: kthomas@mcdonaldcarano.com
Telephone: 775-788-2000

The cost of additional copies must be paid by the person ordering them.  Alternatively, all pleadings and other papers filed in the Case may be obtained for a fee by accessing the Court's PACER system through the website of the United States Court for the District of Nevada (http://www.nvb.uscourts.gov), or for free by accessing the website maintained by Debtor's counsel (http://www.mcdonaldcarano.com).

## VII.

## CRAMDOWN: TREATMENT OF NON-CONSENTING CLASSES

Even if only one class consents to the proposed treatment in that class under a plan, that plan nonetheless may be confirmed if the dissenting classes are treated in the manner prescribed by the Bankruptcy Code.  The process by which a dissenting class is forced to abide by the terms of a plan is commonly referred to as "cram-down."  The Bankruptcy Code allows a dissenting class to be crammed down if the plan does not "discriminate unfairly" and is "fair and equitable."  The Bankruptcy Code does not define unfair discrimination, but it does set forth certain minimum requirements for "fair and equitable" treatment.  For a class of secured claims, "fair and equitable" can mean that the secured claimants retain their liens and receive deferred cash payments, the present value of which equals the value of their interests in collateral.  For a class of unsecured claims, a plan is fair and equitable if the claims in that class receive value equal to the allowed amount of the claims, or, if the unsecured claims are not fully satisfied, no claims or interests that are junior to such claims receive or retain anything under the plan.  Accordingly, if a class of unsecured claims rejects a plan under which a junior class (e.g., a class of interest holders) will receive or retain any assets under the plan, the plan generally cannot be confirmed unless the plan provides that the dissenting class of unsecured creditors receives value equal to the allowed amount of the claims in that class.[4]

---

[4]        This paragraph does not purport to explain fully the applicable statutes or case law, which are complex.

## VIII.

## WHO MAY OBJECT TO PLAN CONFIRMATION

A hearing has been scheduled for [Date] at [Time] (Pacific time) at the United States Bankruptcy Court, for the District of Nevada, 300 Las Vegas Boulevard South, 3rd Floor, Courtroom 3, Las Vegas, Nevada 89101, to determine whether the Court will confirm the Plan.  If, after tabulating the Ballots, it appears that entities holding a sufficient number and amount of Claims have voted to accept the Plan, the Debtor will file a memorandum of points and authorities supporting the entry of the Confirmation Order.  This memorandum will be served on the U.S. Trustee, counsel for the DIP Lender, all entities that have requested special notice in the Cases, and all parties that have timely objected to confirmation of the Plan.

Any party in interest in the Case—including any creditor or shareholder that voted (or was deemed to have voted) to accept or reject the Plan—may File an objection to confirmation of the Plan assuming such party has standing to do so.  Any such objection must be Filed and served on the Debtor and its counsel; the U.S. Trustee; and counsel for the DIP Lender, by [date], at [time] (Pacific time).  If you fail to properly and timely File an objection to Plan confirmation, you may be deemed to have consented to the Plan's confirmation.  If you wish to obtain more information, you should contact Ms. Thomas at the address above.

## IX.

## BACKGROUND ON THE DEBTOR, ITS BUSINESS, EVENTS PRECIPITATING ITS BANKRUPTCY FILING, AND SIGNIFICANT EVENTS IN THE CASE

A.    Description and History of the Debtor's Business.

The Debtor APFC has been involved in private equity and sub-debt investment in various types of companies since 1978. APFC's assets include loans and investments in distressed properties, development projects, real estate, and other types of operating companies in various industries.  APFC added value to its acquisitions by actively managing the assets to maximize the return on investment, however, because of the nature of its assets, APFC has been heavily impacted by this recession and lack of liquidity in the economy.

B.    The Debtor's Current and Future Management and Board of Directors.

The following individuals currently manage the Debtor and will constitute the officers and Director of Debtor following Confirmation of the Plan:

- *Larry Polhill*, President, Director

President and Founder of American Pacific Financial Corporation, Mr. Polhill has a background in finance, tax planning, real estate, real estate franchising, investment analysis, and insurance.  He is constantly searching for new opportunities.  Often he has been able to capitalize on relationships built over the 30 plus years in business to assist other institutions with distressed assets. Mr. Polhill has personal knowledge in the areas of Individual Retirement Accounts (IRAs), pension and profit sharing retirement account establishment and maintenance.  He has been involved in the restructuring of many projects and businesses over the years.  Through his  experience in real estate development, brokerage and investment, as well as enterprise or operating company development, Mr. Polhill has been directly involved in the organization of and served on the board of directors of several California Thrift and Loan holding and operating companies. Those included the Channel Isle Bancorp, Santa Barbara Thrift and Loan, and Golden Empire Bancorp that were sold in the late 1980s to a larger institution.

 In 1973 he made his home in California, where he continued his work in insurance and finance.  A native of Illinois, Mr. Polhill studied insurance, business and real estate law, aviation and tax planning.  While working as a Loss Control Specialist/OSHA Compliance Inspector for Kemper Insurance Group in Los Angeles and previously a similar position at the Crum and Forester Group Inc. He is also licensed real estate professional, with the professional GRI designation and is a licensed commercial pilot.

Mr. Polhill acquired a controlling interest of American Pacific Financial Corporation in 1980 and in the fall of 1993 he became involved in the food processing business.  He lead the acquisition, consolidation and/or turn of several food processors, growers and packagers since that time.  He was involved in the process manufacturing of a complete line of bakery and salty snack items which will

include the Salerno cookie brand.  At the time, it was the 2nd largest in market share of the Chicago region, second only to Nabisco.   Today he serves on the board of directors of several such companies.

Mr. Polhill was a director and was involved in the acquisition of, capital formation and turn-around of Realty Information Systems Inc., the franchisor of Help U Sell® Real Estate, a leader in the fee for service real estate brokerage space.  Prior to the economic down turn, this entity was capturing significant market share in the industry and sold billions of dollars of single family residences through 2007.  Polhill also serves as a member of several not-for-profit and charitable organizations at this time.

- *Marilyn Donegan*,Vice President

As Vice President, Marilyn R. Donegan coordinates company procedures. She is responsible for overseeing and directing administrative functions, including employee training and development, client relations and services, public relations, and data processing.  Additional responsibilities include accounting functions, editing the newsletter and other marketing information, budgeting, forecasting, and cost feasibility studies.

Following a career in instruction and supervision at the high school and college level Ms. Donegan entered the business field.  She is a California Notary Public and a California real estate broker.  She has been a free lance writer for Booklist, a library association publication.   She graduated magna cum laude with a Bachelor of Arts degree from the University of Dubuque, Dubuque, Iowa, where her concentrations were mathematics and chemistry.   Ms. Donegan received a Master of Science Degree from the University of Wisconsin, Madison, Wisconsin, with a major in mathematics education and a Master of Business Degree from the University of Redlands, Redlands, California.

As part of a management contract, these officers will be compensated.

C.    Description of the Debtor.

APFC is working to protect, manage, and add value to the remaining investments.  APFC's assets include loans and equity investments.  APFC has executed a management contract to outsource consultation services and investor relations, asset management, and administrative assistance.

APFC has retained one employee whose salary is reimbursed via a contract with Infinium Real Estate Group.  This employee works solely with Realty Information Systems and Help U Sell® Real Estate, a portfolio asset, as senior management consultant.

The principal executive office of the Debtor is located in Grand Terrace, California now. It is to be situated in Nevada post-Effective Date of the Plan.

Debtor is a California Corporation.  On or before the Effective Date, Debtor intends to change its situs to Nevada.  This will require Debtor to delete the word "Financial" from its name at which time the Debtor intends to change its name to American Pacific Fidelity Corporation so that it can continue to use its acronym APFC.

     D.    <u>The Debtor's Pre-Petition Assets and Liabilities</u>.

     1.    <u>Pre Petition Assets</u>.

The Debtor's Pre-Petition Assets are set forth on <u>Exhibit 2</u> attached hereto.  The assets consist of interests in partnership and other types of companies (the "<u>Interests</u>") and of several parcels of real property, including: vacant land in Hesperia, California; vacant land in Orange, Texas, vacant land in Apple Valley, California and two lots on Scotch Lane in Colton, California.  All of the Interests are free and clear of liens.  *See* Exhibit 2.  The Interests are difficult to value at this time because of the volatile market.  The Debtor has listed these Interests at book value unless a different value is readily ascertainable.

     2.    <u>Pre Petition Secured Liabilities</u>.

The vacant land in Hesperia, California, with a book value of $1,233,718.43, has several following constitute the lien holders against this property:

| | | |
|---|---|---|
| Waveta Taylor 1st lien parcel 1: | Debt | $44,875.07 |
| Mercer Pension 2nd lien parcel 1: | Debt | $1,000,408.40 |
| Charles McCamey 1st lien parcel 4: | Debt | $300,000.00 |

The two lots on Scotch Lane in Colton California, with a book value of $411,608.37, have the following lien holders:

| | | |
|---|---|---|
| Ada Albright 1st lien | Debt | $50,000.00 |

3.    Unsecured liabilities.

Debtor's unsecured liabilities are listed on Exhibit 3, attached hereto.

E.    Significant Events of the Case.

1.    Preliminary Motions and Other Early Activity in the Case.

Debtor filed this case with an affiliated debtor - Classic Transportation Leasing, LLC. ("Classic") under case no. 10-27755, also pending in the United States Bankruptcy Court, District of Nevada. Debtor is a creditor of Classic. Classic was originally filed as a Chapter 11 jointly represented by McDonald Carano Wilson LLP; however, in order to avoid the appearance of any conflict of interest Classic has been converted to a Chapter 7 case and will be independently administered by a Chapter 7 trustee.

2.    Debtor-in-Possession Financing.

The Debtor intends to seek debtor in possession financing to pay its administrative expenses. The financing will be unsecured and advanced by Debtor's affiliate American Pacific Management Corporation (the "DIP Facility"). The DIP Facility is intended to permit the Debtor to fund operations, bankruptcy-related expenses (including U.S. Trustee fees and professional fees, which are discussed in further detail below), and critical expenses of the Debtor. The DIP Facility must be approved by the Bankruptcy Court.

