EDWARD M. MCDONALD JR., Trial Attorney
State Bar # NY 4126009
*edward.m.mcdonald@usdoj.gov*
**UNITED STATES DEPARTMENT OF JUSTICE**
Office of the United States Trustee
300 Las Vegas Boulevard, So., Suite 4300
Las Vegas, Nevada 89101
Telephone: (702) 388-6600 Attorney Ext. 234
Facsimile:  (702) 388-6658

E-Filed on March 19, 2011

Attorney for the Acting United States Trustee
        AUGUST B. LANDIS

## UNITED STATES BANKRUPTCY COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| In re:<br><br>**AMERICAN PACIFIC FINANCIAL CORPORATION,**<br><br>Debtor. | CASE NO: BK-**S-10-27855-BAM**<br><br>Chapter 11<br><br>Date: O.S.T. Pending<br>Time:  O.S.T. Pending<br>Place:  Foley Courtroom 3 (third floor) |

## THE ACTING UNITED STATES TRUSTEE'S MOTION FOR THE APPOINTMENT OF A CHAPTER 11 TRUSTEE PURSUANT TO 11 U.S.C. § 1104(a)(1)

To the Honorable BRUCE A. MARKELL, United States Bankruptcy Judge:

August B. Landis, the Acting United States Trustee for Region 17 moves the Court for entry of an order appointing a chapter 11 trustee in this case pursuant to 11 U.S.C. §§ 1104(a)(1). This motion is based upon the pleadings and papers comprising the official court docket in this case, the following memorandum of points and authorities, and any oral argument the Court may permit on the motion.

The Acting United States Trustee requests that the Court take judicial notice of the pleadings and documents filed in this bankruptcy case pursuant to Federal Rule of Bankruptcy Procedure 9017 and Federal Rule of Evidence 201.  To the extent that this motion contains factual assertions predicated upon statements made by American Pacific Financial Corporation

("Debtor" or "APFC") or its representatives in documents filed by Debtor in this case, or in hearings held before this Court, the Acting United States Trustee submits that such factual assertions are supported by admissible evidence in the form of admissions of a party opponent under FED. R. BANKR. P. 9017 and FED. R. EVID. 801(d)(2).

## MEMORANDUM OF POINTS AND AUTHORITIES

### JURISDICTION AND VENUE

1. This Court has jurisdiction over this motion pursuant to 28 U.S.C. §§ 1334(a) and (b), and 28 U.S.C. §§ 157(a) and (b)(1).

2. This motion is predicated upon 11 U.S.C. § 1104(a), and presents the Court with a core proceeding under 28 U.S.C. §§ 157(b)(2)(A) and (O).

3. Venue is appropriate in the District of Nevada pursuant to 28 U.S.C. § 1409(a).

4. Pursuant to 28 U.S.C. § 586(a)(3), the Acting United States Trustee is charged with responsibility for supervising the administration of cases under Chapters 7, 11, 12 and 13 of the United States Bankruptcy Code.[1]  The Acting United States Trustee has standing to raise and to "appear and be heard on any issue in any case or proceeding" brought under the Code. 11 U.S.C. § 307. *See Stanley v. McCormick, Barstow, Sheppard, Wayte & Carruth (In re Donovan Corp.)*, 215 F.3d 929, 930 (9th Cir. 2000) (stating that "The United States Trustee may be heard on any issue in any case or proceeding under title 11.").

### BACKGROUND FACTS

5. APFC commenced this case by filing a voluntary petition under the Code on September 21, 2010.

6. No Chapter 11 trustee has been appointed in this case and the debtor operates as a debtor-in-possession.

7. An unsecured creditor's committee was appointed in this case on November 4, 2010. [*See* Docket Nos. 79 and 80].

---

[1]     11 U.S.C. §§ 101-1532 (as amended).  The word "Code" as used in this Objection refers to the United States Bankruptcy Code.  The word "Section" refers to the corresponding section of the Code unless otherwise noted.

8.  Larry R. Polhill ("Polhill") is the debtor's representative, president, director, 100%
equity owner, and a creditor in this case for $442,554.90.  [Docket No. 1, p. 3 of 5; Docket No.
25, pp. 11, 13 & 22 of 28; Docket No. 59-1, p. 11 of 15].

9.  APFC's Schedule F lists $159.5 million in unsecured claims, including approximately
494 promissory notes issued between 1988 and 2008 amounting to approximately $103.6
million.  [Docket No. 25, p. 14 of 28; *see also* Docket No. 25, pp. 15-25 of 28].  Noteholders
include: (a) Paul Hazell/Veronica Chew for $1,018,978.07 on a note dated 1/28/2003 [Docket
No. 25, p. 16 of 28; *see also* Docket No. 98-1, p. 3 of 15]; (b) William & France Mudd for
$576,331.46 on a note dated 3/21/2003 [Docket No. 25, p. 21 of 28; *see also* Docket No. 98-1, p.
8 of 15]; and, © Jose Pabon for $109,082.24 on a note dated 12/30/1992 [Docket No. 25, p. 22 of
28; *see also* Docket No. 98-1, p. 9 of 15].

10.  APFC's amended statement of financial affairs lists 43 companies in which APFC
owned an interest of 5% or more within 6 years of the petition date including: (a) G, B & L
Corporation, a "leasing/trucking" company, which APFC has owned a 50% interest in from 1992
to the present;  (b) Glen Cove Properties LLC, an "asset management" company, which APFC
has owned a 100% interest in from 2006 to the present; and, © Realty Information Systems Inc.,
a "real estate franchise," which APFC owned a 6.01% interest in through "Venture Fund" from
1997 to 2009.  [Docket No. 59-1, p. 8-10 of 13 at Item 18 and attachment thereto].

*The USPL and Glen Cove Notes*

11.  Paul Hazell ("Mr. Hazell") is a creditor of APFC.  As detailed below, Polhill
withheld material information from Mr. Hazell and his wife concerning the notes they received
for their investments.  Specifically, while Polhill told Mr. Hazell and his wife that one of their
notes was secured by the assets of a specific company and other note was secured by real
property, he failed to tell them that the company had recently filed bankruptcy, and that the real
property was subject to a secured claim that was in default.  Had Mr. Hazell and his wife been
told this information, they would not have agreed to the terms of the notes.  They relied on the
representations made by Polhill and other APFC employees to their detriment.