3.    Claims Filed By Creditors.

a.    The Schedules and the Bar Dates.

On October 5, 2010, the Debtor filed its Schedules of Assets and Liabilities (as amended, the "Schedules") and Statements of Financial Affairs. The Court established February 2, 2011 as the general bar date for filing proofs of claim.

The following chart sets forth the total amount of Claims, including the non-contingent, liquidated and undisputed Claims set forth in the Schedules and the proofs of Claim filed as of October 5, 2010.

| Debtor | Secured Claims | Administrative Claims | Priority Claims | General Unsecured Claims | Total Claims |
|---|---|---|---|---|---|
| APFC | $1,395,283.47 | Unliquidated | $73,212.40 | $159,508,939.65 | $160,977,435. |

The Schedules and proofs of Claim may be obtained by accessing the Court's PACER system through the website of the United States Court for the District of Nevada (http://www.nvb.uscourts.gov), or for free by accessing the website maintained by McDonald Carano Wilson LLP, the Debtor's counsel (http://www.mcdonaldcarano.com).

THE DEBTOR, THE REORGANIZED DEBTOR AND THE CREDITOR TRUST RESERVE ANY AND ALL RIGHTS, EXCEPT AS EXPRESSLY STATED IN THE PLAN, TO OBJECT TO, DEFEND AGAINST, AND REQUEST DISALLOWANCE, REDUCTION, SUBORDINATION AND/OR RECHARACTERIZATION OF ANY CLAIM OR INTEREST ASSERTED AGAINST, OR IN, THE DEBTOR OR ITS ESTATE.

> b.     <u>Objections to Claims</u>.

Article X.A. of the Plan provides that Objections to Claims shall be filed : (A) for any and all Claims to which the General Bar Date applies, forty-five (45) days after the Effective Date; (B) for any and all Claims to which the Administrative Claims Bar Date applies, thirty (30) days after the Administrative Claims Bar Date; and (C) for any and all Claims to which the Executory Contracts Bar Date applies, thirty (30) days after the expiration of that Bar Date.

Except as to Claims allowed under the Plan, holders of Claims should assume that the Reorganized Debtor or the Creditor Trust, as applicable, may file an objection to any proof of Claim that differs in amount or priority from the amount or priority of such holder's Claim as listed in the Schedules, or if such holder's Claim is listed in the Schedules as disputed, contingent, or unliquidated. Therefore, in voting to accept or reject the Plan, no creditor of the Debtor may rely on the absence of an objection to its proof of Claim as any indication that the Reorganized Debtor or the Creditor Trust, as applicable, ultimately will not object to the amount, priority, secured status, or allow ability of its Claim. Moreover, the Debtor, the Reorganized Debtor and the Creditor Trust reserve their rights with respect to all objections to Claims, and all counterclaims they may have with respect to Claims

asserted against the Debtor or the Reorganized Debtor, and, except as specifically set forth in the Plan, further reserve their rights to prosecute claims of the Debtor and its Estates (including rights to affirmative recoveries, rights to subordinate Claims, setoff rights, as well as other rights).

    4.    <u>Litigation</u>.

    a.    <u>Pre-Petition Litigation</u>.

Case 30-2009 0032056; filed November 16, 2009 is a breach of contract case filed in Superior Santa Anna Court captioned *The Mudd Family Trust, William Mudd Trustee vs. American Pacific Financial Corporation.* Plaintiff seeks collection of a matured promissory note in the amount of $245,279.90.  The action is stayed because of the bankruptcy filing.

Case 10M1 402006; a claim for equitable and other relief, filed in Circuit Court of Cook County, Municipal Department captioned *City of Chicago vs. 2600 Roosevelt Associates, LLC v. American Pacific Financial Corporation and South Jersey Development LLC* seeking collection of code violations beginning August 15, 2009.  The amount of this claim is undetermined.  The action is stayed because of the bankruptcy filing.

    b.    <u>Avoidance Actions</u>.

Debtor is not aware of any avoidance actions.  Debtor has been unable to make payments of its debts for more than 90 days prior to the filing of this case due to Debtor's cash flow problems.

    c.    <u>Retention of Claims, Causes of Action and Other Rights</u>.

Except where expressly released or except as otherwise provided in the Plan, pursuant to Bankruptcy Code section 1123(b), the Reorganized Debtor and the Creditor Trust shall be vested with and retain and may enforce any claims, rights, and causes of action that the Debtor or the Estates may hold or have against any entity, all of which are hereby preserved, including rights of disallowance, offset, re-characterization and/or equitable subordination with respect to Claims, and causes of action that have been or may be brought by or on behalf of the Debtor, the Estate, or the Creditor Trust.  The Debtor's investigation of these Claims is ongoing.

    5.    <u>Professionals Retained by the Estate</u>.

Debtor has retained McDonald Carano Wilson LLP (the "<u>Firm</u>") to assist it during the

pendency of the Case.  The Court has specifically approved the employment of the Firm.

    6.  The Debtor's Post-Confirmation Business Plan.

   After the Plan becomes effective, the Reorganized Debtor will continue working to protect, manage, and add value to the remaining investments.  Net Proceeds from asset sales will be paid to the Class 3 Trust for distribution to Class 3 Creditors.

   APFC has executed a management contract to outsource consultation services and investor relations, asset management, and administrative assistance.  APFC intends to assume the management agreement so that it will remain in effect post confirmation of the Plan.

**X.**

**SUMMARY OF MATERIAL PLAN PROVISIONS**

   The following is a narrative description of certain provisions of the Plan.  The Plan is attached hereto as Exhibit 1.  The following summary of the Plan is qualified in its entirety by the actual terms of the Plan.  In the event of any conflict, the terms of the Plan will control over any summary set forth in this Disclosure Statement.

   A.  Factors Affecting the Nature and Extent of Certain Distributions.

   The Debtor intends to satisfy its obligations to creditors under the Plan from cash on hand (including the remaining proceeds of the DIP Facility), the lease or sale of assets and Participation Interest in Net Operating Profits executed for the benefit of the Creditor Trust, or a combination of the foregoing.

   The nature and amount of distributions under the Plan nevertheless will depend upon at least four variables: (1) the outcome of objections to Claims, (2) the recovery realized, if any, on the Avoidance Actions, and other preserved causes of action, (3) the magnitude of Administrative and Priority Claims, and (4) the income and/or distributions produced by the operation or sale of Assets.  As noted, the Debtor has engaged in only a preliminary analysis of claims and the Claims Bar Date has not passed.  The outcome of claim objections will affect (perhaps materially so) the distribution to holders of Allowed General Unsecured Claims in Classes 2 and 3.

B.    <u>Classification and Treatment of Claims Under the Plan</u>.

The Bankruptcy Code requires that a plan divide the different claims against, and equity interests in, the debtor into separate classes based upon their legal nature.  Claims of a substantially similar legal nature are usually classified together, as are equity interests of a substantially similar legal nature.  The Bankruptcy Code does not require the classification of administrative claims and certain priority claims, and they are typically denominated "unclassified claims."

The Debtor believes that the classification of Classes specified in the Plan and described above in Section

1.    <u>Unclassified Claims</u>.

Certain types of Claims are not placed into voting classes; instead, they are unclassified.  They are not considered impaired, and they do not vote to accept or reject a plan of reorganization because they are automatically entitled to specific treatment provided for them in the Bankruptcy Code.  Therefore, the Debtor has not placed the following categories of Claims into a Class.

a.    <u>Administrative Claims</u>.

(1)    <u>Allowance of Administrative Claims</u>.

Administrative Claims are Claims under Bankruptcy Code section 503(b).  The Bankruptcy Code requires that all Administrative Claims be paid on the date that a plan of reorganization becomes effective, unless a particular claimant agrees to a different treatment.

(2)    <u>Allowance of Ordinary Course Administrative Claims</u>.

An entity holding an Ordinary Course Administrative Claim may, but need not, File a motion or request for payment of its Claim.  The Reorganized Debtor or any other party in interest may File an objection to an Ordinary Course Administrative Claim in their discretion.  Unless a party in interest objects to an Ordinary Course Administrative Claim, such Claim will be an Allowed Claim in accordance with the terms and conditions of the particular transaction that gave rise to the Claim.

(3)    <u>Allowance of Professional Fee Claims</u>:

Unless otherwise expressly provided in the Plan, a Professional Fee Claim will be an Allowed Claim only if, and to the extent that:

(i)      on or before sixty (60) days after the Effective Date, the entity holding such Professional Fee Claim both Files with the Court a final fee application or a motion requesting allowance of the fees and reimbursement of expenses and serves the application or motion on the Reorganized Debtor and the U.S. Trustee; and

(ii)      the Court determines it is an Allowed Claim.    The Reorganized Debtor or any other party in interest may File an objection to such application or motion by no later than thirty (30) days after the Filing and service of such application or motion.    Entities holding Professional Fee Claims that do not timely File and serve a fee application or motion for allowance of a Professional Fee Claim will be forever barred from asserting those Claims against the Debtor, the Reorganized Debtor, the Estates, or their respective assets.

(4)      <u>Allowance of Cure Claims</u>:

Cure Claims shall be allowed in accordance with the procedures set forth in Section III.A.2 of the Plan.

(5)      <u>Allowance of Non-Ordinary Course Administrative Claims</u>:

Unless otherwise expressly provided in the Plan, Non-Ordinary Course Administrative Claims will be Allowed Claims only if:

(i)      on or before sixty (60) days after the Effective Date, the entity holding such Non-Ordinary Course Administrative Claim both Files with the Court a motion requesting allowance of the Non-Ordinary Course Administrative Claim and serves the motion on the Reorganized Debtor and the U.S. Trustee; and

(ii)      the Court determines it is an Allowed Claim.    The Reorganized Debtor or any other party in interest may File an objection to such motion within thirty (30) days after the expiration of the deadline for the Filing of a Non-Ordinary Course Administrative Claim set forth in subparagraph (i), above (i.e., within ninety (90) days after the Effective Date),

unless such time period for Filing such objection is extended by the Court.  Entities holding Non-Ordinary Course Administrative Claims that do not timely File and serve a request for payment will be forever barred from asserting those Claims against the Debtor, the Reorganized Debtor, the Estates, or their respective assets.

      b.    <u>Treatment of Administrative Claims</u>.