12.  On December 16, 2004, Mr. Hazell and his wife, Veronica Chew ("Ms. Chew"),

invested with APFC in the form of a $400,000 promissory note secured by pledged collateral defined as "U.S. Plastic Lumber Equipment Financing" ("USPL Note").  [*See* Docket No. 231, Declaration of Paul Hazell, sworn to Mar. 17, 2011 ("Hazell Decl."), at p. 2 of 6, ¶ 4; *see also* Hazell Decl., p. 4 of 6 at Exh. A].

13.  Polhill told Mr. Hazell that the USPL Note was secured by U.S. Plastic Lumber Corp. ("USPL") equipment worth over $1 million, which could be sold if necessary ("USPL Collateral").  [Hazell Decl., p. 2 of 6, ¶ 5].

14.  The USPL Note is entitled "Contractual Loan Agreement/Promissory Note, Secured by Pledge of Collateral" and provides that the "Pledged collateral is defined as: U.S. Plastic Lumber Equipment Financing."  [Hazell Decl., p. 4 of 6 at Exh. A].  In addition, the USPL Note includes a provision containing remedial procedures if the pledged collateral becomes in default ("Pledged Collateral Default Provision"):

> Whenever pledged collateral becomes in default, or whenever requested by American Pacific Financial Corporation, Beneficiary agrees to release said pledged collateral to American Pacific Financial Corporation and upon such release, Beneficiary shall select any of these three options:
>
> (1) Receiving a principal reduction in this loan (in an amount equal to that pledged as security by the released collateral), or
>
> (2) Accepting substitute security, or
>
> (3) Directing that funds be held in trust, pending approval of replacement security by beneficiary.

[Hazell Decl., p. 4 of 6 at Exh. A].

15.  Based on Polhill's statements to Mr. Hazell, as well as the language on the face of the USPL Note itself, Mr. Hazell believed that the USPL Collateral would remain as security for the USPL Note until it was fully repaid.  [Hazell Decl., p. 2 of 6, ¶ 5].

16.  Approximately 5 months <u>before</u> the USPL Note was signed, on July 23, 2004, USPL filed a voluntary petition under Chapter 11 of the Code in the Southern District of Florida.  *See In re U.S. Plastic Lumber Corp.*, Case No. 04-33579-BKC-PGH (S.D. Fla. (West Palm Beach)

1  (filed July 23, 2004))("USPL Case").[2]  AMPAC Capital Solutions, an affiliate of the Debtor,

2  appeared in the USPL Case on August 4, 2004.  [USPL Docket No. 52; *see also* Docket No. 59-

3  1, p. 9 of 13].

4       17.  During the discussions between Polhill and Mr. Hazell concerning the USPL Note,

5  Polhill never informed Mr. Hazell that USPL had recently filed bankruptcy.  [Hazell Decl., p. 2

6  of 6, ¶ 6].  Had Mr. Hazell known that USPL had filed bankruptcy, he would not have agreed to

7  the terms of the USPL Note. [*Id.*].

8       18.  On September 1, 2007, Mr. Hazell and Ms. Chew agreed to roll the USPL Note into

9  a note for $507,364.00 ("Glen Cove Note #1") secured by pledged collateral in the form of real

10  estate located at 88-90 Hazel Street, Glen Cove, New York (the "Glen Cove Property").  [Hazell

11  Decl., p. 2 of 6, ¶ 7].

12       19.  On January 28, 2008, Mr. Hazell and Ms. Chew agreed to roll two other APFC

13  secured promissory notes issued to them in January 2003 into another APFC secured promissory

14  note in the amount of $501,151.28, which was also secured by the Glen Cove Property ("Glen

15  Cove Note #2").  [Hazell Decl., p. 3 of 6, ¶ 9].

16       20.  Based on Polhill's statements to Mr. Hazell, as well as the language on the face of

17  Glen Cove Note #1 and Glen Cove Note #2, Mr. Hazell believed that the Glen Cove Property

18  would remain as security for the notes until they were fully repaid.[3]  [Hazell Decl., pp. 2-3 of 6,

19  ¶¶ 8 & 10].

20       21.  APFC owns 100% of Glen Cove Properties LLC, which in turn owns 100% of GCP,

21  LLC. [Docket No. 61-6, p. 1 of 6].  GCP, LLC owns the Glen Cove Property.  [*See* Docket No.

22

23

---

24  [2]     The court in the USPL Case, entered an order on January 13, 2006 granting
25        USPL's emergency motion to sell substantially all of the debtors' assets to
         AMPAC Capital Solutions.  [*See* USPL Case, Docket No. 814].  APFC owned a
26        99% interest in AMPAC Capital Solutions from 2004 until 2008.  In 2008, all of
         its assets and liabilities were transferred to APFC.  [*See* Docket No. 61, p. 1 of 2].

27  [3]     Glen Cove Note #1 and Glen Cove Note #2 both contain a Pledged Collateral
28        Default Provision.  [*See* Hazell Decl., pp. 5-6 of 6 at Exhs. B & C].

61-6, p. 3 of 6]. In its filings with the Court, APFC describes the property held by GCP, LLC as follows:

> GCP, LLC owns property in Long Island, New York. The mortgage holders of said property have foreclosed and consequently the property and the two LLC's have no value.
> ....
> The property is very well located and lies in the Townships of Glen Cove and Oyster Bay, Long Island, New York.
> ....
> As the senior lender has charged a default interest rate of 21% since the end of 2007, and advanced various funds to pay property taxes and other issues, the secured debt on the property now greatly exceeds the current value of the real estate.

[Docket No. 61-6, p. 3 of 6].

22. Polhill did not inform Mr. Hazell that all right, title, and interest in the Glen Cove Property had been assigned to a third party mortgage lender before Mr. Hazell agreed to sign either Glen Cove Note #1 or #2. [Hazell Decl., pp. 2-3 of 6, ¶¶ 8 & 10]. Nor did Polhill tell Mr. Hazell that the mortgage was in default as of the end of 2007 before Mr. Hazell signed Glen Cove Note #2. [*Id.*]. If Mr. Hazell had known this information, he would not have agreed to roll the funds he was owed into Glen Cove Notes #1 and #2. [*Id.*].