      (1)    <u>Treatment of Allowed Ordinary Course Administrative Claims</u>:

Unless otherwise agreed, Allowed Ordinary Course Administrative Claims will be paid by the Reorganized Debtor in accordance with the terms and conditions of the particular transaction that gave rise to the Allowed Claim.

      (2)    <u>Treatment of Professional Fee Claims</u>:

Unless otherwise agreed, an Allowed Professional Fee Claim will be paid by the Reorganized Debtor within ten (10) days after the date on which the Court determines such Claim is an Allowed Claim.

      (3)    <u>Treatment of Cure Claims</u>:

The Debtor will pay the Allowed amounts of Cure Claims to the non-Debtor parties to the executory contracts or unexpired leases in accordance with Section III.A.2 of the Plan.

      (4)    <u>Treatment of U.S. Trustee Fees Under 28 U.S.C. § 1930</u>:

The Reorganized Debtor will pay to the U.S. Trustee all fees due and owing under 28 U.S.C. § 1930 on the Effective Date.

      (5)    <u>Treatment of Non-Ordinary Course Administrative Claims</u>:

Unless the entity holding a Non-Ordinary Course Administrative Claim Allowed by the Court agrees to different treatment, the Reorganized Debtor will pay the full amount of such Allowed Non-Ordinary Course Administrative Claim, without interest, on the later of:  (i) ten (10) days after the Effective Date, or (ii) ten (10) days after the date on which the Court determines such Claim is an Allowed Claim.

      (6)    <u>Treatment of Claims Under the DIP Facility</u>:

The DIP Lender will receive, on the Effective Date, in full and final satisfaction of their Claims under the DIP Facilitycash, equivalents, or assigns as otherwise agreed.

2.        Classified Claims (Classes 1-4).

Claims, other than Administrative Claims, are classified under the Plan.  Secured Claims are Claims that are secured by valid, enforceable and unavoidable liens against assets in which an Estate has an interest or that are subject to set off under Bankruptcy Code section 553.  A Claim is a Secured Claim only to the extent of the value of the claimant's interest in the collateral securing the Claim.  Priority Claims are Claims arising under Bankruptcy Code sections 507(a)(4), 507(a)(5) and 507(a)(7).  Priority Claims are not secured by Estate assets, but have statutory priority over General Unsecured Claims.  General Unsecured Claims are not secured by liens on Estate assets and are not entitled to statutory priority.  Finally, Interests are ownership interests (i.e., equity interests) in a Debtor.

* * *

The following section identifies the Plan's treatment of the classified Claims against each of the Estates.  All descriptions set forth in the following section are qualified in their entirety by the specific treatment of each of the classified Claims under the Plan.

a.        Secured Claims (Class 1).

All Allowed Secured claims will retain their liens on their collateral and receive the proceeds for sale of their collateral if  and when the collateral is sold.  Notwithstanding the foregoing, the holder of a claim in Class 1 may receive such other less favorable treatment as to which the holder of such claim and the Debtor have agreed upon in writing.

b.        Priority Claims (Class 2).

Unless such holder agrees to other treatment, on or as soon as reasonably practicable after the Effective Date, a holder of a Priority Claim shall receive, in full satisfaction of its Priority Claim, cash in the full amount of such Priority Claim on or before the latest of:  (a) ten (10) days after the Effective Date; (b) ten (10) days after the date on which such Priority Claim becomes an Allowed Claim; and (c) the date on which such Priority Claim first becomes due and payable in accordance with its terms.  To the extent that a Priority Claim is not paid on the Effective Date, if otherwise due and payable in

accordance with its terms on or prior to such date, then the Priority Claim will accrue interest at the federal judgment interest rate from the Effective Date through the date of payment of such Priority Claim, which interest shall be paid at the time the Priority Claim is paid.

     c.  General Unsecured Claims (Class 3).

    Each holder of an Allowed Unsecured Claim against APFC shall receive its Pro Rata distribution of the Class 3 Participation Agreement from the Class 3 Trust.  Notwithstanding the foregoing, the holder of Claim in Class 3 may receive such other less favorable treatment as to which the holder of such claim and the Debtor or Class 3 Trustee, as applicable, have agreed upon in writing.

     d.  Administrative Convenience Claims (Class 4).

    Each holder of an Allowed Administrative Convenience Claim against APFC shall receive Cash in the amount of  50 percent of its Allowed Claim within  six (6) months of the later of Allowance by Final Order or the Effective Date.

     e.  Interests (Class 5).

    The holder of the Interests will retain his Interests.

   C.  Treatment of Executory Contracts and Unexpired Leases.

     1.  Assumption of Executory Contracts and Unexpired Leases.

     a.  Assumption of Agreements.

    On the Effective Date, the Reorganized Debtor shall assume all executory contracts and unexpired leases of the Debtor listed on the Schedule of Assumed Agreements.

    The Debtor, with the consent of the DIP Lender, reserve the right to amend the Schedule of Assumed Agreements at any time prior to the Effective Date to:  (a) delete any executory contract or unexpired lease and provide for its rejection under the Plan or otherwise, or (b) add any executory contract or unexpired lease and provide for its assumption under the Plan.  The Debtor will provide notice of any amendment to the Schedule of Assumed Agreements to the party or parties to any agreement affected by the amendment.

    The Confirmation Order will constitute a Court order approving the assumption, on the Effective Date, of all executory contracts and unexpired leases identified on the Schedule of Assumed

Agreements.

                          b.     <u>Cure Claims</u>.

Exhibit 4 contains a list of proposed amounts of Cure Claims for all contracts or leases scheduled to be assumed.  The Reorganized Debtor shall pay Allowed Cure Claims on or before ten (10) days following the Effective Date, or on such other terms as the parties to each such executory contract or unexpired lease may otherwise agree.  In the event of a dispute regarding (a) the amount of any Cure Claim, (b) the ability of the Reorganized Debtor to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed, if applicable, or (c) any other matter pertaining to assumption, the cure payments required by section 365(b)(l) of the Bankruptcy Code shall be made promptly when an order resolving the dispute and approving the assumption becomes a Final Order.  Pending a Final Order resolving such a dispute, the applicable lease or contract shall be neither assumed nor rejected, and the Reorganized Debtor may, no later than ten (10) days following a Final Order resolving such dispute, elect to reject the lease or contract subject to the dispute.

                          c.     <u>Objections to Assumption</u>.

Any entity who is a party to an executory contract or unexpired lease that will be assumed under the Plan and that objects to such assumption or the amount of the Debtor's proposed Cure Claim must File with the Court and serve upon interested parties a written statement and supporting declaration stating the basis for its objection.  This statement and declaration must be Filed and served by no later than ten (10) days prior to the Confirmation Hearing.  Any entity that fails to timely File and serve such a statement and declaration will be deemed to waive any and all objections to the proposed assumption of its contract or lease and the amount of the Debtor's proposed Cure Claim.  In the absence of a timely objection by an entity who is a party to an executory contract or unexpired lease, the Confirmation Order shall constitute a conclusive determination as to the amount of any cure and compensation due under the executory contract or unexpired lease, and that the Reorganized Debtor  have demonstrated adequate assurance of future performance with respect to such executory contract or unexpired lease.  If the Debtor amends Exhibit 4, then any entity that is a party to an executory contract or unexpired lease that

is affected by the amendment shall have fourteen (14) days from the giving of notice of any such amendment to object to the amendment.

              d.        <u>Resolution of Claims Relating to Assumed Agreements</u>.

In accordance with the procedures set forth in Section VIII. of the Plan relating to the payment of the Cure Claims with respect to executory contracts or unexpired leases that will be assumed under the Plan payment of the Cure Claim shall be deemed to satisfy, in full, any pre-petition or post-petition arrearage or other Claim asserted in a filed proof of Claim or listed in the Schedules, irrespective of whether the amount of the Cure Claim is less than the amount set forth in such proof of Claim or the Schedules.  Upon the tendering of the payment of the Cure Claim, any such Claim with respect to such agreement shall be disallowed, without further order of the Court or action by any party.

              2.        <u>Rejection of Executory Contracts and Unexpired Leases</u>.

              a.        <u>Rejected Agreements</u>.

On the Effective Date, the Debtor will reject all executory contracts and unexpired leases set forth on the Schedule of Rejected Agreements as well as all executory contracts and unexpired leases neither set forth on the Schedule of Assumed Agreements nor the Schedule of Rejected Agreements nor the Schedule of Deferred Agreements.  The Confirmation Order will constitute a Court order approving the rejection, on the Effective Date, of the executory contracts and unexpired leases not previously assumed or deferred under the Plan.

              b.        <u>Bar Date for Rejection Damage Claims</u>.

Any Rejection Damage Claim or other Claim for damages arising from the rejection of an executory contract or unexpired lease under the Plan must be Filed and served upon counsel to the Reorganized Debtor within thirty (30) days after the mailing of notice of the occurrence of the Effective Date.  Any such Claims that are not timely Filed and served will be forever barred and unenforceable against the Debtor, the Reorganized Debtor, the Estates, and their respective assets, and entities holding these Claims will be barred from receiving any distributions under the Plan on account of such untimely Claims.

3.      Post-Petition Contracts and Leases.

Except as expressly provided in the Plan or the Confirmation Order, all contracts, leases, and other agreements that the Debtor entered into after the Petition Date will be retained by the Reorganized Debtor.

D.      Means of Execution and Implementation of the Plan.

1.      Funding of the Plan.

Obligations required to be satisfied in cash under the Plan on and after the Effective Date will be satisfied from the Reorganized Debtor's income and cash on hand, including the remaining proceeds of the DIP Facility, the lease or sale of assets and general revenues.