*The GBL and Orange Texas Notes*

23. William Mudd ("Mr. Mudd") is also a creditor of APFC. As detailed below, Polhill and other APFC officers withheld material information from Mr. Mudd concerning the notes he received for his investments. Polhill signed notes purporting to be secured by the assets of a specific company and other real property, yet failed to tell Mr. Mudd when the company went out of business, that the real property was encumbered, and that APFC might have trouble making mortgage payments. Had Mr. Mudd been told this information, he would not have agreed to the terms of the notes. Mr. Mudd relied on the representations made by Polhill and other APFC employees to his detriment.

24. In 2003, Mr. Mudd invested approximately $60,000 of individual retirement account monies into an APFC affiliate, entitled American Pacific Financial Group Ltd. [*See* Docket No. 232, the Declaration of William Mudd, sworn to on March 18, 2011 ("Mudd Decl."), at p. 4 of 11, ¶ 15]. Mr. Mudd made this investment after being told in an email from former Vice

Page -6-

President of APFC, Todd Dreyer, that "[t]his fund is secured by all of the assets of APFC, including real estate, accounts receivable, stock, and inventories.  It is further Personally Guaranteed by Larry."  [*See* Mudd Decl., pp. 1, 2 & 4 of 11, ¶¶ 3, 4 & 15; *see also* Mudd Decl., p. 6 of 11 at Exh. A].

25.  Mr. Mudd also invested in APFC in the form of a promissory note (the "GBL Note") for $360,134.00 secured by accounts receivable of G, B & L, a trucking company (the "GBL Collateral").  [*See* Mudd Decl., p. 2 of 11, ¶¶ 5-6].  Former Vice President of APFC, Todd Dreyer, also told Mr. Mudd that the GBL Note was secured by the GBL Collateral.  [Mudd Decl., p. 2 of 11, ¶ 6].  The GBL Note contains a Pledged Collateral Default Provision.  [*See* Mudd Decl., p. 7 of 11 at Exh. B].

26.  Mr. Mudd also invested $400,000.00 with APFC in April 2004 in a note secured by land at 601 Division Street, Orange, Texas ("Orange Texas Property").  On January 22, 2008, Mr. Mudd agreed to rollover this note into a new note ("Orange Texas Note") for $490,279.90 that was also secured by the Orange Texas Property as pledged collateral.  [Mudd Decl., pp. 3-4 of 11, ¶12; *see also* Mudd Decl., p. 11 of 11 at Exh. D].  Mr. Mudd never received any interest payments on the Orange Texas Note.  [Mudd Decl., pp. 4 of 11, ¶13].

27.  After the original GBL Note expired on or about March 21, 2005, Mr. Mudd agreed to roll the GBL Note over for another term.  [Mudd Decl., p. 2 of 11, ¶7].  In 2008, APFC was late in paying on the GBL Note.  Mr. Mudd met with Polhill and Todd Dreyer in March 2008 ("March 2008 Meeting") to discuss the GBL Note and the Orange Texas Note.  [Mudd Decl., pp. 2-3 of 11, ¶8].

28.  At the March 2008 Meeting, Polhill told Mr. Mudd that G, B & L had gone out of business years earlier due to litigation concerning a fatal trucking accident involving one of its trucking employees.  [Mudd Decl., p. 3 of 11, ¶9; *see also* Docket No. 61-5, p. 3 of 4]. This was the first that Mr. Mudd had heard of G, B & L having financial troubles.  Had he known this information, he would not have continued to roll the GBL Note over.  [Mudd Decl., p. 3 of 11, ¶9].

29.  At the March 2008 Meeting, Polhill informed Mr. Mudd that given the situation with G, B & L, he should be thankful that he was continuing to receive interest payments.  [Mudd Decl., p. 3 of 11, ¶10].  Both Polhill and Todd Dreyer explained that APFC was having difficulty liquidating its real estate assets and was being kept afloat with income from an affiliate named Help-U-Sell.  [*Id.*].  On March 28, 2008, an involuntary petition under Chapter 7 was filed against Help-U-Sell Real Estate in the District of Nevada.  *In re Realty Information Systems, Inc. aka Help-U-Sell Real Estate*, Case No. 08-50463-GWZ (Bankr. D. Nev. filed Mar. 28, 2008)("Realty Information System Case").[4]

30.  On April 21, 2008, less than three months after APFC issued Mr. Mudd the Orange Texas Note, the Orange Texas Property was transferred by APFC's affiliate, Set Properties, LP, to two third parties, pursuant to a No Warranty Deed (In Lieu of Foreclosure).[5]  Had Mr. Mudd known that APFC and its affiliates planned to stop making mortgage payments on the Orange Texas Property, he would not have agreed to the terms of the Orange Texas Note.  [Mudd Decl., p. 4 of 11, ¶14].

31.  After the March 2008 Meeting, APFC resumed paying interest on the GBL Note until September 2008.  [Mudd Decl., p. 3 of 11, ¶11].  Mr. Mudd sued APFC and received a judgment against APFC for $392,607.30 dated March 15, 2010.[6]  [Mudd Decl., p. 3 of 11, ¶11;

---

[4]  *In re Realty Information Systems Inc.* was converted to Chapter 11 on July 15, 2008 [*see Realty Information Systems Inc.*, Docket No. 73] and was subsequently reconverted to Chapter 7 on June 22, 2010 [*see* Realty Information Systems Case Docket No. 617].

[5]  *See* "No Warranty Deed (In Lieu Of Foreclosure)," attached as Exhibit 1 to the Declaration of Edward M. McDonald Jr. ("McDonald Decl.") filed herewith. Debtor's filings note that APFC owned 24.75% of SET Properties, LP from 2003 until 2008, when all of the assets and liabilities of SET Properties, LP were transferred to APFC. [Docket No. 61, p. 2 of 2; *see also* Mudd Decl., p. 3 of 11, ¶11].