2.      Creation of the Class 3 Trust and Appointment of the Trustee.

The Confirmation Order shall approve, effective on the Effective Date, the Class 3 Trust Agreement, the establishment of the Trust and the appointment of the Trustee.  The Class 3 Trust will be organized for the primary purpose of Class 3 and distributing assets (the "Assets") transferred to it. The activities of the Trust shall be reasonably necessary to, and consistent with, accomplishing that purpose.  The Trust's liquidation of the assets transferred to it shall not be unreasonably prolonged and its Class 3 purpose shall not become so obscured by business activities that its declared purpose of liquidation is lost or abandoned.  The Trust will have no objective to continue or engage in the conduct of trade or business, except to the extent reasonably necessary to, or consistent with, its Class 3 purpose.

a.      Management of the Class 3 Trust.

The Trust Agreement shall provide for the appointment of one (1) person to act as the Class 3 Trustee to administer the Class 3 Trust.  After the earliest of (i) the expiration of the initial Trustee's first two-year term, (ii) his or her resignation, or (iii) his or her removal by the board of advisors for cause, then the board of advisors for the Trust shall select the successor and all subsequent Trustees; provided, however, that in the case of (i), the board may re-appoint the then serving Trustee.  The Trustee shall serve without any bond and shall act in accordance with the Trust Agreement and the Plan.  The Trustee shall be entitled to receive, on a monthly basis, payment of reasonable fees and

reimbursement of reasonable expenses, without further Court approval, from the assets of the Trust, in accordance with the Trust Agreement.

There also will be a board of advisors for the Trust, which will initially consist of two (2) representatives selected by the Creditor Committee and one (1) representative selected by the debtor. The Trust Agreement shall provide a mechanism for appointing successor members of the board of advisors of the Trust. Among other things, the board of advisors shall consult with the Trustee as to strategy with respect to Avoidance Actions will have approval rights with respect to certain actions taken by the Trustee with respect thereto, including their settlement, release, transfer or abandonment.

**The Trust Agreement shall be filed with other Plan Exhibits as Exhibit 5 to the Disclosure Statement on or before the Exhibit Filing Date.**

The initial Trustee and the board of advisors for the Trust shall be Filed by the Exhibit Filing Date. Chairman of the creditor's committee shall be the initial Trustee.

b.    Funding of the Trust.

The Trust will be funded by the Net Operating Profits as they are realized by the Debtor pursuant to the Participation Agreement, Exhibit 6, as soon as reasonably practicable following the Effective Date, and continuing thereafter.

For federal income tax purposes, a transfer of assets to the Trust under the Participation Agreement for the benefit of holders of Allowed Claims is treated as a transfer of assets to such holders to the extent that such holders are beneficiaries of the Trust. The transfer will be treated as a deemed transfer to such holders followed by a deemed transfer by such holders to the Trust. Such holders will be treated as the grantors and deemed owners of the Trust. The Reorganized Debtor and Trustee shall jointly determine the valuations of the transferred assets by the Trustee. Such valuations shall be binding on the beneficiaries of the Trust, and must be used for all federal income tax purposes.

c.    Powers and Duties.

The Trust shall have the following rights, powers and duties:

a.    hold all of the Trust assets: the Trust shall have full right, power and discretion to manage such assets and execute, acknowledge and deliver any and all instruments as may be

appropriate or necessary, as determined by the Trust in its discretion;

      b.     make interim and final distributions of the Assets to the holders of beneficial interests in the Trust pursuant to the terms of the Plan;

      c.     file objections to General Unsecured Claims;

      d.     file all tax and regulatory forms, returns, reports and other documents required with respect to the Trust; and

      e.     file suit or any appropriate motion for relief in the Court or in any other court of competent jurisdiction to resolve any claim, disagreement, conflict or ambiguity in connection with the exercise of its rights, powers or duties.

In connection with the above, the Trust and the Trustee shall, from the Effective Date, be a representative of the Estates, pursuant to Bankruptcy Code section 1123, appointed for the purposes of, among other things, pursuing the Avoidance Actions.  In furtherance of that objective, the Trustee shall have the rights of a trustee under Bankruptcy Code section 1106.  The Trust shall have the full power and authority, either in its name or in the Debtor's name, to commence, if not already commenced, prosecute, settle, assign, convey and abandon any action, subject to the approval rights of the board of advisors set forth in the Trust Agreement.  The Trust shall be authorized to retain professionals without Court approval (which may include existing professionals retained by the Debtor, the Reorganized Debtor, and which need not be "disinterested").  The reasonable professional fees (including any contingency fees), expenses and costs of such professionals are to be paid out of the assets of the Class 3 Trust.

d.    <u>The Termination of the Class 3 Trust</u>.

The Trust shall be irrevocable.  The Trust shall terminate when the Trustee has performed all of its duties under the Plan and the Trust Agreement, including the final distribution of all the assets of the Trust in respect of holders of beneficial interests in the Trust, which date shall not be more than seven (7) years and one (1) month after the Effective Date; <u>provided</u>, <u>however</u>, the holders of Claims and Beneficial Interests may, upon good cause shown, approve the Trust to remain open so long as shall be necessary to liquidate and distribute all its assets.  The Court shall retain jurisdiction to

interpret and enforce the terms of the Trust.

           e.        Additional Provisions of the Class 3 Trust Agreement.

In addition to the provisions in the Plan with respect to the Trust, the Trust Agreement will provide for, among other things, other actions to be taken by the Trust and the Class 3 Trustee, the removal of the Class 3 Trustee or appointment of successor Class 3 Trustees, the circumstances under which the Class 3 Trustee, in its capacity as such, will be liable for a action or inaction, the effect of actions by the Class 3 Trustee, and the indemnification of the Class 3 Trustee.  The Class 3 Trust Agreement shall also contain language consistent with IRS Revenue Procedure 94-95 establishing that the Class 3 Trust is a Class 3 trust.  To the extent not set forth in the Plan, the functions and procedures applicable to the Class 3 Trust, the powers and duties of the Class 3 Trustee, and the rights of the holders of beneficial interests in the Class 3 Trust shall be governed by the provisions of the Class 3 Trust Agreement.

           4.        Revesting of Assets.

Except as otherwise provided in the Plan, on the Effective Date all assets of the Estates shall vest in the Reorganized Debtor, free and clear of all Claims, liens, encumbrances, and Interests.  From and after the Effective Date, the Reorganized Debtor may operate its business and use, acquire and dispose of assets without supervision by the Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Plan and the Confirmation Order.

           5.        Preservation/Revesting of Rights of Action/No Waiver of Claims.

Except as expressly released or otherwise expressly provided in the Plan, pursuant to Bankruptcy Code section 1123(b), the Reorganized Debtor and the Class 3 Trust, as applicable, shall be vested with and shall retain and may enforce any claims, rights, and causes of action that the Debtor or the Estates may hold or have against any entity, all of which are hereby preserved, including the Avoidance Actions, and all rights of disallowance, offset, recharacterization and/or equitable subordination with respect to Claims, and causes of action that have been or may be brought by or on behalf of the Debtor, the Estate, or the Class 3 Trust.  Such claims, rights and causes of action shall

remain assets of and vest in the Reorganized Debtor, and the Class 3 Trust, as applicable, whether or not litigation relating thereto is pending on the Effective Date.  Neither the Reorganized Debtor, the Debtor, the Estates, nor the Class 3 Trust waives, releases, relinquishes, forfeits, or abandons (nor shall they be estopped or otherwise precluded or impaired from asserting) any claims, rights and causes of action, or defenses that constitute assets of the Debtor or its Estate: (a) whether or not such claims, rights, causes of action, or defenses have been listed or referred to in this Plan, the Disclosure Statement, or any other document filed with the Court, (b) whether or not such claims, rights and causes of action, including the Avoidance Actions or defenses are currently known to the Debtor, and (c) whether or not a defendant in any litigation relating to such claims, rights and causes of action, including the Avoidance Actions, filed a proof of claim in any of the Case, filed a notice of appearance or any other pleading or notice in any of the Cases, voted for or against this Plan, or received or retained any consideration under this Plan.  Without in any manner limiting the scope of the foregoing, notwithstanding any otherwise applicable principle of law or equity, including any principles of judicial estoppel, res judicata, collateral estoppel, issue preclusion, or any similar doctrine, the failure to list, disclose, describe, identify, analyze or refer to any claims, rights and causes of action, or defenses in the Plan, the Disclosure Statement, or any other document filed with the Court shall in no manner waive, eliminate, modify, release, or alter the right of the Debtor, Reorganized Debtor or the Class 3 Trust to commence, prosecute, defend against, settle, recover on account of, and realize upon any such claims, rights and causes of action that the Debtor or its Estate have or may have as of the Effective Date.

The Debtor expressly reserves all its claims, rights and causes of action and defenses for later adjudication by the Reorganized Debtor or the Class 3 Trust, as the case may be, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches will apply to such claims, rights and causes of action and defenses upon or after the confirmation or consummation of the Plan based on the Disclosure Statement, the Plan or the Confirmation Order.  In addition, the Reorganized Debtor and the Class 3 Trust expressly reserve the right to pursue or adopt claims, rights and causes of

action that are alleged in any lawsuits in which the Debtor is a defendant or an interested party, against any entity, including the plaintiffs or co-defendants in such lawsuits.  Any entity to whom the Debtor has incurred an obligation (whether on account of services, purchase, sale of goods or otherwise), or who has received services from the Debtor, or who has received money or assets from the Debtor, or who has transacted business with the Debtor, or who has leased equipment or assets from or to the Debtor should assume that such obligation, receipt, transfer or transaction may be reviewed by the Reorganized Debtor or the Class 3 Trust subsequent to the Effective Date and may be the subject of an action after the Effective Date, whether or not: (a) such entity has Filed a proof of Claim against the Debtor in this Case; (b) such entity's proof of Claim has been objected to by the Debtor; (c) such entity's Claim was included in the Debtor's Schedules; or (d) such entity's scheduled Claim has been objected to by the Debtor or has been identified by the Debtor as contingent, unliquidated or disputed.