[6]  *Mudd vs. American Pacific Financial Corporation*, Case No. 30-2008-00115953-CU-CO-CJC (Cal. Super. Ct. (Orange Co.) Filed Dec. 11, 2008).  [*See also* Docket No. 59-1, p. 3 of 13 at Item 4].  Mr. Mudd had the judgment recorded in San Bernardino County on March 26, 2010. [Mudd Decl.,

*see also Mudd Decl.*, pp. 8-10 of 11 at Exh. C].

32.  At least twice following the March 2008 Meeting, Mr. Mudd attempted to withdraw his investment from the American Pacific Financial Group Ltd., however, Polhill refused to permit Mr. Mudd to either withdraw or transfer the investment to another individual retirement account.  [Mudd Decl., p. 5 of 11, ¶16].  In December 2008, Mr. Mudd learned that APFC had reduced the value of the American Pacific Financial Group Ltd. shares by approximately 80%. To date, Mr. Mudd has been unable to access any of his American Pacific Financial Group Ltd. investment.  [Mudd Decl., p. 5 of 11, ¶16].

33.  On or about November 16, 2009, after the Orange Texas Note expired, Mr. Mudd sued APFC for the recovery of the funds secured by the Orange Texas Note.  *See Mudd v. American Pacific Financial Corp.*, Case No. 30-2009-00320568-CU-BC-CJC (Cal. Super. Ct. (Orange Co.) Filed Nov. 16, 2009).  [*See also* Mudd Decl., p. 4 of 11, ¶14; Docket No. 59-1, p. 3 of 13 at Item 4].  This action has been stayed. [*See* Mudd Decl., p. 4 of 11, ¶14].

*The Hesperia Note*

34.  Jose Pabon ("Mr. Pabon") is also a creditor of APFC.  As detailed below, APFC, under Polhill's management, withheld material information from Mr. Pabon concerning the note he received for one of his investments.  Specifically, Polhill told Mr. Pabon that his note was secured by real property, yet failed to tell him when the land was sold to a third party.  Had Mr. Pabon been told this information, he would have asked for the return of his investment.  Mr. Pabon relied on the representations made by Polhill and other APFC employees to his detriment, .pursuant to a No Warranty Deed (In Lieu of Foreclosure).

35.  Mr. Pabon began investing with APFC in or about 1988.  [*See* Docket No. 230, the Declaration of Jose Pabon, sworn to on March 17, 2011 ("Pabon Decl."), at pp. 1-2 of 11, ¶4]. On June 6, 1997, Mr. Pabon rolled over his investment and was issued a promissory note for $47,124.00 secured by pledged property ("Hesperia Property").  The Hesperia Property

---

pp. 8-10 of 11 at Exh. C].  However, Debtor has not scheduled this claim as secured.  [*See* Docket No. 25 (Schedule D), pp. 9-10 of 28].

consisted of real estate located at 16545 Hercules Street, Hesperia, CA 92345 (the "Hesperia Note"). [*See* Pabon Decl., at p. 2 of 11, ¶6; *see also* Pabon Decl., p. 5 of 11 at Exh. A]. The Hesperia Note contains a Pledged Collateral Default Provision. Beginning in January 1988, Mr. Pabon received client notifications of, *inter alia*, the value of the principal on the Hesperia Note, the interest rate, the new rollover date, and a notice that the Hesperia Note would rollover unless he notified APFC within 10 days. [*See* Pabon Decl., at p. 2 of 11, ¶8; *see also* Pabon Decl., p. 6 of 11 at Exh. B].

36. Based on Polhill's statements to Mr. Pabon, as well as the language on the face of the Hesperia Note itself, Mr. Pabon believed that the Hesperia Property would remain as security for the Hesperia Note until it was fully repaid. [Pabon Decl., p. 2 of 11, ¶ 7]. In 2008, Mr. Pabon stopped receiving interest payments on the Hesperia Note. [Pabon Decl., pp. 2-3 of 11, ¶ 9]. Mr. Pabon subsequently learned that APFC had sold the Hesperia Property in February 2004. [*Id.*]. [7]

37. Had Mr. Pabon been given notice regarding the sale of the Hesperia Property, he would have requested the repayment of his investment at the time of the sale. [Pabon Decl., p. 2-3 of 11, ¶ 9]. The Pledged Collateral Default Provision in the Hesperia Note provides that Pabon could receive a principal reduction in the amount equal to the value of the pledged collateral. [*See* Pabon Decl., p. 5 of 11 at Exh. A].

38. Mr. Pabon also rolled $13,000 of retirement savings into American Pacific Financial

---

[7] The contract date for this sale was February 13, 2004 and the recording date was March 5, 2004. The sale price was for $2,182,000. *See* McDonald Decl. at Exhibit 2.

The Hesperia Property's assessor parcel number ("APN") is 0407061190000. *See* McDonald Decl. at Exhibit 3.

The Hesperia Property was transferred to a number of buyers who held it as tenants in common until they sold it on or about January 31, 2005 to an individual buyer. [*See* Corporation Grant Deed, McDonald Decl. at Exhibit 4; *see also* Ownership History Report For Parcel 0407-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, McDonald Decl. at Exhibit 5].

Group II, Ltd. ("APFG II Fund") in reliance on representations made by Polhill and Todd Dreyer that the APFG II Fund was a safe investment. [Pabon Decl., p. 3 of 11, ¶ 10]. Mr. Pabon received periodic statements of the value of his investment in the APFG II Fund. [Pabon Decl., p. 3 of 11, ¶¶ 11-12]. However, between September 2008 and June 2009, the value of Mr. Pabon's investment dropped by 80%. No explanation was provided to Mr. Pabon from anyone at APFC regarding this precipitous drop in value and he has not been able to withdraw his funds. [Pabon Decl., p. 3 of 11, ¶ 12].

## ARGUMENT SUMMARY AND RELIEF REQUESTED

39. The Acting United States Trustee requests the Court to order the appointment of a trustee pursuant to 11 U.S.C. § 1104(a)(1). Cause has been established in this case by the fraudulent and/or dishonest acts committed by Larry Polhill as detailed herein. Specifically, Polhill and his employees withheld material information from investors, or potential investors, in order to induce them to invest or rollover their investments in APFC. Once cause is established, the Court must order the appointment of a trustee pursuant to 11 U.S.C. § 1104(a)(1).