Neither the failure to list a Claim in the Schedules filed by the Debtor, the failure of the Debtor or any other person to object to any Claim for purposes of voting, the failure of the Debtor or any other person to object to a Claim or Administrative Claim before confirmation or consummation of the Plan or the Effective Date, the failure of any person to assert a claim or cause of action before confirmation or consummation of the Plan or the Effective Date, the absence of a proof of claim having been filed with respect to a Claim, nor any action or inaction of the Debtor or any other person with respect to a Claim, or Administrative Claim, other than a legally effective express waiver or release, shall be deemed a waiver or release of the right of the Reorganized Debtor, the Debtor or the Class 3 Trust, before or after solicitation of votes on the Plan or before or after the Confirmation Date or the Effective Date to (a) object to or examine such Claim or Administrative Claim, in whole or in part or (b) retain and either assign or exclusively assert, pursue, prosecute, utilize, otherwise act or otherwise enforce any claim or cause of action against the holder of any such Claim.

6.     Objections to Claims.

Unless otherwise extended by the Court, objections to the allowance of Claims shall be Filed and served upon the Entities asserting such Claims as follows: (A) for any and all Claims to which the General Bar Date applies, forty-five (45) days after the Effective Date; (B) for any and all Claims to

which the Administrative Claims Bar Date applies, thirty (30) days after the Administrative Claims Bar Date; and (C) for any and all Claims to which the Executory Contracts Bar Date applies, thirty (30) days after the expiration of that Bar Date.

7.    Full Satisfaction.

The Disbursing Agent shall make, and each holder of a Claim or Interest shall receive, any distributions provided for in the Plan in full satisfaction and discharge of such Claim or Interest.

8.    Compliance with Tax Requirements.

APFC and the Class 3 Trustee shall comply with all withholding and reporting requirements imposed on them by governmental units, if any, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements.

9.    Setoff, Recoupment and Other Rights.

Notwithstanding anything to the contrary contained in the Plan, the Reorganized Debtor may, but shall not be required to, setoff, recoup, assert counterclaims or withhold against the distributions to be made pursuant to the Plan on account of any claims that the Debtor, the Estates, or the Reorganized Debtor may have against the entity holding an Allowed Claim; provided, however, that neither the failure to effect such a setoff or recoupment, nor the allowance of any Claim against the Debtor or the Reorganized Debtor, nor any partial or full payment during the Case or after the Effective Date in respect of any Allowed Claim, shall constitute a waiver or release by Debtor, the Estates or the Reorganized Debtor of any claim that they may possess against such holder.

10.    Conditions to Effectiveness.

a.    Conditions.

The Plan shall not become binding unless and until the Effective Date occurs.  The Effective Date is the first Business Day on which all of the following conditions have been satisfied as set forth below or waived:

a.    The Confirmation Order shall have become a Final Order;

b.    No request for revocation of the Confirmation Order under section 1144 of the

Bankruptcy Code has been made, or, if made, remains pending;

c.      Each exhibit, document or agreement to be executed in connection with the Plan shall be in final form acceptable to the Debtor and the DIP Lender and their respective counsel,  and the Class 3 Trust Agreement shall be in final form acceptable to the foregoing entities;

d.      The Class 3 Trust Agreement shall have been executed and delivered;

e.      The Exit Facility shall each be in full force and effect and all conditions therein to the obligations of the parties to such loans shall have been satisfied or waived as set forth in the Exit Facility Documents;

f.      All other agreements, writings and undertakings required under the Plan shall be executed and ready for consummation; and

The Reorganized Debtor shall mail a "Notice of Occurrence of Effective Date" to all creditors and interest holders of record as of the date of entry of the Confirmation Order upon the occurrence of the Effective Date.

b.    <u>Waiver of Conditions</u>.

Except as specified above, the requirement that the conditions to the occurrence of the Effective Date be satisfied may be waived in whole or in part, and the time within which any such conditions must be satisfied may be extended, by the Debtor with the consent of the DIP Lender. The failure to timely satisfy or waive any of such conditions may be asserted by the Debtor regardless of the circumstances giving rise to the failure of such condition to be satisfied, including any action or inaction by the Debtor.  The failure of the Debtor to exercise any of the foregoing rights shall not be deemed a waiver of any rights and each such right shall be deemed ongoing and subject to assertion at any time.

11.    <u>Authorization of Entity Action</u>.

Each of the matters provided for under the Plan involving the entity structure of the Debtor or the Reorganized Debtor or any action to be taken by or required of the Debtor or the Reorganized Debtor shall, as of the Effective Date, be deemed to have occurred and be effective as provided herein, and shall be authorized, approved and, to the extent taken prior to the Effective Date, ratified in all

respects without any requirement of further action by equityholders, creditors, or managers, officers or directors of the Debtor or the Reorganized Debtor.

12.    Periodic Reporting.

As of the Effective Date, the Reorganized Debtor shall not be a public reporting company under the Securities Exchange Act of 1934, as amended.

E.    Other Plan Provisions.

1.    Exculpation.

No Liability for Solicitation or Prosecution of Confirmation.

Conditioned on the occurrence of the Effective Date, none of the Debtor, the Estate, the Reorganized Debtor, the DIP Lender, or any of the foregoing parties' respective Associated Released Parties shall have or incur any liability to any holder of a Claim or Interest, or to one another, for any act or omission occurring on or after the Petition Date through to and including the Effective Date in connection with, related to, or arising out of the Case, the pursuit of confirmation of the Plan, the consummation or administration of the Plan, or assets to be distributed under the Plan, except to the extent that the act or omission is determined by Final Order to be solely due to its own respective willful misconduct or gross negligence, and in all respects, the Debtor, the Estate, the Reorganized Debtor, the DIP Lender, or any of the foregoing parties' respective Associated Released Parties  shall be entitled to rely on the advice of their respective counsel with respect to their duties and responsibilities during the Case and under the Plan.

2.    Revocation of Plan/No Admissions.

The Debtor reserves the right to revoke or withdraw the Plan prior to the Confirmation Date. Notwithstanding anything to the contrary in the Plan, if the Plan is not confirmed or the Effective Date does not occur, the Plan will be null and void, and nothing contained in the Plan or the Disclosure Statement will:  (a) be deemed to be an admission by the Debtor with respect to any matter set forth in the Plan, including liability on any Claim or the propriety of any Claim's classification; (b) constitute a waiver, acknowledgment, or release of any Claims against, or any Interests in, the Debtor, or of any claims of the Debtor; or (c) prejudice in any manner the rights of any party in any further proceedings.

3.      <u>Modifications of the Plan</u>.

The Plan may be modified at any time before or after confirmation, subject to sections 1125 and 1127 of the Bankruptcy Code.  Provided the proposed modification does not materially and adversely affect either (i) the treatment and recovery by holders of General Unsecured Claims under the Plan or (ii) the prospects for confirming the Plan.

The Plan is a "Confirming Plan of Reorganization" (as defined under the DIP Facility).  The Debtor will need to obtain the approval of the DIP Lender to any amendment to the Plan.

4.      <u>Exemption from Certain Transfer Taxes</u>.

In accordance with Bankruptcy Code section 1146(c), in the event of the issuance, transfer or exchange of a security, or the making or delivery of an instrument of transfer under the Plan may not be taxed under any law imposing a stamp tax or similar tax.  The Confirmation Order shall direct all governmental officials and agents to forego the assessment and collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without payment of such tax or other governmental assessment.

5.      <u>Form of Agreements and Documents</u>.

All documents and agreements to be Filed with the Court as part of the Plan or which are to become Exhibits to the Plan or the Disclosure Statement or which are to be executed or delivered in connection with the Plan, and any revisions or amendments thereto prior to the Effective Date, shall be in form and substance acceptable to the DIP Lender in its sole discretion prior to any Filing, execution, delivery or amendment; and the form and substance of the Class 3 Trust Agreement.

F.      <u>Effect of Confirmation of the Plan</u>.

1.      <u>Discharge and Injunction</u>.

The rights afforded in the Plan and the treatment of all Claims and Interests shall be in exchange for and in complete satisfaction, discharge, and release of all Claims and Interests of any nature whatsoever arising prior to the Effective Date, including any interest accrued on such Claims from and after the Petition Date, against the Debtor, the Estates and their assets.

Except as otherwise provided in the Plan or the Confirmation Order, the Plan and Confirmation

Order shall, on the Effective Date: (a) discharge and release the Debtor, the Estates, the Reorganized Debtor, and their assets to the fullest extent permitted by Bankruptcy Code sections 524 and 1141, from all Claims and Interests, including all debts, obligations, demands, liabilities, Claims, and Interests that arose before the Effective Date, and all debts of the kind specified in Bankruptcy Code sections 502(g), 502(h), or 502(i) (collectively, "Discharged Liabilities"), regardless of whether or not (i) a proof of Claim or Interest based on such Discharged Liability is filed or deemed filed, (ii) a Claim or Interest based on such Discharged Liability is allowed pursuant to Bankruptcy Code section 502, or (iii) the holder of a Claim or Interest based on such Discharged Liability has or has not accepted the Plan; (b) void any judgment underlying a Discharged Liability discharged hereunder; and (c) preclude all entities from asserting against the Debtor, the Estate, the Reorganized Debtor, or their respective assets any Discharged Liability based upon any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date.

Except as otherwise provided in the Plan or the Confirmation Order, on and after the Effective Date, all entities who have held, currently hold, or may hold a Discharged Liability against the Debtor, the Estate, the Reorganized Debtor, or their respective assets that is based upon any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date, that otherwise arose or accrued prior to the Effective Date, or that is otherwise discharged pursuant to the Plan, shall be permanently enjoined from taking any of the following actions on account of any such Discharged Liability (the "Permanent Injunction"): (a) commencing or continuing in any manner any action or other proceeding against the Debtor, the Estates, the Reorganized Debtor, the Class 3 Trust or their respective assets that is inconsistent with the Plan or the Confirmation Order; (b) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order against the Debtor, the Estate, the Reorganized Debtor or the Class 3 Trust, or their respective assets other than as specifically permitted under the Plan or the Confirmation Order; (c) creating, perfecting, or enforcing any lien or encumbrance against the Debtor, the Estate, the Reorganized Debtor, the Class 3 Trust, or their respective assets; and (d) commencing or continuing any action, in any manner, in any place that does not comply with or is inconsistent with the provisions of the Plan, the Confirmation Order, or the

discharge provisions of Bankruptcy Code Section 1141.  Any entity injured by any willful violation of such Permanent Injunction shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages, from the willful violator.