## ARGUMENT

*A. Ample cause exists to appoint a trustee in this case pursuant to 11 U.S.C. § 1104(a)(1).*

40. Section 1104(a)(1) of the Code provides, in relevant part, as follows:

> (a) At any time after the commencement of the case but before confirmation of a plan, on request of a party in interest or the United States trustee, and after notice and a hearing, the court *shall* order the appointment of a trustee
>
> > (1) for cause, including fraud, dishonesty, incompetence or gross mismanagement of the affairs of the debtor by current management, either before or after commencement of the case, or similar cause, but not including the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor.

11 U.S.C. § 1104(a)(1) (emphasis added).

41. The Code also provides that:

> The United States trustee shall move for the appointment of a trustee under subsection (a) if there are reasonable grounds to

> suspect that current members of the governing body of the debtor,
> the debtor's chief executive or chief financial officer, or members of
> the governing body who selected the debtor's chief executive or
> chief financial officer, participated in actual fraud, dishonesty, or
> criminal conduct in the management of the debtor or the debtor's
> public financial reporting.

11 U.S.C. § 1104(e).

42. Section 1104(a) of the Bankruptcy Code is rooted in the concept of the debtor's fiduciary duty and obligation owed to all of its creditors and parties-in-interest. *See, e.g.*, *Wolf v. Weinstein*, 372 U.S. 633, 649 (1963) ("so long as the Debtor remains in possession, it is clear that the corporation bears essentially the same fiduciary obligations to the creditors as does the trustee for the Debtor out of possession"); *Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 355 (1985) (stating that the willingness to leave debtors in possession "is premised upon an assurance that the officers and managing employees can be depended upon to carry out the fiduciary responsibility of a trustee").

43. By including the mandatory auxiliary verb "shall," Section 1104 of the Code requires the appointment of a chapter 11 trustee once cause has been established. The statutory term "cause," however, is not defined in either Section 101 or 1104 of the Code.

44. The examples of cause in Section 1104 of the Code are preceded by the term "including." 11 U.S.C. § 1104(a)(1). Under the Code's rules of construction set forth in Section 102, the term "including" is not limiting. 11 U.S.C. § 102(3). Finally, Section 1104(a)(1) of the Code includes the phrase "or similar cause," leading to the conclusion that the examples of cause set forth in Section 1104(a)(1) are just that - examples.

45. Indeed, courts that have been called upon to apply 11 U.S.C. § 1104(a)(1) have concluded that the list of examples of cause set forth therein is non-exhaustive. *See, e.g., In re SunCruz Casinos, LLC*, 298 B.R. 821, 828 (Bankr. S.D. Fla. 2003) (describing the list of examples of cause set forth in Section 1104 of the Code as "nonexhaustive "); *In re Microwave Prods. Of America, Inc.*, 102 B.R. 666, 671 (Bankr. W.D. Tenn. 1989) (noting that courts may consider both prepetition and postpetition conduct in determining whether cause exists to appoint a chapter 11 trustee).

46. Broad construction of the term "cause" not only pays fidelity to the text of Sections 1104(a)(1) and 102(3) of the Code, such a construction properly recognizes the role of a chapter 11 trustee as a potential check on abuse or disregard of creditor and/or interest holder goals by a debtor-in-possession that fails to discharge its fiduciary duties. *See In re V. Savino Oil & Heating Co.*, 99 B.R. 518, 525 (Bankr. E.D.N.Y. 1989) ("Section 1104(a) represents a potentially important protection that courts should not lightly disregard or encumber with overly protective attitudes towards the debtor-in-possession").

47. In addition to giving credence to the nonexhaustive nature of the list of examples of cause, courts have imbued the term "cause" with additional meaning and substance by identifying the following six factors courts should evaluate in determining whether to appoint a chapter 11 trustee:

> (1) Materiality of misconduct;
>
> (2) Evenhandedness or lack of same in dealings with insiders or affiliated entities vis-a-vis other creditors or customers;
>
> (3) The existence of prepetition voidable preferences or fraudulent transfers;
>
> (4) Unwillingness or inability on the part of management to pursue estate causes of action;
>
> (5) Conflicts of interest on the part of management interfering with its ability to fulfill its fiduciary duties to the debtor;
>
> (6) Self-dealing by management or waste or squandering of corporate assets.

*Sun Cruz Casinos*, 298 B.R. at 830, *citing In re Intercat, Inc.*, 247 B.R. 911, 921 (Bankr. S.D. Ga. 2000) and *In re Bellevue Place Assocs.*, 171 B.R. 615, 622 (Bankr. N.D. Ill. 1994).

48. Establishment of one of the factors listed above constitutes sufficient cause to appoint a chapter 11 trustee. *See In re Cajun Elec. Power Coop., Inc.*, 74 F.3d 599 (5th Cir.1996). The Acting United States Trustee submits that the record before the Court establishes the existence of material misconduct (one of the 6 *Intercat* factors constituting "cause") on the part of Debtor's current management under either the 'preponderance of the evidence' standard or the 'clear and convincing evidence' standard of proof.