Notwithstanding the discharge of the Debtor's obligations under the DIP Facility, obligations, between and among the DIP Lender,   and their respective Associated Released Parties, shall be preserved and shall survive the confirmation of the Plan and the releases and discharge injunctions set forth in the Plan and the Confirmation Order

2.    Payment of U.S. Trustee Fees.

The Reorganized Debtor shall pay all U.S. Trustee Fees in accordance with Section II.B.1 of the Plan.

3.    Retention of Jurisdiction.

Notwithstanding the entry of the Confirmation Order or the occurrence of the Effective Date, the Court shall retain jurisdiction over the Case after the Effective Date to the fullest extent provided by law, as more particularly set forth in Section VII.C of the Plan.

# XI

# FINANCIAL INFORMATION

A.    Financial Projections and Feasibility.

The Bankruptcy Code provides that a plan may only be confirmed if confirmation is not likely to be followed by the liquidation or the need for further financial reorganization of the debtor, unless such liquidation or reorganization is proposed in the Plan.  11 U.S.C. § 1129(a)(11).  This is referred to as the "feasibility" requirement.

The Disclosure Statement includes, as Exhibit 7, financial projections for the Reorganized Debtor (collectively, the "Projections").  The Projections show financial information for the 18-month period following the anticipated Effective Date.  In particular, the Projections demonstrate that the Reorganized Debtor will be able to meet their obligations for the first year and a half after the Effective Date and that the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Reorganized Debtor other than as called for in the Plan (the liquidation

of the Assets for the benefit of Class 3 Beneficiaries).  As a result, the Plan satisfies the feasibility requirement set forth in Bankruptcy Code section 1129.

**XII**

**LIQUIDATION ANALYSIS / BEST INTEREST TEST**

Bankruptcy Code section 1129(a)(7) requires that each holder of a Claim or Interest in an impaired Class either (i) vote to accept the Plan, or (ii) receive or retain under the Plan cash or assets of a value, as of the effective date of the Plan, that is not less than the value such holder would receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code.  This is commonly referred to as the "Best Interests Test."

In a chapter 7 case, a trustee or trustees would be elected or appointed to liquidate the debtor's assets and make distributions to creditors in accordance with the priorities set forth in the Bankruptcy Code.  Secured creditors generally are paid from the proceeds of sale of the properties securing their liens.  If any assets are remaining after the satisfaction of secured claims, administrative expenses generally are next to receive payments.  Unsecured claims are paid from any remaining sales proceeds or other estate assets, according to their rights to priority.  Unsecured claims with the same right to priority receive a pro rata distribution based on the amount of their allowed claim in relation to the total amount of allowed unsecured claims with the same right to priority.  Finally, interest holders receive the balance that remains, if any, after all creditors are paid.

Thus, for the Court to confirm the Plan, the Court must find that all creditors and shareholders in impaired Classes who do not accept the Plan will receive at least as much under the Plan as such holders would receive under a hypothetical chapter 7 liquidation.

The Debtor prepared the liquidation analysis, attached hereto as <u>Exhibit 8</u>, reflecting the estimated cash proceeds, net of liquidation-related costs, that would be realized if each Debtor were liquidated in accordance with chapter 7 of the Bankruptcy Code.  The liquidation analysis projects that, under either a best-case or worst-case scenario, the Plan provides at least as good a recovery as a chapter 7 liquidation.  Accordingly, all of the Debtor's creditors and interest holders will receive at least as much under the Plan as they would receive under a chapter 7 liquidation.

THE LIQUIDATION ANALYSIS, INCLUDING THE CLAIMS ESTIMATES, WAS PREPARED SOLELY TO ASSIST THE COURT IN MAKING THE FINDINGS REQUIRED UNDER SECTION 1129(a)(7) OF THE BANKRUPTCY CODE AND MAY NOT BE USED OR RELIED UPON FOR ANY OTHER PURPOSE.

THE DEBTOR BELIEVES THAT ANY ANALYSIS OF A HYPOTHETICAL LIQUIDATION IS NECESSARILY SPECULATIVE.  THERE ARE A NUMBER OF ESTIMATES AND ASSUMPTIONS UNDERLYING THE LIQUIDATION ANALYSIS THAT ARE INHERENTLY SUBJECT TO SIGNIFICANT ECONOMIC, COMPETITIVE AND OPERATIONAL UNCERTAINTIES AND CONTINGENCIES BEYOND THE CONTROL OF THE DEBTOR OR A CHAPTER 7 TRUSTEE.  NEITHER THE LIQUIDATION ANALYSIS, NOR THE FINANCIAL INFORMATION ON WHICH IT IS BASED, HAS BEEN EXAMINED OR REVIEWED BY INDEPENDENT ACCOUNTANTS IN ACCORDANCE WITH STANDARDS PROMULGATED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS. THERE CAN BE NO ASSURANCE THAT ACTUAL RESULTS WOULD NOT VARY MATERIALLY FROM THE HYPOTHETICAL RESULTS REPRESENTED IN THE LIQUIDATION ANALYSIS.

## XIII

## RISK FACTORS

The Debtor's ability to perform its obligations under the Plan is subject to various factors and contingencies, some of which are described in this section.  The following discussion summarizes only some material risks associated with the Plan and the Reorganized Debtor, and is not exhaustive.  Moreover, this section should be read in connection with the Plan and the other disclosures contained in this Disclosure Statement.

PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN, ALL HOLDERS OF CLAIMS THAT ARE IMPAIRED SHOULD, WITH THEIR ADVISORS, READ AND CONSIDER CAREFULLY THE FACTORS SET FORTH HEREIN, AS WELL AS ALL OTHER INFORMATION SET FORTH OR OTHERWISE REFERENCED IN THIS DISCLOSURE STATEMENT AND THE PLAN.

A.     Bankruptcy Considerations.

1.     Parties in Interest May Object to the Debtor's Classification of Claims and Interests.

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if the claim or equity interest is substantially similar to the other claims or equity interests in that class. The Debtor believes that the classification of holders of claims against and holders of equity interests in the Debtor under the Plan complies with the requirements set forth in the Bankruptcy Code because the classes established under the Plan each encompass claims or interests that are substantially similar to similarly classified claims or interest. Nevertheless, there can be no assurance that the Court will reach the same conclusion.

2.     Failure to Satisfy Voting Requirements.

If the Debtor receives votes in number and amount sufficient to enable the Court to confirm the Plan, the Debtor intends to seek, as promptly as practicable thereafter, to confirm the Plan. In the event the Debtor does not receive sufficient votes, the Debtor may seek to accomplish an alternative chapter 11 plan. There can be no assurance, however, that the terms of any such alternative chapter 11 plan would be similar to, or as favorable to the holders of Allowed Claims as, those proposed in the current proposed Plan.

3.     Failure to Secure Confirmation of the Plan.

Bankruptcy Code section 1129 sets forth the requirements for confirmation of a chapter 11 plan, and requires the Court to make a series of specified, independent findings.

Even if the Debtor receives the required votes accepting the Plan, there can be no assurance that the Court will confirm the Plan. A non-accepting holder of an Allowed Claim

might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules.  Even if the Court determined that this Disclosure Statement, the balloting procedures and voting results were appropriate, the Court could still decline to confirm the Plan if it finds that any of the statutory requirements for confirmation of the Plan are not met, including the requirement that the terms of the Plan do not "unfairly discriminate" and are "fair and equitable" to non-accepting Classes.  If the Plan is not confirmed, it is unclear what distributions, if any, holders of Allowed Claims would receive with respect to their Allowed Claims.

The Plan may be modified as necessary for confirmation of the Plan.  Any such modifications could result in a less favorable treatment of any non-accepting Class, as well as of any Classes junior to such non-accepting Class, than the treatment currently provided in the Plan. Such a less favorable treatment could include a distribution of assets to the Class affected by the modification of a lesser value than currently provided in the Plan or no distribution of assets whatsoever under the Plan.

4.    <u>Non-Consensual Confirmation</u>.

In the event that any impaired class of claims does not accept a chapter 11 plan, a Court may nevertheless confirm the plan under the procedure for non-consensual confirmation described in Section VII of this Disclosure Statement.  The Debtor believes that the Plan would satisfy the requirements for non-consensual confirmation.   Nevertheless, there can be no assurance that the Court will reach this conclusion.

5.    <u>Debtor May Object to the Amount or Classification of a Claim</u>.

Except as otherwise provided in the Plan, the Debtor, the Reorganized Debtor and the Class 3 Trust reserve the right to object to the amount or classification of any Claim.  The estimates set forth in this Disclosure Statement cannot be relied on by any holder of a Claim against the Debtor.

6.    <u>The Effective Date Might Not Occur</u>.

Even if the Court confirms the Plan, the Plan shall not become binding until the Effective

Date occurs.  The Effective Date is the first Business Day (a) that is at least fourteen (14) days after the Confirmation Date; (b) on which no stay of the Confirmation Order is in effect; and (c) on which the conditions set forth in Section IV.P.1 of the Plan have been satisfied or waived by the Debtor and the DIP Lender.  While there can be no assurances as to when exactly the Effective Date will occur, based on the current circumstances of the Cases, the Debtor presently believes that the Effective Date will occur within thirty (30) days following the Confirmation Date.

7.    The Reorganized Debtor May Not be Able to Meet Post Reorganization Debt Obligations and Operational Needs.

The Reorganized Debtor's ability to service its debt obligations as they come due and meet operational needs after the Effective Date will depend, in part, on the Reorganized Debtor's future operating performance and market conditions.  If the Reorganized Debtor is unable to service its debt obligations and operational needs, this may preclude the Reorganized Debtor from fulfilling its post-reorganization business plan and taking advantage of future opportunities.If such an event occurs the Class 3 Trustee can foreclose on its security interest.

8.    The Actual Allowed Amounts of Claims May Differ from the Estimated Claims and Adversely Affect the Percentage Recovery on General Unsecured Claims.