*B. The Burden of Proof*

49.   Parties seeking the appointment of a trustee pursuant to 11 U.S.C. § 1104(a)(1) bear the burden of proving by a preponderance of the evidence that the appointment of a trustee is appropriate.  The higher standard of clear and convincing evidence does not control.  *See Tradex Corp. v. Morse*, 339 B.R. 823, 830-32 (D. Mass. 2006) (noting that "general Supreme Court reasoning in the bankruptcy realm suggests that the reflexive endorsement of a demanding 'clear and convincing' evidentiary burden regarding trustee appointments under § 1104 is anamolous."); *In re Altman*, 230 B.R. 6, 16-17 (Bankr. D. Conn. 1999), *vacated in part on other grounds*, 254 B.R. 509 (D. Conn. 2000) (same); *see also Grogan v. Garner*, 498 U.S. 279, 286 (1991) (noting that the general standard of proof in civil and bankruptcy cases, and in nondischargeability litigation in particular, is a preponderance of the evidence); *see also* Clifford J. White III & Walter W. Theus, Jr., *Chapter 11 Trustees and Examiners After BAPCPA*, 80 Am. Bankr. L. J. 289, 315-16 (2006) (Because 11 U.S.C. § 1104(e) requires the United States Trustee to file a motion for appointment of a trustee based only upon "reasonable grounds to suspect fraud or other dishonest conduct," the adoption of § 1104(e) "calls for a reexamination of the case law that established this heightened level of proof.").  *But see In re Marvel Entertainment Group, Inc.*, 140 F.3d 463, 471 (3d Cir. 1998) (requiring clear and convincing evidence for the appointment of a trustee under 11 U.S.C. § 1104(a)).  Although there is a presumption that a debtor will remain in possession, Section 1104(a)(1) "reflects criteria which mandate the appointment of a trustee for cause. . . .  Under this subsection the court's discretionary powers are circumscribed and are limited to a judicial determination of whether 'cause,' as defined, exists." *Tradex Corp.*, 339 B.R. at 827, quoting *In re Eichorn*, 5 B.R. 755, 757 (Bankr. D. Mass. 1980).

*C. Cause Exists for the Appointment of a Trustee Under 11 U.S.C. § 1104(a)(1).*

50.  "Cause" necessitating the appointment of a trustee may be based on "fraud, dishonesty, incompetence, or gross mismanagement" of a debtor.  *See* 11 U.S.C. § 1104(a)(1).

51.  Fraud or "[i]ntentional misrepresentation is established by three factors: (1) a false representation that is made with either knowledge or belief that it is false or without a sufficient

foundation; (2) an intent to induce another's reliance; and, (3) damages that result from this reliance.  With respect to the false representation element, the suppression or omission 'of a material fact which a party is bound in good faith to disclose is equivalent to a false representation, since it constitutes an indirect representation that such fact does not exist.' " *Nelson v. Heer*, 163 P.3d 420, 426 (Nev. 2007).

52.  In addition, "dishonesty" includes a "lack of fairness and straightforwardness." BLACK'S LAW DICTIONARY 468 (6th Ed. 1990).  Courts have also held that an "independent ground for appointing a trustee is either a perceived dishonesty or withholding of information." *In re Plaza de Retiro, Inc.*, 417 B.R. 632, 641 (Bankr. D. N. M. 2009).  The *Plaza de Retiro* court also held that the appointment of a trustee was appropriate because it was selling contracts for services it knew it could not supply.  *Id.* at 642.  The court held that doing so verged on the fraudulent, and "even if it is not fraudulent, it was dishonest." *Id.*  Polhill was similarly providing investors with notes purportedly secured by collateral that he knew, or should have known, was distressed or worthless.

53.  The Hazell, Mudd, and Pabon Declarations clearly show that Polhill engaged in intentional misrepresentations, or at the least dishonesty, in his dealings with Mr. Hazell, Mr. Mudd, and Mr. Pabon.

54.  Mr. Hazell asserts that Polhill told him that the USPL Note was secured by equipment worth over $1 million that could easily be sold, if necessary.  Mr. Hazell also states he relied on the face of the USPL Note, which provides that it is a promissory note "Secured by Pledge of Collateral."  Polhill failed to disclose that USPL had filed for bankruptcy several months before.  Polhill knew, or should have known, of the USPL bankruptcy.  In fact, AMPAC Capital Solutions, a company managed by Polhill and an affiliate of the Debtor, filed a notice of appearance in the USPL Case on August 4, 2004.  [*See* McDonald Decl. at Exhibit 6; *see also* Docket No. 59-1, p. 9 of 13; *see also* USPL Case Docket No. 52].  Mr. Hazell would not have agreed to the terms of the USPL Note if Polhill had disclosed the USPL bankruptcy to him.

55.  Mr. Hazell also asserts that Glen Cove Notes #1 and #2 appear on their faces to be secured by real property.  In addition, Mr. Hazell assets that prior to signing Glen Cove Note #1

on September 1, 2007, Polhill failed to tell him that all right title and interest in the Glen Cove Property had been assigned to a third party mortgagor in 2006. [*See* UCC Financing Statement, McDonald Decl. at Exhibit 7]. In addition, Mr. Hazell asserts that prior to signing Glen Cove Note #2 on January 28, 2008, Polhill failed to tell him that the APFC affiliate (which owned the Glen Cove Property) was in default to the senior lender. [*See* Docket No. 61-6, p. 3 of 6]. Debtor discloses in its filings that "[t]he mortgage holders of said property have foreclosed and consequently the property and the two LLC's [APFC affiliates GCP, LLC and Glen Cove Properties, LLC] have no value." [*Id.*].

56. Mr. Mudd received the GBL Note and the Orange Texas Note in exchange for some of the money he invested in APFC. Mr. Mudd rolled the GBL Note over in 2005, although Polhill neglected to tell him until the March 2008 Meeting, that G, B & L had gone out of business years before because of litigation related to fatal trucking accidents. Debtor discloses in its filings that "[m]ultiple fatalities, as well as litigation and a 42 million dollar judgment with various subsidiaries forced the company to cease all operations." [Docket No. 61-5, p. 3 of 4].

57. Mr. Mudd entered into the Orange Texas Note at the end of January 2008 but was not told that APFC was not making mortgage payments on that land. The Orange Texas Property was transferred pursuant to a Deed in Lieu of Foreclosure to third parties less than three months after Mr. Mudd signed the Orange Texas Note. [*See* McDonald Decl. at Exhibit 1]. Had Mr. Mudd known this information, he would not have agreed to roll his investments into the Orange Texas Note or the GBL Note.

58. Mr. Pabon invested with APFC and received the Hesperia Note, which he continued to rollover pursuant to client notifications he received from APFC. [*See* Pabon Decl., p. 6 of 11 at Exh. B]. Mr. Pabon was not told by APFC that the Hesperia Property was sold in February 2004. Had he been provided this information, he would have demanded repayment pursuant to the Pledged Collateral Default Provision of the Hesperia Note.