The Claims estimates set forth in this Disclosure Statement are based on various assumptions.  The actual allowed Claims amounts may differ significantly from those estimates should one or more of those underlying assumptions prove to be incorrect.  Such differences may materially and adversely affect the percentage recovery to holders of such Claims under the Plan.

## XIV

## ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

A.    Liquidation Under Chapter 7.

If no plan of reorganization can be confirmed or the Effective Date does not occur, the Case may be converted to cases under chapter 7 of the Bankruptcy Code, in which case a trustee or trustees would be elected or appointed to liquidate the assets of the Estates for distribution in accordance with the priorities established by the Bankruptcy Code.  A discussion of the effects that a chapter 7

liquidation would have on the recoveries of the holders of Claims and Interests is set forth in Section XII and in the liquidation analysis included in this Disclosure Statement at <u>Exhibit 8</u>.  As noted therein, the Debtor believes that in a liquidation under chapter 7, the value of the Debtor's assets would be reduced based upon the distressed nature of the liquidation and the recovery to holders of Allowed General Unsecured Claims would be reduced.

      B.    <u>Alternative Plans</u>.

If the Plan is not confirmed or the Effective Date does not occur, the Debtor (or any other party in interest) could attempt to formulate a different plan.  Such a plan could potentially involve a reorganization and continuation of the Debtor's businesses, or an orderly liquidation of the assets of the Estates.  During the Case, the Debtor explored various alternatives in connection with the formulation and development of the Plan described herein.  The Debtor believes that the Plan enables creditors to realize a greater value under the circumstances.  Under a Class 3 plan filed under chapter 11, the assets of the Estates would likely be sold in an orderly fashion over a more extended time period than a liquidation under chapter 7, possibly resulting in indeterminately greater recoveries than would be obtained in an accelerated liquidation under chapter 7.  However, following either a chapter 11 or chapter 7 liquidation, it is likely that after satisfying senior claims there would be no assets available to distribute to the holders of Allowed General Unsecured Claims.

**XV**

**TAX CONSEQUENCES OF THE PLAN**

The following discussion is a summary of certain U.S. federal income tax consequences expected to result from the implementation of the Plan.  This discussion is based on the Tax Code, as in effect on the date of this Disclosure Statement and on U.S. Treasury Regulations in effect (or in certain cases, proposed) on the date of this Disclosure Statement, as well as judicial and administrative interpretations thereof available on or before such date.  All of the foregoing are subject to change, which change could apply retroactively and could affect the tax consequences described below.  There can be no assurance that the Internal Revenue Service (the "<u>IRS</u>") will not take a contrary view with

respect to one or more of the issues discussed below, and no opinion of counsel or ruling from the IRS has been or will be sought with respect to any issues which may arise under the Plan.

The following summary is for general information only and discusses certain U.S. federal income tax consequences of the Plan to the Debtor and the "U.S. Holders" of Allowed Claims. For purposes of this summary, a "U.S. Holder" is a beneficial owner of the Allowed Claims that, for U.S. federal income tax purposes, is: (a) an individual who is a citizen or resident of the United States; (b) a corporation (or other business entity treated as a corporation) created or organized in or under the laws of the United States or any state thereof (including the District of Columbia); (c) an estate the income of which is subject to U.S. federal income taxation regardless of its source; or (d) a trust if such trust validly elects to be treated as a United States person for U.S. federal income tax purposes, or if (I) a court within the United States is able to exercise primary supervision over its administration and (II) one or more United States persons have the authority to control all of the substantial decisions of such trust.

This summary does not purport to address all of the U.S. federal income tax consequences that may be applicable to any particular holder. The tax treatment of a U.S. Holder of Allowed Claims may vary depending upon such holder's particular situation. The following discussion does not address state, local or foreign tax considerations that may be applicable to the Debtor and the U.S. Holders of Allowed Claims. The following discussion also does not address tax considerations as a result of entering into the Exit Facility. This summary does not address tax considerations applicable to holders that may be subject to special tax rules, such as financial institutions, insurance companies, real estate investment trusts, regulated investment companies, grantor trusts, dealers or traders in securities or currencies, tax-exempt entities, persons that hold an equity interest or a security in a Debtor as a position in a "straddle" or as part of a "hedging," "conversion" or "integrated" transaction for U.S. federal income tax purposes, persons that have a "functional currency" other than the U.S. dollar, persons who acquired an equity interest or a security in a Debtor in connection with the performance of services and persons who are not U.S. Holders.

If a partnership (or any other entity treated as a partnership for U.S. federal income tax purposes) holds Allowed Claims, the tax treatment of a partner in such partnership generally will depend on the status of the partner and the activities of the partnership.  Any such partner should consult its tax advisor as to its tax consequences.

EACH HOLDER OF AN ALLOWED CLAIM IS URGED TO CONSULT ITS OWN TAX ADVISOR WITH RESPECT TO THE U.S. FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES OF THE IMPLEMENTATION OF THE PLAN.

INTERNAL REVENUE SERVICE CIRCULAR 230 DISCLOSURE

PURSUANT TO INTERNAL REVENUE SERVICE CIRCULAR 230, WE HEREBY INFORM YOU THAT THE DESCRIPTION SET FORTH HEREIN WITH RESPECT TO U.S. FEDERAL TAX ISSUES WAS NOT INTENDED OR WRITTEN TO BE USED, AND SUCH DESCRIPTION CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING ANY PENALTIES THAT MAY BE IMPOSED ON THE TAXPAYER UNDER THE U.S. TAX CODE.  THIS DESCRIPTION IS LIMITED TO THE U.S. FEDERAL TAX ISSUES DESCRIBED HEREIN.  IT IS POSSIBLE THAT ADDITIONAL ISSUES MAY EXIST THAT COULD AFFECT THE U.S. FEDERAL TAX TREATMENT OF THE MATTER THAT IS THE SUBJECT OF THE DESCRIPTION NOTED HEREIN, AND THIS DESCRIPTION DOES NOT CONSIDER OR PROVIDE ANY CONCLUSIONS WITH RESPECT TO ANY SUCH ADDITIONAL ISSUES. TAXPAYERS SHOULD SEEK ADVICE BASED ON THE TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

1.    Tax Treatment of Debtor.

APFC has made an election to be treated as a corporation for U.S. federal income tax purposes and files a U.S. federal income tax return.

2.    Cancellation of Debt Income.

APFC  will generally realize cancellation of debt ("COD") income to the extent that its debt  is discharged for an amount less than the adjusted issue price of that debt creditor's Claim (which is generally the amount the Debtor received upon incurring the obligation with certain adjustments).  The

amount of consideration paid to discharge a debt generally equals the amount of cash, the fair market value of assets (including the fair market value of any equity interest), and/or the issue price of any new debt instrument issued in satisfaction of the debt.  The issue price of such new debt instrument is determined under either Section 1273 or 1274 of the Tax Code.  Generally, these provisions treat the fair market value of a publicly-traded debt instrument as its issue price and the stated principal amount of any other debt instrument as its issue price if its terms provide for interest not less than the applicable federal rate.

Because the Debtor will be a debtor in a bankruptcy case at the time they realize COD income, APFC will not be required to include such COD income in its gross income, but rather, subject to Section 108(i) of the Tax Code, discussed below, will be required to reduce certain of its tax attributes by the amount of COD income so excluded.  Under the general rules of Section 108 of the Tax Code, the required attribute reduction will be applied to reduce certain tax attributes of APFC, including net operating losses ("NOLs"), tax credits and tax basis in assets.  Section 108(b)(5) of the Tax Code permits a taxpayer to reduce first the basis of its depreciable assets to the extent of such basis, with any excess applied next to reduce its net operating losses, and then certain other tax attributes.

The projected amount of COD before reduction of tax attributes is approximately $100 million.  This amount is computed using in-house year-to-date financial statements and assumes that the underlying assets have a fair market value of $40 million.   The estimated amount of COD income before the bankruptcy exclusion is approximately $0 million.  The tax attributes available for reduction under Section 108(b) of the Tax Code include approximately (i) $16 million in asset basis, (ii) $144 million in NOLs, and (iii) $0 in general business credit carryover.   APFC has not yet determined whether it will make the election under Section 108(b)(5).

A recently-enacted amendment to the COD income rules, Section 108(i) of the Tax Code, provides that taxpayers that recognize COD income in 2009 or 2010 may elect to forgo the COD income exclusion and attribute reduction rules described above.  Instead, the taxpayer may elect to take into taxable income the COD income with respect to such debt in equal installments in 2014 through 2018 (i.e., the taxpayer would report 20% of the COD income in each such year).  This

election to defer COD income is made separately with respect to each debt instrument on which COD income is realized and must be made on the taxpayer's tax return for the year that includes the transaction that creates the COD income.  Recent IRS guidance provides that a taxpayer is not required to make an election for the same portion of COD income arising from each reacquired applicable debt instrument, but rather may make an election for different portions of such income arising from different applicable debt instruments.  APFC has not yet determined whether such an election will be made with respect to the COD income generated in connection with the consummation of the Plan.

3.    Consequences to the Debtor of Exchanging Allowed Claims for Assets Other than Debt.

Under the Plan, the Debtor may under certain circumstances satisfy certain Allowed Claims for assets with their collateral (in the case of Class 1 Secured Claims)  or with beneficial interests in the Class 3 Trust. To the extent the Debtor satisfies an Allowed Claim by transferring other assets to a creditor (including collateral securing the Claim), the Debtor will be deemed to have sold such assets at its fair market value and will recognize taxable income in an amount equal to the difference between the fair market value of the assets and its adjusted basis in the assets.

4.    Accrued Interest.

To the extent that there exists accrued but unpaid interest on the indebtedness owing to holders of Allowed Claims and to the extent that such accrued but unpaid interest has not been deducted previously by APFC, portions of payments made in consideration for the indebtedness underlying such Allowed Claims that are allocable to such accrued but unpaid interest should be deductible by APFC. Any such interest that is not paid will not be deductible by such Debtor and will not give rise to COD income.