59. Polhill and APFC failed to provide Mr. Hazell, Mr. Mudd, and Mr. Pabon with material information concerning the collateral securing their notes, either at the time the notes were signed, or in the client rollover notices. The information withheld from them was

1   information that APFC and its principal, Polhill, knew, or should have known was important for

2   an investor to have.  These three investors relied on the information provided to them by APFC

3   and/or Polhill as well as on the language in the notes, all of which are titled "Contractual

4   Loan/Promissory Note Secured by Pledge of Collateral."  The notes specify the property pledged

5   as collateral and provide that if the collateral became in default the investor would receive his

6   funds or be given new collateral.  Had these three investors been told the information detailed

7   above they would not have agreed to the terms of the notes, or agreed to roll them over for

8   another term.  The investors have been damaged economically as a result of keeping their

9   investments in the Debtor.  They have not been afforded the rights granted to them by the

10  Pledged Collateral Default Provisions in their notes.

11      60.  Accordingly, Polhill appears to have defrauded Messrs. Hazell, Mudd, and Pabon by

12  omitting material information they needed in order to decide whether to invest, or to continue to

13  invest in APFC.  Even if the evidence contained herein does not rise to the level of fraud, it

14  certainly is indicative of dishonesty.  In addition, failure to track the collateral in the notes, notify

15  investors that the collateral securing their notes was in default, and notify investors that the

16  Pledged Collateral Default Provision had been triggered, indicates incompetence and/or gross

17  mismanagement on the part of Polhill and APFC.[8]

18  _____

19          [8]     At the 341 meeting of the creditors, held on November 4, 2010, Mr. Polhill

20                  testified that the Debtor did not have any insurance coverage for its property,
                    either real or personal.  [Recording of 341 Meeting of Creditors, *In re American*
21                  *Pacific Financial Corporation*, Case No. 10-27855-BAM, sworn to Nov. 4, 2010
                    at 00:37:34 - 00:41:21 of 01:39:05; *see also* McDonald Decl. at ¶ 2]
22

23                  Debtor subsequently obtained insurance on its real estate.  [*See* McDonald Decl.
                    at Exh. 8]  Counsel for the Debtor confirmed on March 15, 2011 that Debtor does
24                  not have either Directors & Officers Liability Insurance or Errors & Omissions
                    Insurance.  [*See* McDonald Decl. at Exh. 9]
25

26                  Bankruptcy courts have found that failure to maintain adequate insurance
                    constitutes incompetence and is cause for appointing a trustee. *See, e.g. In re*
27                  *Caroline Desert Disco, Inc.*, 5 B.R. 536, 537 (Bankr.C.D.Cal.1980) ("[T]he
                    current management's failure to comply with the Court's rules on insurance,
28

61.  Indeed, Messrs. Hazell, Mudd, and Pabon are not the only creditors in this case who believed that their claims were secured by a promissory note signed by Polhill.  At least two other creditors have filed documents asserting that they believed their investment in APFC was secured by a promissory note signed by Polhill. [*See* Docket No. 101 (Letter dated Nov. 18, 2010 from Donald W. Kurtz and Carol L. Kurtz), pp. 1 & 3 of 3; *see also* Docket No. 63; *see also* Claim No. 10-1].

62.  A number of other investors listed on APFC's Schedule F have filed secured claims and attached a promissory note or rollover notices, including:

• Claim No. 6-1 (Donald Gainey), pp. 1, 6 & 7 of 7; compare Docket No. 25, p. 18 of 28;

• Claim No. 7-1 (Eileen Valenti), pp. 4-8 of 11; compare Docket No. 25, p. 24 of 28;

• Claim No. 9-1 (Seth Ingersoll), pp. 1 & 6 of 6; compare Docket No. 25, p. 20 of 28;

• Claim No. 11-1 (Steven & Deborah Martin), pp. 1& 4of 5; compare Docket No.25, p. 20 of 28;

• Claim No. 12-1 (Joshua Ingersol), pp. 1 & 3 of 6; compare Docket No. 25, p. 20 of 28;

• Claim No. 14-1 (Winona Blessinger), pp.1, 3 & 4 of 4; compare Docket No. 25, p. 16 of 28;

• Claim No. 17-1 (Patricia French), pp. 1 & 8 of 9; compare Docket No. 25, p. 18 of 28;

• Claim No. 24-1 (Julie Dailey), pp. 1-2 of 4; compare Docket No. 25, p. 18 of 28;

• Claim No. 25-1 (Glenn & Charlene Frank), pp. 1& 4 of 5; compare Docket No. 25, p. 18 of 28;

• Claim No. 29-1 (Anna Robison), pp. 1-2 of 2; compare Docket No. 25, p. 23 of 28;

• Claim No. 31-1 (Lenda Anderson), pp. 1 & 4 of 5; compare Docket No. 25, p. 15 of 28;

• Claim No. 32-1 (Joseph/Chantal Rabay F Ts), pp. 1-2of4; compare Docket No. 25, p. 22 of 28;

• Claim No. 56-1 (Curtis & Emma Hickey), pp. 1 & 3 of 5; compare Docket No. 25, p. 19 of 28;

• Claim No. 71-1 (Molly M. Frantz Rev. Tr.), pp. 1-2 of 4; compare Docket No. 25, p. 18 of 28;

• Claim No. 79-1 (Kurt & Roanna Frieze), pp. 1-4 of 12; compare Docket No. 25, p. 18 of 28;

• Claim No. 80-1 (Kurt Frieze), pp. 1,3 & 4 of 4; compare Docket No. 25, p. 18 of 28;

• Claim No. 82-1 (Lonnie & Lynn Svedin), pp. 1-3 of 4; compare Docket No. 25, p. 24 of 28;

operating controls, and reports to the U.S. Trustee constitutes incompetence or gross mismanagement, justifying ... appointment of a Trustee."); *see also In re AG Service Centers, L.C.*, 239 B.R. 545 (Bankr.W.D.Mo. 1999).

- Claim No. 83-1 (Lonnie & Lynn Svedin), pp. 1-6 of 7; compare Docket No. 25, p. 24 of 28; and,

- Claim No. 84-1 (Dennis Mikkelson), pp. 1-3 of 3; compare Docket No. 25, p. 21 of 28.