To the extent that APFC has previously taken a deduction for accrued but unpaid interest, any amounts so deducted that are paid will not give rise to any tax consequences to APFC.  If such amounts are not paid, they will give rise to COD income that would be excluded from gross income pursuant to the bankruptcy exclusion discussed above.  As a result, APFC would be required to reduce its tax attributes to the extent of such interest previously deducted and not paid.

5.      <u>NOL Carryback</u>.

The law governing NOL carrybacks was amended November 6, 2009.  It permits taxpayers to elect to carry back either their 2008 or 2009 operating losses for up to 5 years, rather than the normal 2 years.  Losses carried back 3 or 4 years can be used to offset all income generated in those years. Losses carried back to the 5th year can only offset half of the income in that year.  In addition, for losses for which an extended carryback period is elected, this law suspends the application of the normal rule that NOLs can only offset 90% of alternative minimum taxable income.  Taxpayers may file an irrevocable election to carry back 2008 or 2009 losses (but not both 2008 and 2009 losses) for this extended period at any time up to the due date of their 2009 returns (including extensions).  This recent change in the tax law extending the NOL carryback period does not benefit APFC.  As APFC incurred net operating losses since inception, there is no taxable income in a prior year to which NOLs can be carried back.

6.      <u>Utilization of APFC's Net Operating Loss Carryforwards</u>.

a.      <u>Limitation on NOLs and Other Tax Attributes</u>.

Under Section 382 of the Tax Code, whenever there is a more than fifty percent ownership change of a corporation during a three-year testing period, the ability of the corporation to utilize its NOL carryovers and certain subsequently recognized built-in losses and deductions (collectively, "<u>Pre-Change Losses</u>") to offset future taxable income may be subject to an annual limitation.  The purpose of Class 5 (Equity Interests) interest holders retaining their equity interest is to avoid any impairment to APFC's ability to utilize NOL carryforwards so that these carryforwards can be used for the benefit of the Class 3 Beneficiaries.

A.      <u>Certain U.S. Federal Income Tax Consequences to the Holders of Allowed Claims that Are Paid in Cash</u>.

A holder who receives cash in exchange for all or a portion of its Allowed Claim pursuant to the Plan, such as holders of claims in Classes 1, 2 and 4, will generally recognize income, gain or loss for U.S. federal income tax purposes in an amount equal to the difference between (i) the amount of cash received in exchange for all or the portion of its Allowed Claim, and (ii) the holder's adjusted tax

basis in its Allowed Claim that is treated as exchanged for cash.  Where a holder receives cash and other assets in a fully taxable exchange, the holder should consult its own tax advisor regarding the allocation of tax basis in the Allowed Claim among the various types of consideration received.  The character of such income, gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the holder, the nature of the Allowed Claim in such holder's hands, whether the Allowed Claim constitutes a capital asset in the hands of the holder, whether the Allowed Claim was purchased at a discount, and whether and to what extent the holder has previously claimed a bad debt deduction with respect to its Allowed Claim.  To the extent that any amount received by a holder of an Allowed Claim is attributable to accrued interest not previously included in the holder's income, such amount should be taxable to the holder as interest income.  Conversely, a holder of an Allowed Claim may be able to recognize a deductible loss (or, possibly, a write-off against a reserve for worthless debts) to the extent that any accrued interest on the Allowed Claims was previously included in the holder's gross income but was not paid in full by the Debtor.  Such loss should be ordinary.  To the extent any amounts are paid to a Claim holder in such holder's capacity as an employee and which for U.S. federal income tax purposes constitute wages, such amounts will generally be treated for tax purposes as ordinary income and will be subject to withholding by the Debtor.

      B.    <u>Certain U.S. Federal Income Tax Consequences to Holders of Allowed Claims that Are Paid Using Consideration Other than Cash</u>.

The U.S. federal income tax consequences to holders of Allowed Claims that are paid using consideration other than cash may vary depending upon, among other things: (i) the type of consideration received by the holder in exchange for its Allowed Claim; (ii) the nature of the indebtedness owing to the holder; (iii) whether the holder has previously claimed a bad debt deduction in respect of such holder's Allowed Claim; and (iv) whether such Allowed Claim constitutes a "security" for purposes of the reorganization provisions of the Tax Code (as described below). Holders of Secured Claims in Class 1 and 3 may be subject to these consequences.

1.  <u>Consequences of the Receipt and of Holding a Beneficial Interest in the Class 3 Trust</u>.

    a.  <u>Receipt of a Beneficial Interest in the Class 3 Trust</u>.

The Debtor intends to treat the Class 3 Trust as a grantor trust for U.S. federal income tax purposes.  As a result, holders of Claims who receive interests in the Class 3 Trust are expected to be treated as receiving a distribution from the Debtor of the Class 3 Trust Assets and then participating in the Class 3 Trust.  It is also expected that such holders will be treated as the grantors and deemed owners of the Class 3 Trust and will each therefore be treated as owning their Pro Rata shares of the Class 3 Trust Asset.

    b.  <u>Deemed Distribution of the Assets of the Class 3 Trust</u>.

A holder of a Class 3 Claim who receives a beneficial interest in the Class 3 Trust should recognize gain or loss in an amount equal to the difference between (i) the fair market value of the assets deemed distributed to the holder, and (ii) the holder's adjusted basis in the portion of the Claim that is treated as exchanged therefor.

To the extent that the holder has realized gain on the exchange, it can either recognize the gain in the taxable year of the distribution, or it can defer the gain based on the application of the installment method (provided that none of the exceptions to installment sale treatment apply) or the open transaction doctrine.  Reporting under either the installment method or the open transaction doctrine would generally result in deferral of tax on such gain until such amounts are actually or constructively received.  However, the open transaction method of reporting is available only if the fair market value of the holder's share of the assets distributed or deemed distributed to the holder in satisfaction of its claim is not reasonably ascertainable as of the effective date of the chapter 11 plan.  The IRS has taken the position that the open transaction method is available only in rare and extraordinary circumstances and, accordingly, could assert that the open transaction treatment is not available.  The rules relating to the availability and the application of the installment method and open transaction doctrine are complex.  Holders should consult with their tax advisors regarding the availability of either of these methods and the application of such methods to their specific situations,

including the basis recovery rules and the potential application of an interest charge under the installment sale method.

To the extent that the holder has realized a loss on the exchange, the holder may be precluded from recognizing the loss until the taxable year that the final payment is made.  Holders are urged to consult their tax advisors regarding the limitations on the recognition of losses in these circumstances.

To the extent any amounts are deemed distributed to a Claim holder in such holder's capacity as an employee and which for U.S. federal income tax purposes constitute wages, such amounts will generally be treated for tax purposes as ordinary income and will be subject to withholding by the Debtor.

c. <u>Consequences of Holding an Interest in the Class 3 Trust</u>.

As noted above, assuming that the Class 3 Trust is treated as a grantor trust for U.S. federal income tax purposes, the holders of interests in the Class 3 Trust will be treated as owning their Pro Rata share of the Class 3 Trust Assets and will be required to include on their U.S. federal income tax return their Pro Rata share of the income, gains, losses, deductions, and credits of the trust that is reported to them on the Schedule K-1 issued to them by the trust.  The trust is required to file Form 1041, U.S. Income Tax Return for Estates and Trusts, with the IRS, reporting its income, gains, losses, deductions, and credits, as applicable, as well as the allocation of each beneficiary's share of the reported trust items (Schedule K-1).

d. <u>Consequences to the Debtor</u>.

The U.S. federal income tax consequences to the Debtor upon the deemed distribution of the Class 3 Trust Assets will be as described above under the heading "Consequences to the Debtor of Exchanging Allowed Claims for Assets Other than Debt."

2. Accrued but Unpaid Interest.

In general, to the extent a holder of a debt instrument receives cash or assets in satisfaction of interest accrued during the holding period of such instrument, the amount of such cash or the value of such assets will be taxable to the holder as interest income (if not previously included in the holder's gross income).  Conversely, such holder may recognize a deductible loss to the extent that any accrued

interest claimed or amortized original issue discount was previously included in its gross income and is not paid. The extent to which cash or assets received by a holder of a debt instrument will be attributable to accrued but unpaid interest is unclear. Pursuant to the Plan, all distributions in respect of any Allowed Claim will be allocated first to the principal amount of such Allowed Claim, and thereafter, to the extent permitted under the Bankruptcy Code, to accrued but unpaid interest, if any. However, it is unclear whether such allocation will be respected for tax purposes. Certain legislative history indicates that an allocation of consideration between principal and interest provided in a bankruptcy plan of reorganization generally is binding for U.S. federal income tax purposes. However, regulations issued by the IRS require, in general, that payments made on a debt instrument first be allocated to unpaid interest and original issue discount.

Each holder of an Allowed Claim is urged to consult its tax advisor regarding the inclusion in income of amounts received in satisfaction of accrued but unpaid interest, the allocation of consideration between principal and interest, and the deductibility of previously included unpaid interest for tax purposes.

THE ABOVE SUMMARY HAS BEEN PROVIDED FOR INFORMATIONAL PURPOSES ONLY. ALL HOLDERS OF ALLOWED CLAIMS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS WITH RESPECT TO THE U.S. FEDERAL, STATE, LOCAL OR FOREIGN TAX CONSEQUENCES OF THE IMPLEMENTATION OF THE PLAN.

## XVI

## RECOMMENDATION AND CONCLUSION

The Debtor believes that Plan confirmation and implementation are preferable to any feasible alternative. Accordingly, the Debtor urges entities that hold impaired Claims to vote to accept the Plan by checking the box marked "Accept" on their Ballots and then returning the Ballots as directed in the Plan and Disclosure Statement.

1    DATED this /st day of November, 2010.

2

3    AMERICAN PACIFIC FINANCIAL
CORPORATION

4

5    By: _____

6    Its:    President    Larry R. Polhill

7

8    MCDONALD CARANO WILSON LLP

9

10    By:    /s/ Kaaran E. Thomas
_____
11    Kaaran E. Thomas
Nevada Bar No. 7193
12    100 West Liberty St., 10th Floor
P.O. Box 2670
13    Reno, Nevada 89505-2670
Phone: (775) 788-2000
14

15    Attorney for Debtor and Debtor-in-Possession

16

17

18

19

20

21

22

23

24

25

26

27

28