63. In addition, some of the promissory notes issued by APFC and signed by Polhill may qualify as securities. Section 3(a)(10) of the Securities Exchange Act of 1934 broadly defines the term "security" as:

> any *note*, stock, treasury stock, security future, bond, debenture, certificate of interest or participation in any profit-sharing agreement... but shall not include currency or any note, draft, bill of exchange, or banker's acceptance which has a maturity at the time of issuance of not exceeding nine months, exclusive of days of grace, or any renewal thereof the maturity of which is likewise limited.

15 U.S.C. § 78c(a)(10)(emphasis added). "[A] note is presumed to be a security unless the note resembles one of the several judicially-enumerated instruments that are not securities." *Pollack v. Laidlaw Holdings, Inc.*, 27 F.3d 808, 811 (2d Cir. 1994) (citations omitted). Notes that do not qualify as securities include:

> the note delivered in consumer financing, the note secured by a mortgage on a home, the short-term note secured by a lien on a small business or some of its assets, the note evidencing a 'character' loan to a bank customer, short-term notes secured by an assignment of accounts receivable, or a note which simply formalizes an open-account debt incurred in the ordinary course of business (particularly if, as in the case of the customer of a broker, it is collateralized).

*Reves v. Ernst & Young*, 494 U.S. 56, 65 (1990) (quoting *Exchange Nat. Bank of Chicago v. Touche Ross & Co.*, 544 F.2d 1126, 1138 (2d 1976).

64. Accordingly, Polhill's actions described *supra* may have violated federal securities laws. Indeed the U.S. Securities and Exchange Commission has filed a proof of claim in this case, stating that:

> Based on a preliminary investigation of certain pre-bankruptcy transactions and conduct involving the debtor, the United States Securities and Exchange Commission ("SEC") may file a civil action against the debtor in an appropriate forum for possible violations of federal securities laws. Such an action may result in a judgment against the debtor for an unknown amount of disgorgement of ill-gotten gains and prejudgment interest, as well

1    as an unknown amount of penalties pursuant to Section 20(d) of
     the Securities Act of 1933, 15 U.S.C. § 77t(d), Section 21 (d)(3) of
2    the Securities Exchange Act of 1934, 15 U.S.C. § 78u(d)(3), and
     Section 209(e) of the Investment Advisers Act of 1940, 15
3    U.S.C. § 80b-9(e). Accordingly, the SEC files this protective Proof
     of Claim to preserve any relief to which it may be entitled should
4    such a judgment be obtained against the debtor.

5    [Claim No. 98-1, p. 2 of 4].

6        65.  Polhill is the Debtor's representative and its president, director, and owner.  Polhill

7    appears to have engaged in fraudulent and/or dishonest behavior in order to induce potential

8    investors to invest money in APFC.  Accordingly, there is "cause" as defined by 11 U.S.C. §

9    1104(a)(1) to order the appointment of a trustee.

10        **WHEREFORE,** the Acting United States Trustee respectfully requests that the Court

11   enter an order granting the relief requested in this motion, and directing the Acting United States

12   Trustee to appoint a Chapter 11 trustee in this case.

13       Dated:  March 19, 2011

14                                     Respectfully submitted,

15

16                                     **AUGUST B. LANDIS**
                                       **ACTING UNITED STATES TRUSTEE**
                                       **REGION 17**

17
                                       By:  _/s/ Edward M. McDonald Jr._
18                                         Edward M. McDonald Jr., Esq.
                                           Attorney for the United States Trustee
19

20

21

22

23

24

25

26

27

28

# CERTIFICATE OF MAILING

I, the undersigned, hereby certify and declare that I deposited a true and correct copy of this Motion, the McDonald Declaration with attached exhibits, a proposed form of order, the Mudd Declaration, the Hazell Declaration, and the Pabon Declaration in first class United States mail, postage fully prepaid, and, if a facsimile number is listed, by facsimile, on this date to each of the parties listed below:

KAARAN E. THOMAS, ESQ.
MCDONALD CARANO WILSON LLP
100 W LIBERTY ST, 10TH FLR
RENO, NV 89505

Internal Revenue Service
P.O. Box 21126
DPN 781
Philadelphia, PA 19114

LISA M WILTSHIRE, ESQ.
McDonald Carano Wilson LLP
2300 West Sahara Avenue , Suite 1000
LAS VEGAS, NV 89102

Nevada Department of Taxation,
Bankruptcy Section
555 E. Washington Ave., #1300
Las Vegas, NV 89101

RYAN J. WORKS, ESQ.
MCDONALD CARANO WILSON LLP
2300 W. SAHARA AVE., SUITE 1000
LAS VEGAS, NV 89102

Clark County Treasurer
C/o Bankruptcy Clerk
500 S Grand Central Pkwy, Box 551220
Las Vegas, NV 89155-1220

AMERICAN PACIFIC FINANCIAL CORP.
Attn: Larry R. Polhill, President (Officer, Managing Agent
or General Agent)
7380 S. EASTERN AVENUE, SUITE 150
LAS VEGAS, NV 89123

Dept. of Employment, Training & Rehab
Employment Security Division
500 East Third Street
Carson City, NV 89713

JEFFREY A. SCHWAB, ESQ.
ABELMAN, FRAYNE & SCHWAB
666 THIRD AVENUE, FLOOR 10
NEW YORK, NY 10017

State of Nevada Dept. of Motor Vehicles
Attn: Legal Division
555 Wright Way
Carson City, Nevada 89711

LOUIS M. BUBALA III, ESQ.
ARMSTRONG TEASDALE LLP
50 WEST LIBERTY, SUITE 950
RENO, NV 89501

Clark County Assessor
c/o Bankruptcy Clerk
500 S Grand Central Pkwy, Box 551401
Las Vegas, NV 89155-1401

Sarah D. Moyed, Esq.
U. S. Securities and Exchange Commission
5670 Wilshire Boulevard, Suite 1100
Los Angeles, California 90036

Dated:  March 19, 2011

OFFICE OF THE UNITED STATES TRUSTEE


By: _/s/ Edward M. McDonald Jr._____

An Authorized Employee of the United States Trustee