1

KAARAN E. THOMAS (NV Bar No. 7193)                    *Electronically filed on April 1, 2011*
RYAN WORKS (NV Bar No. 9224)

2

McDONALD CARANO WILSON LLP
2300 West Sahara Avenue, Suite 1000

3

Las Vegas, Nevada  89102
Telephone:     (702) 873-4100

4

Facsimile:     (702) 873-9966

5

Counsel for Debtor and Debtor in Possession

6

7

8

# UNITED STATES BANKRUPTCY COURT

## DISTRICT OF NEVADA

9

10

| | |
|---|---|
| **In re:** | **Case No. BK-S-10-27855-BAM** |

11

| | |
|---|---|
| **AMERICAN PACIFIC FINANCIAL CORPORATION** | **Chapter 11** |

12

Debtor in Possession.

13

**DISCLOSURE STATEMENT DESCRIBING CHAPTER 11 PLAN OF REORGANIZATION PROPOSED BY AMERICAN PACIFIC FINANCIAL CORPORATION (DATED APRIL 1, 2011)**

14

15

16

| | |
|---|---|
| **Hearing Date:** | **April 18, 2011** |
| **Hearing Time:** | **9:30 a.m.** |

17

18

**Foley Federal Building**
**300 Las Vegas Blvd. South**
**Las Vegas, Nevada 89101**
**3rd Floor, Courtroom 3**

19

20

21

22

23

24

25

26

27

28

TABLE OF CONTENTS

Page

I.   INTRODUCTION AND PLAN OVERVIEW ................................................................. 3

    A.   Challenges Faced by the Debtor and the Business ......................................... 3

        1.   Description of the Business. ........................................................ 3

        2.   Debtor's Obligations to Creditors. ............................................ 4

        3.   Reasons for Financial Difficulties. ........................................... 4

    B.   Resolution of Problems Under the Plan .......................................................... 4

    C.   The Treatment of Creditors ............................................................................. 5

II.   INFORMATION REGARDING THE CHAPTER 11 CASE ......................................... 6

III.   GENERAL DISCLAIMERS AND INFORMATION ................................................... 7

IV.   WHO MAY VOTE TO ACCEPT OR REJECT THE PLAN ....................................... 9

    A.   Allowed Claims .............................................................................................. 10

    B.   Impaired Claims and Interests ....................................................................... 10

V.   VOTES NECESSARY TO CONFIRM THE PLAN ................................................... 11

VI.   INFORMATION REGARDING VOTING IN THE CASE ........................................ 12

VII.   CRAMDOWN: TREATMENT OF NON-CONSENTING CLASSES ...................... 13

VIII.   WHO MAY OBJECT TO PLAN CONFIRMATION .............................................. 14

IX.   BACKGROUND ON THE DEBTOR, ITS BUSINESS, EVENTS PRECIPITATING
ITS BANKRUPTCY FILING, AND SIGNIFICANT EVENTS IN THE CASE ........................ 15

    A.   Description and History of the Debtor's Business and Management ........................ 15

    The Debtor's Current and Future Management. .................................................. 18

    B.   The Debtor's Pre-Petition Assets and Liabilities ............................................ 24

        1.   Introduction. ............................................................................. 27

        2.   Pre-Petition Assets. .................................................................. 27

        3.   Asset Values. ............................................................................ 27

        4.   Pre-Petition Secured Liabilities. ............................................... 27

        5.   Unsecured liabilities. ................................................................ 28

    C.   Significant Events of the Case ....................................................................... 28

        1.   Preliminary Motions and Other Early Activity in the Case. ................... 28

        2.   Debtor-in-Possession Financing. ............................................... 28

        3.   Claims Filed By Creditors. ........................................................ 29

i

|  |  | 4. | Litigation. | 30 |
|  |  | 5. | Professionals Retained by the Estate. | 31 |
|  |  | 6. | The Debtor's Post-Confirmation Business Plan. | 31 |
| X. | SUMMARY OF MATERIAL PLAN PROVISIONS | | | 32 |
|  | A. | Factors Affecting the Nature and Extent of Certain Distributions | | 32 |
|  | B. | Classification and Treatment of Claims Under the Plan | | 32 |
|  |  | 1. | Unclassified Claims. | 33 |
|  |  | a. | Administrative Claims. | 33 |
|  |  | b. | Treatment of Administrative Claims. | 34 |
|  | C. | Treatment of Executory Contracts and Unexpired Leases | | 35 |
|  |  | 1. | Assumption of Executory Contracts and Unexpired Leases. | 35 |
|  |  | a. | Assumption of Agreements. | 35 |
|  |  | b. | Cure Claims. | 36 |
|  |  | c. | Objections to Assumption. | 36 |
|  |  | d. | Resolution of Claims Relating to Assumed Agreements. | 37 |
|  |  | 2. | Rejection of Executory Contracts and Unexpired Leases. | 37 |
|  |  | a. | Rejected Agreements. | 37 |
|  |  | b. | Bar Date for Rejection Damage Claims. | 37 |
|  |  | 3. | Post-Petition Contracts and Leases. | 38 |
|  | D. | Means of Execution and Implementation of the Plan | | 38 |
|  |  | 1. | Funding of the Plan. | 38 |
|  |  | 2. | Creation of the Trust and Appointment of the Trustee. | 38 |
|  |  | a. | Management of the Trust. | 38 |
|  |  | c. | The Termination of the Trust. | 40 |
|  |  | 3. | Revesting of Assets. | 40 |
|  |  | 4. | Preservation/Revesting of Rights of Action/No Waiver of Claims. | 40 |
|  |  | 5. | Objections to Claims. | 42 |
|  |  | 6. | Full Satisfaction. | 43 |
|  |  | 7. | Compliance with Tax Requirements. | 43 |
|  |  | 8. | Setoff, Recoupment and Other Rights. | 43 |
|  |  | 9. | Conditions to Effectiveness. | 43 |
|  |  | 10. | Waiver of Conditions. | 44 |
|  |  | 11. | Authorization of Entity Action. | 44 |

E.    Other Plan Provisions ................................................................................. 45

    1.    Limitation of Liability and Releases. ......................................... 45

    2.    Revocation of Plan/No Admissions. ........................................... 45

    3.    Modifications of the Plan. .......................................................... 45

    4.    Exemption from Certain Transfer Taxes. ................................... 46

    5.    Form of Agreements and Documents. ......................................... 46

F.    Effect of Confirmation of the Plan. ............................................................ 46

    1.    Injunction. .................................................................................. 46

    2.    Payment of U.S. Trustee Fees. ................................................... 47

    3.    Retention of Jurisdiction. ........................................................... 47

XI.    FINANCIAL INFORMATION ................................................................................. 47

A.    Financial Projections and Feasibility ......................................................... 47

B.    Tax Consequences of the Plan .................................................................... 48

XII.    LIQUIDATION ANALYSIS / BEST INTEREST TEST ........................................ 48

XIII.    RISK FACTORS .................................................................................................... 50

A.    Bankruptcy Considerations ......................................................................... 50

    1.    Parties in Interest May Object to the Debtor's Classification of Claims and Interests. ............................................................................ 50

    2.    Failure to Satisfy Voting Requirements. ..................................... 50

    3.    Failure to Secure Confirmation of the Plan. .............................. 51

    4.    Non-Consensual Confirmation. .................................................. 51

    5.    Debtor May Object to the Amount or Classification of a Claim. ........... 52

    6.    The Effective Date Might Not Occur. .......................................... 52

    7.    The Trust May Not be Able to Meet Debt Obligations and Operational Needs. ........................................................................................ 52

    8.    The Actual Allowed Amounts of Claims May Differ from the Estimated Claims and Adversely Affect the Percentage Recovery on General Unsecured Claims. ....................................................... 52

XIV.    ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN. ................................................................................................................. 53

A.    Liquidation Under Chapter 7 ...................................................................... 53

B.    Alternative Plans ........................................................................................ 53

XV.    TAX CONSEQUENCES OF THE PLAN ............................................................... 54

A.    Certain U.S. Federal Income Tax Consequences to the Holders of Allowed Claims that Are Paid in Cash ................................................................................... 56

B.    Certain U.S. Federal Income Tax Consequences to Holders of Allowed Claims that Are Paid Using Consideration Other than Cash ..................................... 57

1.    Consequences of the Receipt and of Holding a Beneficial Interest in the Class 3 Trust ................................................................................................ 57

a.    Receipt of a Beneficial Interest in the Class 3 Trust ............................................ 57

b.    Deemed Distribution of the Assets of the Class 3 Trust ....................................... 57

c.    Consequences of Holding an Interest in the Trust. .............................................. 58

2.    Accrued but Unpaid Interest. ........................................................................... 59

XVI.    SECURITIES LAW MATTERS ................................................................................... 59

XVII.    RECOMMENDATION AND CONCLUSION .............................................................. 62

## LIST OF EXHIBITS

| EXHIBIT NO. | DESCRIPTION |
|---|---|
| 1 | Amended Chapter 11 Plan of Reorganization Proposed by American Pacific Financial Corporation |
| 2 | Pre-Petition Assets |
| 3 | Unsecured Creditors |
| 4 | Assumed Agreements and Cure Claims  [to be filed by Exhibit Filing Date] |
| 5 | Trust Agreement  [to be filed by Exhibit Filing Date] |
| 6 | 18-Month Post-Confirmation Budget & Assumptions |
| 7 | Liquidation Analysis & Assumptions |

### DISCLOSURE STATEMENT DESCRIBING CHAPTER 11 PLAN OF LIQUIDATION PROPOSED BY AMERICAN PACIFIC FINANCIAL CORPORATION (DATED APRIL 1, 2011)[1]

THIS DISCLOSURE STATEMENT HAS NOT YET BEEN APPROVED UNDER BANKRUPTCY CODE SECTION 1125(b) FOR USE IN THE SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THE PLAN OF LIQUIDATION DESCRIBED HEREIN. THE FILING AND DISTRIBUTION OF THIS DISCLOSURE STATEMENT IS NOT INTENDED, AND SHOULD NOT BE CONSTRUED, AS A SOLICITATION OF ACCEPTANCES OR REJECTIONS OF SUCH PLAN OF LIQUIDATION. THE INFORMATION CONTAINED HEREIN SHOULD NOT BE RELIED UPON FOR ANY PURPOSE BEFORE A DETERMINATION BY THE COURT THAT THIS DISCLOSURE STATEMENT CONTAINS "ADEQUATE INFORMATION" WITHIN THE MEANING OF SECTION 1125(a) OF THE BANKRUPTCY CODE.

### PURPOSE OF DISCLOSURE STATEMENT

THE PURPOSE OF THIS DISCLOSURE STATEMENT IS TO PROVIDE ADEQUATE INFORMATION TO ENABLE A HYPOTHETICAL REASONABLE INVESTOR TYPICAL OF THE HOLDERS OF CLAIMS OR INTERESTS IN THE CASE TO MAKE AN INFORMED JUDGMENT ABOUT THE PROPOSED PLAN. THE SOURCE OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS THE DEBTOR'S MANAGEMENT.

### SUMMARY INFORMATION

| | |
|---|---|
| Debtor: | American Pacific Financial Corporation |
| Recommendation: | The Debtor recommends that you vote in favor of the Plan. |
| Vote Required to Accept the Plan: | Acceptance of the Plan by a Class of creditors requires the affirmative vote of two-thirds in amount and a majority in number of the Allowed |

---

[1]     Capitalized terms not otherwise defined in this Disclosure Statement have the meanings ascribed to them in the Plan. The Plan, once confirmed, is the legally binding document regarding the treatment of Claims and Interests and the terms and conditions of the Debtor's reorganization. Accordingly, to the extent that there is any inconsistency between the terms contained herein and those contained in the Plan, the terms of the Plan will govern.

Claims actually voted in such Class.

Generally, only entities that hold Allowed Claims in the Classes designated as impaired under the Plan and that are to receive or retain assets under the Plan on account of their Allowed Claims are entitled to vote.

If any impaired Class votes to reject the Plan, the Court nevertheless may confirm the Plan if the "cramdown" requirements of Bankruptcy Code section 1129(b) are satisfied with respect to such Class, provided that the other requirements for confirmation under Bankruptcy Code section 1129 have been satisfied.

| | |
|---|---|
| Voting Information: | If you are entitled to vote, you should have received a Ballot with this Disclosure Statement.  After completing and signing your Ballot, you should return it to: |

> American Pacific Financial Corporation Ballot
> c/o Kaaran Thomas, Esq.
> McDonald Carano Wilson LLP
> P.O.Box 2670
> Reno, NV 89505-2670

For your Ballot to be counted, McDonald Carano Wilson LLP must receive it no later than 12:00 p.m. Pacific Time on [date].

| | |
|---|---|
| Confirmation Hearing: | The Confirmation Hearing will be held on [date], at [time] (Pacific time).  The Confirmation Hearing may be continued from time to time without further notice. |
| Treatment of Claims and Interests: | The treatment that creditors and shareholders will receive if the Court confirms the Plan is set forth in the Plan and summarized in Section X.B of this Disclosure Statement.  The terms of the Plan are controlling, and all creditors, shareholders and interested parties are urged to read the Plan in its entirety. |
| The Effective Date: | The Plan's Effective Date will be the first Business Day on which all of the conditions set forth in Section IX of the Plan have been satisfied or waived in accordance with the Plan. |
| Questions: | All inquiries about the Plan and Disclosure Statement should be in writing and should be sent to: Kaaran Thomas, McDonald Carano Wilson LLP, PO Box 2670, Reno, NV 89505-2670; Telephone: 775-788-2000; Email: kthomas@mcdonaldcarano.com |
| IMPORTANT NOTICE: | THE PLAN, DISCLOSURE STATEMENT, AND BALLOTS CONTAIN IMPORTANT INFORMATION THAT IS NOT |

INCLUDED IN THIS SUMMARY.  THAT INFORMATION COULD MATERIALLY AFFECT YOUR RIGHTS.  YOU SHOULD THEREFORE READ THE PLAN, DISCLOSURE STATEMENT, AND BALLOTS IN THEIR ENTIRETY.  YOU ALSO SHOULD CONSULT WITH YOUR LEGAL AND FINANCIAL ADVISORS BEFORE VOTING ON THE PLAN.

## I.

### INTRODUCTION AND PLAN OVERVIEW

When this bankruptcy case (the "Case") commenced on September 21, 2010, American Pacific Financial Corporation (the "Debtor" or "APFC") faced a series of challenges to the continued development and viability of its business (the "Business").  This summary describes these challenges, how the Debtor has addressed them during the pendency of the Case and, most importantly, how the Plan proposed by the Debtor will liquidate its business in a way that maximizes the potential recovery to creditors.  This summary should be read in conjunction with the remainder of the Disclosure Statement, which provides further detail regarding the Plan.  This summary is qualified by the express terms of the Plan.

    A.    Challenges Faced by the Debtor and the Business

        1.    Description of the Business.

The Business of APFC is working to protect, manage, and add value to debt and equity investments.  APFC's assets include loans and investments in distressed properties, development projects, real estate, and other types of operating companies in various industries.

APFC added value to its acquisitions by actively managing the assets to maximize the return on investment, however, because of the nature of its assets, APFC has been heavily impacted by this recession and lack of liquidity in the economy.

Before the Case commenced, the Debtor's primary business was asset management, consulting, and development of assets for equity growth and mezzanine financing.

By the time the Case commenced, the Debtor had experienced losses from many of the assets and was unable to liquidate and/or further develop the assets.

    2.    <u>Debtor's Obligations to Creditors</u>.

Before and after the commencement of the Case, the Debtor continued its efforts to resolve each of the above problems. Shortly after the filing of the Case, the Debtor obtained a line of credit for up to $100,000.00. The lender is American Pacific Management Corporation, Debtor's affiliate. This unsecured line of credit provided the Debtor with funds to pay the administrative expenses of the estate, thereby avoiding irreparable harm to the Business.

    3.    <u>Reasons for Financial Difficulties</u>.

Debtor's business, investment in distressed assets, was severely impacted by the recession. Lack of liquidity, decreased consumer spending and increased risk of business failure affected Debtor's ability to reorganize and turnaround its investments.

In short, Debtor's cash flow shortage impacted its ability to pay its creditors.

- Many assets became non-performing and did not contribute to cash flow.

- Assets scheduled to be sold became non-liquid because of the economic downturn and unavailability of purchaser funding.

The Plan is the culmination of the Debtor's efforts to provide for a fair resolution of the various problems facing the Debtor and the Business. By its terms, the Plan transfers all unsecured creditors' claims and all Debtor's and Estate's Property to a Liquidating Trust. Trust Assets will be liquidated and proceeds paid to the Trust Beneficiaries (Classes 1-5).

The Plan is the product of negotiation among the Debtor and its Creditors' Committee. The Debtor believes that the Plan provides creditors with the most value that can reasonably be obtained under the circumstances.

B.    <u>Resolution of Problems Under the Plan</u>

The Plan is a liquidating plan that transfers all Debtor's assets to a Trust. However, the plan provides for assumption and assignment of the Management Agreement so that Debtor's principals can continue to maintain books and records and provide consulting services for a flat fee of $12,000 per month. The Trustee can cancel the Management Agreement on 60 days notice.

C.    The Treatment of Creditors

*Secured Creditors.*  Secured creditors may also receive treatment, at the Debtor's election, that does not impair the rights of such secured creditors.  This could include the turnover of the secured creditors' collateral.

*Priority Creditors.*  Priority Creditors will be paid in cash, or equivalents, as otherwise agreed, on the Effective Date.

*General Unsecured Creditors.*  General unsecured creditors are divided into two classes. Class 4 is an "administrative convenience" class, consisting of small claims ($5,000.00 or less). Class 4 will receive a cash payment of fifty per cent (50%) of their claims out of the first Trust distribution after Administrative Claims and Class 1 and 2 Claims are paid in full.

The remaining creditors (Class 3) will receive beneficial interests in a Creditor's Trust which will entitle them to the Net Sale Proceeds of the Trust Assets.  The Trustee, and will be responsible for funding the costs and expenses of the Trust, including Trustee compensation and expense reimbursement, from Trust Assets.

The following chart summarizes the treatment of claims under the Plan and in a hypothetical liquidation if the parties are unable to reach a settlement of their respective claims:

| Type of Creditors Total claims | What Creditors Can Expect to Receive Under the Plan | What Creditors Will Likely Receive a Liquidation |
|---|---|---|
| Holders of Secured Claims in Class 1 $1,395,283.47 | • Collateral or the value thereof | • Return of collateral or the value thereof |
| Holders of Priority Claims $11,000.00 | • Payment in full without interest | • Payment in full |
| Holders of Claims $5,000 or less $37,315.16 | • Payment of 50% of claim in cash from first distribution after Administrative and Class 1 and 2. | • A Pro Rata share of: Liquidation of Debtor's assets after payment of Trustee's fees and expenses |

5

| Holders of General Unsecured Claims $159,508,939.65 | • Paid pro rata from Trust Assets | • A Pro Rata share of: Assets sold at liquidation prices |
|---|---|---|

The Debtor urges you to read this document carefully, and to support the Plan.

## II.

## INFORMATION REGARDING THE CHAPTER 11 CASE

The Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") on September 21, 2010 (the "Petition Date"), thereby commencing the Case.    The Case is pending before the United States Bankruptcy Court, District of Nevada (the "Court") under case number 10-27855.    Pursuant to Bankruptcy Code Sections 1107 and 1108, the Debtor is operating its businesses and managing its affairs as a Debtor and Debtor in Possession.

The Debtor is a proponent of the "Chapter 11 Plan of Liquidation Proposed by American Pacific Financial Corporation (Dated April 1, 2011)" (the "Plan") that is attached to this Disclosure Statement as Exhibit 1.  THE DOCUMENT THAT YOU ARE READING IS THE DISCLOSURE STATEMENT FOR THE ACCOMPANYING PLAN.  The Plan sets forth the manner in which the Claims against, and Interests in, the Debtor will be treated following the Debtor's emergence from chapter 11.  This Disclosure Statement describes certain aspects of the Plan, the Debtor's current and future business operations and other related matters.    Under the Plan, APFC will cease doing business and transfer all of its assets to the Trust on and after the Effective Date.    The Plan is intended to be a liquidation within the meaning of Section 368(a) of the Internal Revenue Code of 1986, as amended (the "Tax Code"). The Trust is a Liquidating Trust within the meaning of the Tax Code.

FOR A COMPLETE UNDERSTANDING OF THE PLAN, YOU SHOULD READ THIS DISCLOSURE STATEMENT, THE PLAN, AND THE EXHIBITS TO BOTH DOCUMENTS IN THEIR ENTIRETY.

This Disclosure Statement sets forth the assumptions underlying the Plan, describes the process that the Court will follow when determining whether to confirm the Plan, and describes how the Plan will be implemented if it is confirmed by the Court. Bankruptcy Code section 1125 requires that a disclosure statement contain "adequate information" concerning a plan of reorganization. 11 U.S.C. § 1125(a). The Court has [not] approved the form of this document as an adequate Disclosure Statement that contains adequate information to enable entities affected by the Plan to make an informed judgment when deciding whether to vote to accept or to reject the Plan. The Court's approval of the adequacy of this Disclosure Statement, however, does not constitute a determination by the Court with respect to the fairness or the merits of the Plan or the accuracy or completeness of the information contained in the Plan or Disclosure Statement.

THE COURT HAS NOT YET CONFIRMED THE PLAN DESCRIBED IN THIS DISCLOSURE STATEMENT. THEREFORE, THE PLAN'S TERMS ARE NOT YET BINDING ON ANYONE. IF THE COURT LATER CONFIRMS THE PLAN AND THE EFFECTIVE DATE OCCURS, THEN THE PLAN WILL BE BINDING ON THE DEBTOR AND ON ALL PARTIES IN INTEREST IN THESE CASES, INCLUDING CREDITORS AND INTEREST HOLDERS OF THE DEBTOR.

The Debtor believes that the Plan provides, under the circumstances, the best possible recoveries to creditors and that acceptance of the Plan is in the best interests of all parties in interest. They therefore recommend that all eligible creditors entitled to vote to accept or reject the Plan cast their Ballots to accept the Plan.

### III.

### GENERAL DISCLAIMERS AND INFORMATION

Please carefully read this document and the exhibits to this document. These documents explain who is entitled to vote to accept or reject the Plan, who may object to confirmation of the Plan, and the treatment that creditors and shareholders can expect to receive if the Court confirms the Plan. The Disclosure Statement also describes the history of the Debtor, the events precipitating the Case, events in the Case, the effect of Plan confirmation, and some of the issues the Court may

consider in deciding whether to confirm the Plan. It also analyzes the Plan's feasibility and how your treatment under the Plan compares to your hypothetical treatment under a chapter 7 liquidation. The statements and information contained in the Plan and Disclosure Statement, however, do not constitute financial or legal advice. You should therefore consult your own advisors if you have questions about the impact of the Plan on your Claims.

The financial information contained in the Plan and Disclosure Statement was prepared by the Debtor from information in their books and records and is the sole responsibility of the Debtor. The Debtor's professionals prepared the Plan and Disclosure Statement at the direction of, and with the review, input, and assistance of, the Debtor's management. The Debtor's professionals have not independently verified this information.

The statements and information that concern the Debtor set forth in this document constitute the only statements and information that the Court has approved for the purpose of soliciting votes to accept or reject the Plan. Therefore, no statements or information that are inconsistent with anything contained in this Disclosure Statement are authorized for the purpose of soliciting votes to accept or reject the Plan unless otherwise ordered by the Court.

You may not rely on the Plan and Disclosure Statement for any purpose other than to determine whether to vote to accept or reject the Plan. Nothing contained in the Plan or Disclosure Statement constitutes an admission of any fact or liability by any party, or may be deemed to constitute evidence of, the tax or other legal effects that the reorganization set forth in the Plan may have on entities holding Claims or Interests.

Unless another time is expressly specified in this Disclosure Statement, all statements contained in this document are made as of July 31, 2010, Debtor's fiscal year end. Under no circumstances will the delivery of this Disclosure Statement, or the exchange of any rights made in connection with the Plan, create an implication or representation that there has been no subsequent change in the information included in this document. The Debtor assumes no duty to update or supplement any of the information contained in this document, and they do not intend to undertake any such update or supplement.

CAUTIONARY STATEMENT:  Some statements in this document may constitute forward-looking statements within the meaning of the Securities Act of 1933 (as amended, the "Securities Act") and the Securities Exchange Act of 1934 (as amended, the "Exchange Act").  Such statements are based upon information available when the statements were made and are subject to risks and uncertainties that could cause actual results materially to differ from those expressed in the statements.  Neither the Securities and Exchange Commission (the "SEC") nor any state securities commission has approved or disapproved the Disclosure Statement, the Plan, or any Exhibits to either document.

**IV.**

**WHO MAY VOTE TO ACCEPT OR REJECT THE PLAN**

What follows in this Section IV is a general discussion of the rules governing the treatment and satisfaction of claims and equity interests under a plan of reorganization proposed under the Bankruptcy Code.  Where a particular word (such as "Debtor") or term (such as "Allowed Claim") is capitalized in this Disclosure Statement, and not otherwise defined herein, that word or phrase has the meaning provided in Section I (Definitions) of the Plan.  Where, however, a particular word (such as "debtor") or phrase (such as "allowed claim") is not capitalized in this Disclosure Statement, that word or phrase is not intended to refer to the definitions provided in Section I of the Plan, but rather, the word or phrase is intended to have the general meaning ascribed to it.

Generally, to vote to accept or reject the Plan, your Claim must be: (a) an impaired Claim; (b) neither a Disputed Claim nor a Disallowed Claim; and (c) entitled to receive or retain some value under the Plan.  Holders of unimpaired Claims are deemed to have accepted the Plan and do not vote, though they may object to Plan confirmation to the extent they otherwise have standing to do so.  Holders of Claims and/or Interests that do not receive or retain any value under the Plan are deemed to reject the Plan.  As defined by the Bankruptcy Code, a claim generally includes all rights to payment from a debtor, as opposed to an interest which generally represents an ownership stake in a debtor.

### A.    Allowed Claims

With the exceptions explained below, under the Bankruptcy Code, a claim generally is allowed only if a proof of the claim is properly filed before any applicable bar date, and either no party in interest has objected to, or the Court has entered an order allowing, the claim.[2] Under certain circumstances a creditor may have an allowed claim even if a proof of claim was not filed and the applicable bar date for filing a proof of claim has passed.  For example, a claim may be deemed allowed if the claim is listed on a debtor's schedules of liabilities and is not scheduled as disputed, contingent, or unliquidated.

A Claim must be an Allowed Claim for purposes of voting for the holder of such Claim to have the right to vote to accept or reject the Plan.  Generally, for voting purposes, a Claim is deemed Allowed to the extent that:  (a) either (1) a proof of Claim was timely filed; or (2) a proof of Claim is deemed timely filed either under Bankruptcy Rule 3003(b) or by a Final Order; and (b) either (1) the Claim is neither a Disputed Claim nor a Disallowed Claim, or (2) the Claim is allowed either by a Final Order or under the Plan.

Under the Plan, an entity whose Claim is subject to an objection is not eligible to vote to accept or reject the Plan unless that objection has been resolved in the entity's favor prior to the Ballot Deadline, or, after notice and a hearing under Bankruptcy Rule 3018(a), the Court temporarily allows the entity's Claim for the purpose of voting to accept or reject the Plan.  Any entity that seeks temporary allowance of its Claim for voting purposes must promptly file an appropriate motion and take the steps necessary to arrange an appropriate and timely hearing with the Court no later than seven (7) days prior to the Ballot Deadline (i.e., no later than [date]).

### B.    Impaired Claims and Interests

Generally speaking, under the Bankruptcy Code, a class of claims or interests is impaired if the plan alters the legal, equitable, or contractual rights of the members of the class, even if the alteration is beneficial to the creditors or interest holders.  A plan's failure to provide a creditor with

---

[2]    *See* the Notice of Approval of Disclosure Statement and Deadlines Relating to Plan for specific information regarding the bar dates established in these Cases.

an accelerated payment pursuant to a contract provision that entitles a creditor to accelerated payment upon default, however, does not necessarily render such creditor's claim impaired, even if the debtor defaulted.  Instead, the claim is deemed unimpaired if, for example, the plan cures the default, reinstates the maturity of the claim as it existed before the default, and compensates the creditor for any damages incurred as a result of reasonable reliance upon the acceleration provision. Section X.B of this Disclosure Statement and Section III of the Plan set forth a summary of the classification of all Claims and Interests under the Plan and whether or not they are impaired.

V.

**VOTES NECESSARY TO CONFIRM THE PLAN**

Under the Bankruptcy Code, impaired claims or interests are placed in classes under a plan, and each class must accept (or reject) that plan as a class.  Certain types of claims are considered unimpaired and are not classified because the Bankruptcy Code requires that they be treated a specific way.

Under the Bankruptcy Code, a Court may confirm a plan if at least one class of impaired claims has voted to accept that plan (for this purpose, without counting the votes of any insiders whose claims are classified within that class) and if certain statutory requirements are met both as to any non-consenting members within a consenting class and as to any dissenting classes.  A class of claims has accepted the plan only when at least a majority in number and at least two-thirds in amount of the allowed claims actually voting in that class vote to accept the plan.  A class of interests has accepted the plan only when at least two-thirds in amount of the allowed interests actually voting in that class vote to accept the plan.

Even if the Debtor receives the requisite number of votes to confirm the proposed Plan, the Plan will not become binding unless and until, among other things, the Court makes an independent determination that confirmation is appropriate.  This determination will be the subject of the Confirmation Hearing.  Also, even if only one Class of the Debtor's creditors votes to accept the Plan, the Plan nonetheless may be confirmed if the dissenting Classes (and non-consenting members within a consenting Class) are treated in a manner prescribed by the Bankruptcy Code.  The Plan

contains mechanisms providing alternative treatment to certain Classes in the event that certain Classes reject the Plan in order to ensure that the Plan may nevertheless be confirmed.

## VI.

### INFORMATION REGARDING VOTING IN THE CASE

The Debtor believes that the Classes designated as "impaired" in Section IV.B of the Plan are impaired pursuant to Bankruptcy Code section 1124. If the holders of Claims in these Classes are to receive or retain assets under the Plan on account of their Claims, then the holders of such Claims are entitled to vote to accept or reject the Plan except to the extent such holders hold Disputed Claims (unless their Claims are temporarily allowed for voting), or Disallowed Claims. If the holders of Claims in these Classes are not entitled to receive or retain assets under the Plan on account of their claims, then the holders of such Claims are not entitled to vote as a matter of law.

The Debtor believes that the Classes designated as "unimpaired" in the Plan are unimpaired pursuant to Bankruptcy Code section 1124. The holders of Claims and Interests in these Classes are not entitled to vote.

In addition to the foregoing Classes, entities holding Administrative Claims and Priority Tax Claims are not classified and are not entitled to vote to accept or reject the Plan.

Any party that disputes the Debtor's characterization of its Claim as unimpaired may request a finding of impairment from the Court to obtain the right to vote, but such party must promptly take action to request such a finding and arrange for the Court to hold a hearing and adjudicate such request no later than seven (7) days prior to the Ballot Deadline (i.e., no later than [date]).

In voting to accept or reject the Plan, use only the Ballot sent to you with this Disclosure Statement, and carefully read the voting instructions on the Ballot for an explanation of the applicable voting procedures and deadlines. If, after reviewing this Disclosure Statement, you believe that you hold an impaired Claim or Interest and that you are entitled to vote to accept or reject the Plan but you did not receive a Ballot, you did not receive the correct Ballot, or your Ballot is damaged or lost, please send a written request for a Ballot to the Ballot Tabulator at the following address:

Kaaran Thomas, Esq.
McDonald Carano Wilson LLP
PO Box 2670
Reno NV 89505

If you wish to vote to accept or reject the Plan, your Ballot must be received by the Ballot Tabulator, at the address listed above, no later than [time] Pacific Time, on [date].  If your Ballot is not timely received by the Ballot Tabulator, it will not be counted.  Ballots must be provided to the Ballot Tabulator by mail, overnight delivery or messenger.  Ballots sent by e-mail or facsimile will not be accepted by the Ballot Tabulator and will not be counted in tabulating votes accepting or rejecting the Plan.

If your Claim is a Disputed Claim and you wish to vote to accept or reject the Plan, you will be required to move the Court to temporarily allow your Claim or Interest for voting purposes and take the steps necessary to arrange an appropriate and timely hearing with the Court no later than seven (7) days prior to the Ballot Deadline.

Any interested party desiring further information with respect to the Plan, or seeking additional copies of this document, should contact in writing the following:

Kaaran Thomas, Esq.
McDonald Carano Wilson LLP
PO Box 2670
Reno NV 89505
Email: kthomas@mcdonaldcarano.com
Telephone: 775-788-2000

The cost of additional copies must be paid by the person ordering them.  Alternatively, all pleadings and other papers filed in the Case may be obtained for a fee by accessing the Court's PACER system through the website of the United States Court for the District of Nevada (http://www.nvb.uscourts.gov), or for free by accessing the website maintained by Debtor's counsel (http://www.mcdonaldcarano.com).

## VII.

## CRAMDOWN: TREATMENT OF NON-CONSENTING CLASSES

Even if only one class consents to the proposed treatment in that class under a plan, that plan

nonetheless may be confirmed if the dissenting classes are treated in the manner prescribed by the Bankruptcy Code. The process by which a dissenting class is forced to abide by the terms of a plan is commonly referred to as "cram-down." The Bankruptcy Code allows a dissenting class to be crammed down if the plan does not "discriminate unfairly" and is "fair and equitable." The Bankruptcy Code does not define unfair discrimination, but it does set forth certain minimum requirements for "fair and equitable" treatment. For a class of secured claims, "fair and equitable" can mean that the secured claimants retain their liens and receive deferred cash payments, the present value of which equals the value of their interests in collateral. For a class of unsecured claims, a plan is fair and equitable if the claims in that class receive value equal to the allowed amount of the claims, or, if the unsecured claims are not fully satisfied, no claims or interests that are junior to such claims receive or retain anything under the plan. Accordingly, if a class of unsecured claims rejects a plan under which a junior class (e.g., a class of interest holders) will receive or retain any assets under the plan, the plan generally cannot be confirmed unless the plan provides that the dissenting class of unsecured creditors receives value equal to the allowed amount of the claims in that class.[3]

## VIII.

## WHO MAY OBJECT TO PLAN CONFIRMATION

A hearing has been scheduled for [Date] at [Time] (Pacific time) at the United States Bankruptcy Court, for the District of Nevada, 300 Las Vegas Boulevard South, 3rd Floor, Courtroom 3, Las Vegas, Nevada 89101, to determine whether the Court will confirm the Plan. If, after tabulating the Ballots, it appears that entities holding a sufficient number and amount of Claims have voted to accept the Plan, the Debtor will file a memorandum of points and authorities supporting the entry of the Confirmation Order. This memorandum will be served on the U.S. Trustee, counsel for the DIP Lender, all entities that have requested special notice in the Cases, and all parties that have timely objected to confirmation of the Plan.

---

[3]     This paragraph does not purport to explain fully the applicable statutes or case law, which are complex.

Any party in interest in the Case—including any creditor or shareholder that voted (or was deemed to have voted) to accept or reject the Plan—may File an objection to confirmation of the Plan assuming such party has standing to do so.  Any such objection must be Filed and served on the Debtor and its counsel; the U.S. Trustee; and counsel for the DIP Lender, by [date], at [time] (Pacific Time).  If you fail to properly and timely File an objection to Plan confirmation, you may be deemed to have consented to the Plan's confirmation.  If you wish to obtain more information, you should contact Ms. Thomas at the address above.

## IX.

## BACKGROUND ON THE DEBTOR, ITS BUSINESS, EVENTS PRECIPITATING ITS BANKRUPTCY FILING, AND SIGNIFICANT EVENTS IN THE CASE

A.    Description and History of the Debtor's Business and Management

The Debtor was originally a sole proprietorship (1974) that was founded with Larry Polhill personal and immediate family funds.  Debtor's predecessor's initial purpose was to acquire property in California.  The sole proprietorship became a General Partnership with a sponsoring licensed broker in 1977.  However, this general partnership lasted only until mid 1978, when the assets were contributed to a shell company incorporated in as a California corporation, originally known as B,G& K Industries Inc.

Larry Polhill was the first and only operating President of the Debtor in all its forms since it was activated.  He was the founder of the predecessor organizations, the final ultimate decision maker and primary responsible party, Broker, Officer and Director of the corporation during its entire existence.

During its early years, Debtor was a traditional real estate brokerage business.  It was a multi-branch franchised real estate operation with five (5) Realty World sales offices serving the immediate market area.  Debtor acquired real property, using the funds of Mr. Polhill and his family and funds from other personal acquaintances, most of whom have remained as Debtor's creditors throughout the years.  Some of these projects were joint ventures between the Debtor and Mr. Polhill and third parties.

Debtor's participation in projects grew and compounded over the next 30 plus years.   Most often, Debtor reallocated proceeds from the sale of an asset and committed those assets to the next project.   Debtor communicated with its creditors about the status of its various projects through monthly newsletters.   Debtor collected management fees, commissions, referral fees, rents and of course, profits and participations from the sale and often the refinance of the assets.   Debtor's investment in projects took various forms, from fee simple tenant-in-common agreements or participating loans.   In the 1980's Debtor began forming partnerships with third parties, primarily to purchase, improve, develop and manage larger real estate projects like multi-family residential units, land and commercial property.

In the early 1990's Debtor began using "Limited Liability Single Purpose Entities".   These were often dictated by the senior lenders on acquired projects, who wanted to protect their collateral from claims of Debtor's general creditors.       During the 1990's Debtor expanded its investment strategy to include the acquisition of distressed assets and companies such as trucking, snack food, real estate and franchising.

Mr. Polhill, Debtor's president, made the final decision as to the corporation's investments. He learned of investment opportunities largely from industry research and referrals and from cultivating relationships with asset managers, bankruptcy trustees, bankers and life insurance company portfolio managers.   In several instances, the Debtor acquired controlling interests in operating companies with the ultimate goal of acquiring the  underlying real estate.   These types of acquisitions were intended to mitigate risk and provide upside to cover any funds advanced or pledged.

Mr. Polhill's goal in all acquisitions was to limit the corporation's risk to its investment. Debtor would not agree to guaranty obligations to commercial lenders who financed its projects. The project finance was arranged through the acquired company, and if the project lenders acquired guarantees Mr. Polhill served as guarantor.

Debtor added value to its investments by hiring management teams from the acquired companies.   These teams managed the real estate assets and maintained the structures in good order

for eventual re-sale, while contributing cash flow during the holding period.   During the period prior to mid-2007, Debtor's management strategies resulted in a return to its creditors of 9 to 25% per annum.   For example, Debtor purchased a foreclosed commercial office building known as the Cooley building in Colton, CA, in 2002 for $1,150,000.00.  Debtor used existing managers, which Mr. Polhill supervised, and a new marketing strategy, which Mr. Polhill developed, to update the office building.  The building was sold in 2004 for $2,325,000.00. The senior debt was guaranteed by Mr. Polhill in this and most cases.

The Debtor hired staff to assist Mr. Polhill and Ms. Donegan in administrative functions. Staff consisted of full time and part-time, permanent and temporary employees.    Very often the staff was project specific.   The staff maintained records and communicated with partners and clients.

Debtor's original shareholders were Larry R. Polhill, his father (deceased) and mother, brother and seven other relatives and friends.  Prior to the double-digit inflation of the late 1970's and early 1980's the initial value of the shareholders' investment was set at $142,600.00.  During the initial period, Polhill held a minority position in the Debtor.    In the 1980's Mr. Brad Crandall acquired a minority interest in the company.   The other shareholders were bought out during the period from 1977 to 1990 so that Mr. Polhill and Mr. Crandall each owned fifty per cent (50%) of the Debtor.    In 1997, Mr. Crandall moved from California to Colorado and to oversee the development of Realty Information Systems, Inc. (RIS) AKA Help-U-Sell Real Estate and other assets the Debtor had acquired which were located in Colorado.   His involvement and focus in Debtor diminished following the move.  Over the next few years the relationship between Mr. Crandall and Mr. Polhill became strained.   The two shareholders differed on the opinions of how to manage the Debtor.  These differences were especially contentious with regard to RIS, and came to a head when a former Help U Sell franchisee filed an involuntary bankruptcy proceeding against RIS in the District of Nevada in March of 2008 (Bk. No. 08-50463-gwz).

Debtor used its secured loan to RIS to facilitate the acquisition of RIS's assets by Infinium Real Estate Group ("Infinium") (see the relative agreements at docket no 424]. The Infinium

acquisition was financed in part by Debtor, who took a lien on all of Infinium's assets.  The Infinium acquisition was accompanied by termination or rejection of a number of regional and area franchise agreements with franchisees.  A business strategy in which Mr. Crandall disagreed with.  Mr. Polhill supported the termination of these agreements and did all of the bidders.   This difference, together with a number of issues personally and professionally over the years, led to an agreement between them for Mr. Crandall to sell his stock in the Debtor back to the Debtor.  The two shareholders arrived at a formal agreement on or about August 1, 2008.  The agreement left Mr. Polhill as the sole shareholder.  Mr. Polhill's family LLC also acquired substantially all of Crandall's assets in which Crandall and Mr. Polhill that had any common interest, in exchange for notes and other consideration.

The Debtor has consolidated many of the previously funded affiliates to mitigate and reduce continued overhead and preserve the rights of any underlying assets for the benefit of the estate.  For example:  AMPAC Capital Solutions LLC was consolidated into the debtor, assuming its assets and liabilities   The consolidation resulted in an increase of Debtor's direct (as opposed to contingent) liabilities in an attempt to mitigate costs and simplify this process.

<u>The Debtor's Current and Future Management</u>.

The following individuals currently manage the Debtor and will constitute the officers and Director of Debtor following Confirmation of the Plan:

- *Larry Polhill*, President, Director

President and Founder of American Pacific Financial Corporation, Mr. Polhill has a background in finance, tax planning, real estate, real estate franchising, investment analysis, and insurance.  He is constantly searching for new opportunities.  Often he has been able to capitalize on relationships built over the 30 plus years in business to assist other institutions with distressed assets.  Mr. Polhill has personal knowledge in the areas of Individual Retirement Accounts (IRAs), pension and profit sharing retirement account establishment and maintenance.  He has been involved in the restructuring of many projects and businesses over the years.  Through his  experience in real estate development, brokerage and investment, as well as enterprise or operating company development,

Mr. Polhill has been directly involved in the organization of and served on the board of directors of several California Thrift and Loan holding and operating companies. Those included the Channel Isle Bancorp, Santa Barbara Thrift and Loan, and Golden Empire Bancorp that were sold in the late 1980s to a larger institution.

In 1973 he made his home in California, where he continued his work in insurance and finance. A native of Illinois, Mr. Polhill studied insurance, business and real estate law, aviation and tax planning. While working as a Loss Control Specialist/OSHA Compliance Inspector for Kemper Insurance Group in Los Angeles and previously a similar position at the Crum and Forester Group Inc. He is also licensed real estate professional, with the professional GRI designation and is a licensed commercial pilot.

Mr. Polhill lead the acquisition, consolidation and/or turn of several food processors, growers and packagers since that time. He was involved in the process manufacturing of a complete line of bakery and salty snack items which will include the Salerno cookie brand. At the time, it was the 2nd largest in market share of the Chicago region, second only to Nabisco. Today he serves on the board of directors of several such companies.

Mr. Polhill was a director and was involved in the acquisition of, capital formation and turn-around of Realty Information Systems Inc., the franchisor of Help U Sell® Real Estate, a leader in the fee for service real estate brokerage space. Prior to the economic down turn, this entity was capturing significant market share in the industry and sold billions of dollars of single family residences through 2007. Polhill also serves as a member of several not-for-profit and charitable organizations at this time.

From January 1, 2008 to the present, Larry R. Polhill has not received a salary from the Debtor, and the plan does not include a salary for him in the future. Mr. Polhill has a priority claim for $11,000.00 representing unpaid wages incurred within 180 days before the Petition Date.

Mr. Polhill is a member of the Board of Directors for: (a) Inventure Foods, Inc. (NASDAQ: "SNAK"); (b) Café Valley, Inc., an Arizona corporation; and (c) other affiliated companies of the Debtor.

- *Marilyn Donegan*, Vice President

As Vice President, Marilyn R. Donegan coordinates company procedures. She is responsible for overseeing and directing administrative functions, including employee training and development, client relations and services, public relations, and data processing.  Additional responsibilities include accounting functions, editing the newsletter and other marketing information, budgeting, forecasting, and cost feasibility studies.

Following a career in instruction and supervision at the high school and college level Ms. Donegan entered the business field.  She is a California real estate broker.  She has been a free lance writer for Booklist, a library association publication.  She graduated magna cum laude with a Bachelor of Arts degree from the University of Dubuque, Dubuque, Iowa, where her concentrations were mathematics and chemistry.  Ms. Donegan received a Master of Science Degree from the University of Wisconsin, Madison, Wisconsin, with a major in mathematics education and a Master of Business Degree from the University of Redlands, Redlands, California.

Ms. Donegan receives compensation only through AmPac Tri-State CDC for services to the CDC as well as the Debtor per the previously mentioned contract.  Ms. Donegan is the Vice President of the Debtor, and a Vice President of American Pacific Capital Partners, Inc.   Ms Donegan receives no compensation in the above role.   She is not an employee of, and receives o compensation from, the Debtor.

On the Effective Date, Debtor will transfer its assets to the Trust and will cease to exist.  The Trust will be managed by a Trustee selected by the Creditors' Committee and will have the ability to retain and pay for the services of Mr. Polhill and Ms. Donegan under a management agreement.

<u>Management Agreement</u>

Debtor's Management Agreement dated August 1, 2010 was entered into between the Debtor and AMPAC Tri State CDC (Community Development Corporation, a CA Not For Profit IRC501(c)(3)).   This was done as part of an effort to further reduce the overhead of the Debtor and eliminate California payroll. Mr. Polhill, Ms. Donegan and Ms. Jean Aranda ceased their employment with the Debtor and became employees of AMPAC in an effort to avoid California

payroll taxes and other employment restrictions which encumbered Debtor. The Agreement requires AmPac Tri State CDC to provide the services of those two employees and their knowledge of the files to Debtor as needed and able,  plus office rent, storage and copier services and miscellaneous overhead for a monthly flat fee of $12,000.00.   The elements that make up the fee have been provided to the Creditors Committee upon their request.

Debtor's plan offers the Liquidating Trust the ability to continue this agreement, however, the agreement may be terminated upon 60 days notice.   The Trustee will be in full control of any termination decision.

<u>Affiliated or Related Entities and Their Claims</u>

a)      AmPac Management Corporation, a NV corporation ("APMC"); formed in 2008. Officer and Director:  Larry Polhill.  Originally as part of the plans to change or move operational domicile of the Debtor and affiliates out of the state of California.  APMC is one of the General Partners of American Pacific Advisors, GP.  It is a service entity and is approved in these proceedings to provide and hold DIP financing provided for the Debtor.

b)      American Pacific Financial Group, LP, a California limited partnership ("APFG"); formed in 1989.  The General Partner is:  American Pacific Advisors, a California General Partnership.  The limited partners of APFG are various individuals and entities who hold limited partnership units either personally or in self-directed IRA Trustee accounts.   The majority of the IRA Accounts are held at either IRA Services, Inc. or Lincoln Trust Company, successor in interest to First Trust Corporation and later FISERV Corporation.

APFG has filed a Claim of $30,516,500.00 (Proof of Claim dated 1/31/2011) representing the balance due to the fund which were made to or guaranteed by Debtor since APFG's inception.  The loan is represented by a note.  Several of the people who are holders of interests of APFG have erroneously filed claims in the Debtor's case, which are duplicates of the claims filed by APFG.

Nature of Business:    Working Capital financing

Relationship to Debtor:        Creditor

c)        American Pacific Financial Group II, LP, a Colorado limited partnership

(APFGII"); formed in 1992.   The General Partner is:   American Pacific Advisors, a California General Partnership.  The limited partners of APFG II are various individuals and entities who hold limited partnership units either personally or in self-directed IRA Trustee accounts.     The majority of the IRA Accounts are held at either IRA Services, Inc. or Lincoln Trust Company.

APFG II filed a Claim of $21,227,500.00 (Proof of Claim dated 1/31/2011) representing the balance due on loans which were made to or guaranteed by Debtor since APFG's inception.  The loan is represented by a note.  Several of the people who are holders of interests of  APFGII have erroneously filed claims in the Debtor's case, which are duplicates of the claims filed by APFGII.

Nature of Business:    working capital financing

Relationship to Debtor:        Creditor

d)        American Pacific Venture Fund, Ltd. , NV limited partnership ("APVF"); formed in 2004.  The General Partner is:  American Pacific Advisors, a CA General Partnership.  The limited partners of APVF are various individuals and entities who hold limited partnership units either personally or in self-directed IRA Trustee accounts.   The majority of the IRA 8Accounts are held at either IRA Services, Inc. or Lincoln Trust Company. APVF filed a Claim of $4,543,000.00 (Proof of Claim dated 1/31/2011) representing the balance due on loans which were made to or guaranteed by Debtor since APVF's inception.  The loan is represented by a note.  Several of the people who are holders of interests of   APVG have erroneously filed claims in the Debtor's case, which are duplicates of the claims filed by APVG.

Nature of Business:    venture and working capital financing

Relationship to Debtor:        Creditor

e)        American Pacific Advisors, General Partnership ("APA"); formed in 1987.

The General Partners are:  Larry R. Polhill and AmPac Management Corporation, a Nevada corporation.  APA is the General Partner for the limited partnerships described above – APFG, APFGII and APVF.

Nature of Business:  Serves as the GP of the LP.

Relationship to Debtor:    Debtor holds units in the LP's above as assets listed in Debtor's schedules.


f)    AMPAC Tri-State CDC, a California not-for-profit corporation formed in 2005. A SBA licensed 504 lender as a Community Development Company.

President and Chairman of the Board:  Larry R. Polhill

Executive Director:   Hilda J. Kennedy, Managing Director

Director:  Juanita Aranda

Director:  Irene Richardson

Director:  Nicole Bratley

Director:  Paul Leon

Director:  Ron McCoy


Purpose:  This is a 501(c)(3) corporation authorized to offer,  package and service 504 loans and other SBA programs for small business owners.  As a not-for-profit corporation, it has NO shareholders.


Current and Future Management of Debtor

Debtor is currently managed by President Larry R. Polhill, the sole shareholder.   Upon approval of the Plan, and upon the plans effective date, Debtor shall cease operations and transfer its assets to a trust.  The of the Creditors' Committee will select a person or persons serve as the initial trustee(s) with a board of advisors consisting of creditors.

23

It is the expectation that the Trust will incur no more than $12,000 monthly for operational expenses..  These funds shall be utilized pursuant to the terms and provisions of the Management Agreement with AmPac Tri-State CDC which will be assumed by the Debtor and assigned to the Trust.  The Management Agreement will to pay for the services of two employees, which will include employer contributions to Medicare and Social Security taxes, and related office expenses. The Management Agreement will provide for modification or termination by the Trustee upon written notice of not less than 60 days.

Description of the Debtor.

Debtor is a California Corporation with its principal executive office in Grand Terrace, California now.

B.    The Debtor's Pre-Petition Assets and Liabilities

1.    Introduction.

The Class 3 Creditors' claims are based upon promissory notes and property agreements, guarantees issued by the Debtor in exchange for monies contributed or rolled over from previous projects.  Since Debtor's incorporation Debtor has received approximately $156million from its current and PAST PAID OFF creditors (including a lot of recommitted funds) and has paid out approximately $123million  to them.  OF the current creditors of the Debtor, they contributed approximately $136million (including recommitted funds) of which $90million has been paid out over the years.

Debtor made regular quarterly distributions and payments to its creditors until December 31, 2007.  Beyond that time a small amount was paid out the first couple of quarters of 2008.  In many instances Debtor's creditors have received a return that is greater than the principal amount of their contributions.   As that year when on it as becoming more clear that anticipated sales and development of assets were less and less likely to happen.  That the market for development projects was dying.  At the time the Debtor ceased its distributions and payments it communicated this to the creditors by direct mail newsletter which was the practice of the business for many years. Many of the clients called the office and the status was explained one on one to them.   The future status of

the company was in question as we were not yet knowing the depth of the coming downturn in property values and the loss of market demand to sell projects into.   At the time Debtor ceased making payments it anticipated some downturn in the economy however, it did not anticipate the depth and length of the current down turn.  In its over thirty-five years of operations, the Debtor had weathered several typical less damaging yet painful recessions several times.  Debtor had assets under contract and in escrow at year-end 2007 that would have provided over $7mm in cash flow back to the Debtor and its clients to cover expected current obligations and the coming years operating overhead.   Debtor's affiliates such as RIS/Help-U-Sell Real Estate were generating revenue and fees to the debtor.   RIS alone produced royalty income of approximately $13.5mm in mid 2000's.   The Debtor participated in those proceeds by way of management fees, interest payments on funds advanced.  In the crash that organization has gone from a high of about 840 franchise office to about 140 today with the volume per store greatly reduced as well.

By the end of 2008, however, most of those sources of revenue had either ceased or were greatly diminished.  As the depth of the down turn continued with no end in sight Debtor continued to consolidate its assets and business to cut overhead and focus its limited revenue on the assets that could add value for the creditors.  Eliminating staff and consolidating into shared office space.

### 2.    Pre-Petition Assets.

The Debtor's Pre-Petition Assets are set forth on <u>Exhibit 2</u> attached hereto.   The assets consist of interests in partnership and other types of companies (the "<u>Interests</u>") and of several parcels of real property, including: vacant land in Hesperia, California; vacant land in Orange, Texas, vacant land in Apple Valley, California and two lots on Scotch Lane in Colton, California. All of the Interests are free and clear of liens. *See* <u>Exhibit 2</u>.  The Interests are difficult to value at this time because of the volatile market.

### 3.    Asset Values.

Debtor has listed all of its assets on its schedules and has explained the valuation methodology on Exhibit "F" to its schedules.  In the case of affiliates, operating losses would be posted and reflected in the K1's  Debtor asserts that any attempt to place a "fair market" or

"liquidation" value on these assets, with one notable exception, would be misleading.  The valuation difficulty is the reason Debtor's plan is a liquidating plan.  Debtor can only assure the best possible means of realizing the value from the assets, it cannot assure the result.  Many of these assets are dormant companies which may never return value for Debtor's creditors. Mr. Polhill did not follow a "wait and hope" philosophy when deciding how to manage and liquidate assets during the economic downturn.  Debtor shed projects that, in Mr. Polhill opinion, were unlikely to pay their holding costs in the long term based on current conditions and concentrated on projects where Mr. Polhill believed there would be a significant return.

Many of the lenders on Debtor's projects were taken over by the FDIC, consolidated, and/or closed.  The previous relationships were lost and credit lines previously available to Mr. Polhill, Debtor and Debtor's affiliates were terminated. Debtor is not liable for credit extended to the companies it acquired.  However, Mr. Polhill is liable for a significant number of these credit lines and loans by virtue of his personal guarantees.

As of the filing date (and probably as of the Effective Date of Debtor's plan, several of Debtor's assets are in bankruptcy, in default or in foreclosure.    Mr. Polhill continues to work with these assets to attempt to recover at least some value.  One of these assets is the proceeds from a lien securing Debtor in Possession Financing to Naturopathic Laboratories, international, Inc.  Debtor's motion for turnover of funds in that case is pending before this Court as Adversary 11-01026-BAM (American Pacific Financial Corporation vs.  Kenneth Silverman, Chapter 7 Trustee of the Estate of Naturopathic Laboratories International. Inc.).   The results of Debtor's continued efforts to recover are reported in the Monthly Operating Reports, we have received some payments post

Debtor was required to provide a "liquidation analysis" which is attached to its Disclosure Statement.  This analysis was prepared by Mr. Polhill based on his experience in the business. Debtor does not have funds to retain professional valuation experts and believes that since the assets will be turned over to creditors to manage and liquidate such an expense is not justified or required.

Mr. Polhill was also asked to provide his best opinion, based on his business judgment, of the potential "best case' values if the Debtor's assets are liquidated over time.  Mr. Polhill has estimated

that the best case scenario would be a recovery of approximately $67,500,000 if the forecasts are met.

The methodology used to arrive at the above valuations is simply a multiple of anticipated earnings and how that will impact the value of the assets    Debtor's most significant asset is its interest in Capital Foods, LLC.  Mr. Polhill provided extensive sworn testimony regarding Capital Foods in his 2004 examination.  The real estate holdings of Capital Foods, LLC 's subsidiaries was determined taking advantage of the New Markets Tax Credits at a 9% cap rate. Capital Foods' operating companies were valued using a simple 7X of a discount of the projected EBITDA earnings less the project debt for the private company(s).   Capital Foods, LLC's most significant holding is a publicly traded company listed on NASDAQ as SNAK.  A recent direct competitor in the food industry recently sold for 8.75 x of EBITDA.

Mr. Polhill qualifications to make such determination are his experience as a commercial real estate developer, broker and financial analyst for over 30 years.    During this time he has been retained as an advisor and/or participant in numerous business opportunities.  He has been consulted on various properties and projects throughout the country during his career.  Polhill is the person with the most intimate working knowledge of the assets at hand and is best situated to comment on the likelihood of future success.  He has spent most of his professional life in the acquisition of distressed asset acquisitions until the last economic crash

Mr. Polhill currently holds a Broker's real estate license issued by the Department of Real Estate for the State of California,  In addition, he is a member of California Association of Realtors ("CAR") and the National Association of Realtors ("NAR").  He has completed the requirements to be named a Consumer-Certified Real Estate Consultant from the National Association of Real Estate Consultants, as well as the professional designation GRI since the early 1980's.

4.    Pre Petition Secured Liabilities.

The vacant land in Hesperia, California, with a book value of $1,233,718.43, has several following constitute the lien holders against this property:

Waveta Taylor 1st lien parcel 1:                    Debt        $55,931.67

| | | | |
|---|---|---|---|
| Mercer Pension 2nd lien parcel 1: | | Debt | $1,000,408.40 |
| William Mudd 3rd lien parcel 1: | | Debt | 400,000.00 |
| Charles McCamey 1st lien parcel 4: | | Debt | $300,000.00 |
| William Mudd 2nd lien parcel 4: | | Debt | $400,000.00 |
| William Mudd 1st lien parcel 5: | | Debt | $400,000.00 |

The two lots on Scotch Lane in Loma Linda, California, with a book value of $411,608.37, have the following lien holders:

| | | | |
|---|---|---|---|
| Ada Albright 1st lien: | | Debt | $50,000.00 |

5.    Unsecured liabilities.

Debtor's unsecured liabilities are listed on Exhibit 3, attached hereto.

C.    Significant Events of the Case

1.    Preliminary Motions and Other Early Activity in the Case.

Debtor filed this case with an affiliated debtor - Classic Transportation Leasing, LLC. ("Classic") under case no. 10-27755, also pending in the United States Bankruptcy Court, District of Nevada.    Debtor is a creditor of Classic.    Classic was originally filed as a Chapter 11 jointly represented by McDonald Carano Wilson LLP; however, in order to avoid the appearance of any conflict of interest Classic has been converted to a Chapter 7 case and will be independently administered by a Chapter 7 trustee.

2.    Debtor-in-Possession Financing.

The Debtor intends to seek debtor in possession financing to pay its administrative expenses. The financing will be unsecured and advanced by Debtor's affiliate American Pacific Management Corporation (the "DIP Facility").    The DIP Facility is intended to permit the Debtor to fund operations, bankruptcy-related expenses (including U.S. Trustee fees and professional fees, which are discussed in further detail below), and critical expenses of the Debtor.    The total amount advanced under the DIP facility at this time is $40,000.00.    This money has been used to pay retainers to Debtor's counsel and to counsel and accountants for the Committee discussed below.

3.    Claims Filed By Creditors.

    a.    The Schedules and the Bar Dates.

On October 5, 2010, the Debtor filed its Schedules of Assets and Liabilities (as amended, the "Schedules") and Statements of Financial Affairs.  The Court established February 2, 2011 as the general bar date for filing proofs of claim.

The following chart sets forth the total amount of Claims, including the non-contingent, liquidated and undisputed Claims set forth in the Schedules and the proofs of Claim filed as of October 5, 2010.

| Debtor | Secured Claims | Administrative Claims | Priority Claims | General Unsecured Claims |
|---|---|---|---|---|
| APFC | $1,897,222.45 (may be reduced to equal value of collateral which is unknown) | Unliquidated | $24,172.67 IRS claim 59) $11,000.00 Polhill wage claim | $159,508,939.65 |

The Schedules and proofs of Claim may be obtained by accessing the Court's PACER system through the website of the United States Court for the District of Nevada (http://www.nvb.uscourts.gov), or for free by accessing the website maintained by McDonald Carano Wilson LLP, the Debtor's counsel (http://www.mcdonaldcarano.com).

THE DEBTOR, AND THE TRUST RESERVE ANY AND ALL RIGHTS, EXCEPT AS EXPRESSLY STATED IN THE PLAN, TO OBJECT TO, DEFEND AGAINST, AND REQUEST DISALLOWANCE, REDUCTION, SUBORDINATION AND/OR RECHARACTERIZATION OF ANY CLAIM OR INTEREST ASSERTED AGAINST, OR IN, THE DEBTOR OR ITS ESTATE.

    b.    Objections to Claims.

Article X.A. of the Plan provides that Objections to Claims shall be filed : (A) for any and all Claims to which the General Bar Date applies, forty-five (45) days after the Effective Date; (B) for any and all Claims to which the Administrative Claims Bar Date applies, thirty (30) days after the Administrative Claims Bar Date; and (C) for any and all Claims to which the Executory Contracts

Bar Date applies, thirty (30) days after the expiration of that Bar Date.

Except as to Claims allowed under the Plan, holders of Claims should assume that the Debtor or the Trust, as applicable, may file an objection to any proof of Claim that differs in amount or priority from the amount or priority of such holder's Claim as listed in the Schedules, or if such holder's Claim is listed in the Schedules as disputed, contingent, or unliquidated. Therefore, in voting to accept or reject the Plan, no creditor of the Debtor may rely on the absence of an objection to its proof of Claim as any indication that the Reorganized Debtor or the Creditor Trust, as applicable, ultimately will not object to the amount, priority, secured status, or allow ability of its Claim. Moreover, the Debtor and the Trust reserve their rights with respect to all objections to Claims, and all counterclaims they may have with respect to Claims asserted against the Debtor or the Estate, and, except as specifically set forth in the Plan, further reserve their rights to prosecute claims of the Debtor and its Estates (including rights to affirmative recoveries, rights to subordinate Claims, setoff rights, as well as other rights).

4.    Litigation.

a.    Pre-Petition Litigation.

Case 30-2009 0032056; filed November 16, 2009 is a breach of contract case filed in Superior Santa Anna Court captioned *The Mudd Family Trust, William Mudd Trustee vs. American Pacific Financial Corporation.* Plaintiff seeks collection of a matured promissory note in the amount of $245,279.90. The action is stayed because of the bankruptcy filing.

Case 10M1 402006; a claim for equitable and other relief, filed in Circuit Court of Cook County, Municipal Department captioned City of Chicago vs. 2600 Roosevelt Associates, LLC v. American Pacific Financial Corporation and South Jersey Development LLC seeking collection of code violations beginning August 15, 2009. The amount of this claim is undetermined. The action is stayed because of the bankruptcy filing.

b.    Avoidance Actions and Retained Actions.

Debtor is not aware of any avoidance actions. Debtor has been unable to make payments of its debts for more than 90 days prior to the filing of this case due to Debtor's cash flow problems.

Debtor stopped making payments to any creditors at the end of 2007.

c.    Retention of Claims, Causes of Action and Other Rights.

Except where expressly released or except as otherwise provided in the Plan, pursuant to Bankruptcy Code section 1123(b), the Trust shall be vested with and retain and may enforce any claims, rights, and causes of action that the Debtor or the Estates may hold or have against any entity, all of which are hereby preserved, including rights of disallowance, offset, re-characterization and/or equitable subordination with respect to Claims, and causes of action that have been or may be brought by or on behalf of the Debtor, the Estate, or the Trust. The Debtor's investigation of these Claims is ongoing.

5.    Professionals Retained by the Estate.

Debtor has retained McDonald Carano Wilson LLP (the "Firm") to assist it during the pendency of the Case. The Court has specifically approved the employment of the Firm.

The Committee has retained the firm of Armstrong & Teasdale LLP(Janet Chubb and Lou Bubala) as its counsel and McGovern & Greene LLP as its accountant.

None of the estate professionals have filed applications for compensation. These applications are required before professionals can get paid. As of March 30, Armstrong Teasdale has incurred fees of $70,279.50 and costs of $1,196.33 for a total of $71,475.83 through March 28, 2011. Deducting their retainer of $10,000.00 leaves a balance of $61,475.83.

McGovern & Greene has incurred fees of $33,587.50 and costs of $1,183.02 for a total of $34,770.52 as of March 28, 2011. Deducting their retainer of $5,000.00 leaves a balance of $29,770.52

McDonald Carano Wilson has incurred fees of $83,776.00 and costs of $11,264.52 through March 19, 2011. Deducting their retainer of $20,000.00 leaves a balance of $75,040.52.

The estates will continue to incur fees until the Effective Date of the Plan.

Fee payment is subject to approval of the applications by the Court.

6.    The Debtor's Post-Confirmation Business Plan.

After the Plan becomes effective, the Debtor will cease doing business.

# X.

## SUMMARY OF MATERIAL PLAN PROVISIONS

The following is a narrative description of certain provisions of the Plan. The Plan is attached hereto as Exhibit 1. The following summary of the Plan is qualified in its entirety by the actual terms of the Plan. In the event of any conflict, the terms of the Plan will control over any summary set forth in this Disclosure Statement.

A.    Factors Affecting the Nature and Extent of Certain Distributions

The Debtor intends to satisfy its obligations to creditors under the Plan from cash on hand (including the remaining proceeds of the DIP Facility), the lease or sale of assets and Trust Assets or a combination of the foregoing.

The nature and amount of distributions under the Plan nevertheless will depend upon at least four variables: (1) the outcome of objections to Claims, (2) the recovery realized, if any, on the Avoidance Actions and Retained Actions, and other preserved causes of action, (3) the magnitude of Administrative and Priority Claims, and (4) the income and/or distributions produced by the operation or sale of Assets. As noted, the Debtor has engaged in only a preliminary analysis of claims and the Claims Bar Date has not passed. The outcome of claim objections will affect (perhaps materially so) the distribution to holders of Allowed General Unsecured Claims in Classes 2 and 3.

B.    Classification and Treatment of Claims Under the Plan

The Bankruptcy Code requires that a plan divide the different claims against, and equity interests in, the debtor into separate classes based upon their legal nature. Claims of a substantially similar legal nature are usually classified together, as are equity interests of a substantially similar legal nature. The Bankruptcy Code does not require the classification of administrative claims and certain priority claims, and they are typically denominated "unclassified claims."

The classification and treatment of Pre-Petition Claims is specified in the Plan, Exhibit "1" and described above in Section I.C.

1.    <u>Unclassified Claims</u>.

Certain types of Claims are not placed into voting classes; instead, they are unclassified. They are not considered impaired, and they do not vote to accept or reject a plan of reorganization because they are automatically entitled to specific treatment provided for them in the Bankruptcy Code. Therefore, the Debtor has not placed the following categories of Claims into a Class.

a.    <u>Administrative Claims</u>.

(1)    <u>Allowance of Administrative Claims</u>.

Administrative Claims are Claims under Bankruptcy Code section 503(b). The Bankruptcy Code requires that all Administrative Claims be paid on the date that a plan of reorganization becomes effective, unless a particular claimant agrees to a different treatment.

(2)    <u>Allowance of Ordinary Course Administrative Claims</u>.

An entity holding an Ordinary Course Administrative Claim may, but need not, File a motion or request for payment of its Claim. The Reorganized Debtor or any other party in interest may File an objection to an Ordinary Course Administrative Claim in their discretion. Unless a party in interest objects to an Ordinary Course Administrative Claim, such Claim will be an Allowed Claim in accordance with the terms and conditions of the particular transaction that gave rise to the Claim.

(3)    <u>Allowance of Professional Fee Claims</u>:

Unless otherwise expressly provided in the Plan, a Professional Fee Claim will be an Allowed Claim only if, and to the extent that:

(i)    on or before sixty (60) days after the Effective Date, the entity holding such Professional Fee Claim both Files with the Court a final fee application or a motion requesting allowance of the fees and reimbursement of expenses and serves the application or motion on the Reorganized Debtor and the U.S. Trustee; and

(ii)    the Court determines it is an Allowed Claim. The Debtor or any other party in interest may File an objection to such application or motion by no later than thirty (30) days after the Filing and service of such application or motion. Entities holding Professional Fee Claims that do not timely File and serve a fee application or motion for allowance of a Professional

Fee Claim will be forever barred from asserting those Claims against the Debtor, the Estate, the Trust or their respective assets.

(4)    Allowance of Cure Claims:

Cure Claims shall be allowed in accordance with the procedures set forth in Section VIII.C of the Plan.

(5)    Allowance of Non-Ordinary Course Administrative Claims:

Unless otherwise expressly provided in the Plan, Non-Ordinary Course Administrative Claims will be Allowed Claims only if:

(i)    on or before sixty (60) days after the Effective Date, the entity holding such Non-Ordinary Course Administrative Claim both Files with the Court a motion requesting allowance of the Non-Ordinary Course Administrative Claim and serves the motion on the Reorganized Debtor and the U.S. Trustee; and

(ii)    the Court determines it is an Allowed Claim.    The Debtor or any other party in interest may File an objection to such motion within thirty (30) days after the expiration of the deadline for the Filing of a Non-Ordinary Course Administrative Claim set forth in subparagraph (i), above (i.e., within ninety (90) days after the Effective Date), unless such time period for Filing such objection is extended by the Court.    Entities holding Non-Ordinary Course Administrative Claims that do not timely File and serve a request for payment will be forever barred from asserting those Claims against the Debtor, the Estate, the Trust or their respective assets.

b.    Treatment of Administrative Claims.

(1)    Treatment of Allowed Ordinary Course Administrative Claims:

Unless otherwise agreed, Allowed Ordinary Course Administrative Claims will be paid by the Debtor in accordance with the terms and conditions of the particular transaction that gave rise to the Allowed Claim.

(2)    Treatment of Professional Fee Claims:

Unless otherwise agreed, an Allowed Professional Fee Claim will be paid by the Debtor

within ten (10) days after the date on which the Court determines such Claim is an Allowed Claim, or as such professional may agree.

(3)     Treatment of Cure Claims:

The Debtor will pay the Allowed amounts of Cure Claims to the non-Debtor parties to the executory contracts or unexpired leases in accordance with Section VIII.C of the Plan.

(4)     Treatment of U.S. Trustee Fees Under 28 U.S.C. § 1930:

The Reorganized Debtor will pay to the U.S. Trustee all fees due and owing under 28 U.S.C. § 1930 on the Effective Date.

(5)     Treatment of Non-Ordinary Course Administrative Claims:

Unless the entity holding a Non-Ordinary Course Administrative Claim Allowed by the Court agrees to different treatment, the Reorganized Debtor will pay the full amount of such Allowed Non-Ordinary Course Administrative Claim, without interest, on the later of:   (i) ten (10) days after the Effective Date, or (ii) ten (10) days after the date on which the Court determines such Claim is an Allowed Claim.

(6)     Treatment of Claims Under the DIP Facility:

The DIP Lender will receive, on the Effective Date, in full and final satisfaction of their Claims under the DIP Facility cash, equivalents, or assigns as otherwise agreed. The principal balance due and owing on the DIP claim as of March 31, 2011 is $40,000.00.

C.     Treatment of Executory Contracts and Unexpired Leases

1.     Assumption of Executory Contracts and Unexpired Leases.

a.     Assumption of Agreements.

On the Effective Date, the Debtor shall assume all executory contracts and unexpired leases of the Debtor listed on the Schedule of Assumed Agreements, Exhibit 4 and assign them to the Trust or the Trust designee.

The Debtor reserves the right to amend the Schedule of Assumed Agreements at any time prior to the Effective Date to:   (a) delete any executory contract or unexpired lease and provide for its rejection under the Plan or otherwise, or (b) add any executory contract or unexpired lease and

provide for its assumption under the Plan. The Debtor will provide notice of any amendment to the Schedule of Assumed Agreements to the party or parties to any agreement affected by the amendment.

The Confirmation Order will constitute a Court order approving the assumption, on the Effective Date, of all executory contracts and unexpired leases identified on the Schedule of Assumed Agreements.

                          b.      <u>Cure Claims</u>.

<u>Exhibit 4</u> contains a list of proposed amounts of Cure Claims for all contracts or leases scheduled to be assumed. The Reorganized Debtor shall pay Allowed Cure Claims on or before ten (10) days following the Effective Date, or on such other terms as the parties to each such executory contract or unexpired lease may otherwise agree. In the event of a dispute regarding (a) the amount of any Cure Claim, (b) the ability of the Trust to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed, if applicable, or (c) any other matter pertaining to assumption, the cure payments required by section 365(b)(l) of the Bankruptcy Code shall be made promptly when an order resolving the dispute and approving the assumption becomes a Final Order. Pending a Final Order resolving such a dispute, the applicable lease or contract shall be neither assumed nor rejected, and the Debtor or the Trust may, no later than ten (10) days following a Final Order resolving such dispute, elect to reject the lease or contract subject to the dispute.

                          c.      <u>Objections to Assumption</u>.

Any entity who is a party to an executory contract or unexpired lease that will be assumed under the Plan and that objects to such assumption or the amount of the Debtor's proposed Cure Claim must File with the Court and serve upon interested parties a written statement and supporting declaration stating the basis for its objection. This statement and declaration must be Filed and served by no later than ten (10) days prior to the Confirmation Hearing. Any entity that fails to timely File and serve such a statement and declaration will be deemed to waive any and all objections to the proposed assumption of its contract or lease and the amount of the Debtor's proposed Cure Claim. In

the absence of a timely objection by an entity who is a party to an executory contract or unexpired lease, the Confirmation Order shall constitute a conclusive determination as to the amount of any cure and compensation due under the executory contract or unexpired lease, and that the Reorganized Debtor have demonstrated adequate assurance of future performance with respect to such executory contract or unexpired lease. If the Debtor amends Exhibit 4, then any entity that is a party to an executory contract or unexpired lease that is affected by the amendment shall have fourteen (14) days from the giving of notice of any such amendment to object to the amendment.

d.     Resolution of Claims Relating to Assumed Agreements.

In accordance with the procedures set forth in Section VIII. of the Plan relating to the payment of the Cure Claims with respect to executory contracts or unexpired leases that will be assumed under the Plan payment of the Cure Claim shall be deemed to satisfy, in full, any pre-petition or post-petition arrearage or other Claim asserted in a filed proof of Claim or listed in the Schedules, irrespective of whether the amount of the Cure Claim is less than the amount set forth in such proof of Claim or the Schedules. Upon the tendering of the payment of the Cure Claim, any such Claim with respect to such agreement shall be disallowed, without further order of the Court or action by any party.

2.     Rejection of Executory Contracts and Unexpired Leases.

a.     Rejected Agreements.

On the Effective Date, the Debtor will reject all executory contracts and unexpired leases set forth on the Schedule of Rejected Agreements as well as all executory contracts and unexpired leases neither set forth on the Schedule of Assumed Agreements nor the Schedule of Rejected Agreements nor the Schedule of Deferred Agreements. The Confirmation Order will constitute a Court order approving the rejection, on the Effective Date, of the executory contracts and unexpired leases not previously assumed or deferred under the Plan.

b.     Bar Date for Rejection Damage Claims.

Any Rejection Damage Claim or other Claim for damages arising from the rejection of an executory contract or unexpired lease under the Plan must be Filed and served upon counsel to the

Reorganized Debtor within thirty (30) days after the mailing of notice of the occurrence of the Effective Date.  Any such Claims that are not timely Filed and served will be forever barred and unenforceable against the Estate, the Trust and their respective assets, and entities holding these Claims will be barred from receiving any distributions under the Plan on account of such untimely Claims.

    3. <u>Post-Petition Contracts and Leases</u>.

   Except as expressly provided in the Plan or the Confirmation Order, all contracts, leases, and other agreements that the Debtor entered into after the Petition Date will be assigned by the Debtor to the Trust.

   D. <u>Means of Execution and Implementation of the Plan</u>

    1. <u>Funding of the Plan</u>.

   Obligations required to be satisfied in cash under the Plan on and after the Effective Date will be satisfied from cash on hand (including the remaining proceeds of the DIP Facility), the lease or sale of assets and Trust Assets or a combination of the foregoing.  .

    2. <u>Creation of the Trust and Appointment of the Trustee</u>.

   The Confirmation Order shall approve, effective on the Effective Date, the Trust Agreement, the establishment of the Trust and the appointment of the Trustee.  The Trust will be organized for the primary purpose of and distributing assets (the "Trust Assets") transferred to it.  The activities of the Trust shall be reasonably necessary to, and consistent with, accomplishing that purpose.  The Trust's liquidation of the assets transferred to it shall not be unreasonably prolonged and its purpose shall not become so obscured by business activities that its declared purpose of liquidation is lost or abandoned.  The Trust will have no objective to continue or engage in the conduct of trade or business, except to the extent reasonably necessary to, or consistent with, its purpose.

    a. <u>Management of the Trust</u>.

   The Trust Agreement shall provide for the appointment of one (1) person to act as the Trustee to administer the Trust.  All of the terms of the Trust are contained in the Trust Agreement, <u>Exhibit 5</u>.  The Trustee shall be entitled to receive, on a monthly basis, payment of reasonable fees

and reimbursement of reasonable expenses, without further Court approval, from the assets of the Trust, in accordance with the Trust Agreement.

There also will be a board of advisors for the Trust, which will initially consist of two (2) representatives selected by the Creditors Committee. The Trust Agreement shall provide a mechanism for appointing successor members of the board of advisors of the Trust. Among other things, the board of advisors shall consult with the Trustee as to strategy with respect to Avoidance Actions and Retained Actions will have approval rights with respect to certain actions taken by the Trustee with respect thereto, including their settlement, release, transfer or abandonment.

**The Trust Agreement shall be filed with other Plan Exhibits as Exhibit 5 to the Disclosure Statement on or before the Exhibit Filing Date.**

The initial Trustee and the board of advisors for the Trust shall be Filed ten days before the Confirmation Hearing.

          b.    <u>Powers and Duties</u>.

The Trust shall have the following rights, powers and duties:

- hold all of the Trust assets: the Trust shall have full right, power and discretion to manage such assets and execute, acknowledge and deliver any and all instruments as may be appropriate or necessary, as determined by the Trust in its discretion;

- make interim and final distributions of the Assets to the holders of beneficial interests in the Trust pursuant to the terms of the Plan;

- file objections to General Unsecured Claims;

- file all tax and regulatory forms, returns, reports and other documents required with respect to the Trust; and

- file suit or any appropriate motion for relief in the Court or in any other court of competent jurisdiction to resolve any claim, disagreement, conflict or ambiguity in connection with the exercise of its rights, powers or duties.

In connection with the above, the Trust and the Trustee shall, from the Effective Date, be a representative of the Estates, pursuant to Bankruptcy Code section 1123, appointed for the purposes

of, among other things, pursuing the Avoidance Actions and Retained Actions. In furtherance of that objective, the Trustee shall have the rights of a trustee under Bankruptcy Code section 1106. The Trust shall have the full power and authority, either in its name or in the Debtor's name, to commence, if not already commenced, prosecute, settle, assign, convey and abandon any action, subject to the approval rights of the board of advisors set forth in the Trust Agreement. The Trust shall be authorized to retain professionals without Court approval (which may include existing professionals retained by the Debtor, the Reorganized Debtor, and which need not be "disinterested"). The reasonable professional fees (including any contingency fees), expenses and costs of such professionals are to be paid out of the assets of the Class 3 Trust.

c. The Termination of the Trust.

The Trust shall be irrevocable. The Trust shall terminate when the Trustee has performed all of its duties under the Plan and the Trust Agreement, including the final distribution of all the assets of the Trust in respect of holders of beneficial interests in the Trust, which date shall not be more than seven (7) years and one (1) month after the Effective Date; provided, however, the holders of Claims and Beneficial Interests may, upon good cause shown, approve the Trust to remain open so long as shall be necessary to liquidate and distribute all its assets. The Court shall retain jurisdiction to interpret and enforce the terms of the Trust.

3. Revesting of Assets.

Except as otherwise provided in the Plan, on the Effective Date all assets of the Estates shall vest in the Trust, free and clear of all Claims, liens, encumbrances, and Interests except as provided in the Plan.

4. Preservation/Revesting of Rights of Action/No Waiver of Claims.

Except as expressly released or otherwise expressly provided in the Plan, pursuant to Bankruptcy Code section 1123(b), the Trust shall be vested with and shall retain and may enforce any claims, rights, and causes of action that the Debtor or the Estates may hold or have against any entity, all of which are hereby preserved, including the Avoidance Actions and Retained Actions, and all rights of disallowance, offset, recharacterization and/or equitable subordination with respect

to Claims, and causes of action that have been or may be brought by or on behalf of the Debtor, the Estate, or the Trust.  Such claims, rights and causes of action shall remain assets of and vest in the Trust whether or not litigation relating thereto is pending on the Effective Date.  The Debtor, the Estates, and the Trust do not waive, release, relinquish, forfeit or abandon (nor shall they be estopped or otherwise precluded or impaired from asserting) any claims, rights and causes of action, or defenses that constitute assets of the Debtor or its Estate: (a) whether or not such claims, rights, causes of action, or defenses have been listed or referred to in this Plan, the Disclosure Statement, or any other document filed with the Court, (b) whether or not such claims, rights and causes of action, including the Avoidance Actions and Retained Actions or defenses are currently known to the Debtor, and (c) whether or not a defendant in any litigation relating to such claims, rights and causes of action, including the Avoidance Actions and Retained Actions, filed a proof of claim in any of the Case, filed a notice of appearance or any other pleading or notice in any of the Cases, voted for or against this Plan, or received or retained any consideration under this Plan.  Without in any manner limiting the scope of the foregoing, notwithstanding any otherwise applicable principle of law or equity, including any principles of judicial estoppel, res judicata, collateral estoppel, issue preclusion, or any similar doctrine, the failure to list, disclose, describe, identify, analyze or refer to any claims, rights and causes of action, or defenses in the Plan, the Disclosure Statement, or any other document filed with the Court shall in no manner waive, eliminate, modify, release, or alter the right of the Trust to commence, prosecute, defend against, settle, recover on account of, and realize upon any such claims, rights and causes of action that the Debtor or its Estate have or may have as of the Effective Date.

The Debtor expressly reserves all its claims, rights and causes of action and defenses for later adjudication by the Trust, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches will apply to such claims, rights and causes of action and defenses upon or after the confirmation or consummation of the Plan based on the Disclosure Statement, the Plan or the Confirmation Order.  In addition, the Trust expressly reserves the right to pursue or adopt claims,

rights and causes of action that are alleged in any lawsuits in which the Debtor is a defendant or an interested party, against any entity, including the plaintiffs or co-defendants in such lawsuits. Any entity to whom the Debtor has incurred an obligation (whether on account of services, purchase, sale of goods or otherwise), or who has received services from the Debtor, or who has received money or assets from the Debtor, or who has transacted business with the Debtor, or who has leased equipment or assets from or to the Debtor should assume that such obligation, receipt, transfer or transaction may be reviewed by the Trust subsequent to the Effective Date and may be the subject of an action after the Effective Date, whether or not: (a) such entity has Filed a proof of Claim against the Debtor in this Case; (b) such entity's proof of Claim has been objected to by the Debtor; (c) such entity's Claim was included in the Debtor's Schedules; or (d) such entity's scheduled Claim has been objected to by the Debtor or has been identified by the Debtor as contingent, unliquidated or disputed.

Neither the failure to list a Claim in the Schedules filed by the Debtor, the failure of the Debtor or any other person to object to any Claim for purposes of voting, the failure of the Debtor or any other person to object to a Claim or Administrative Claim before confirmation or consummation of the Plan or the Effective Date, the failure of any person to assert a claim or cause of action before confirmation or consummation of the Plan or the Effective Date, the absence of a proof of claim having been filed with respect to a Claim, nor any action or inaction of the Debtor or any other person with respect to a Claim, or Administrative Claim, other than a legally effective express waiver or release, shall be deemed a waiver or release of the right of the Reorganized Debtor, the Debtor or the Class 3 Trust, before or after solicitation of votes on the Plan or before or after the Confirmation Date or the Effective Date to (a) object to or examine such Claim or Administrative Claim, in whole or in part or (b) retain and either assign or exclusively assert, pursue, prosecute, utilize, otherwise act or otherwise enforce any claim or cause of action against the holder of any such Claim.

     5.    <u>Objections to Claims</u>.

Unless otherwise extended by the Court, objections to the allowance of Claims shall be Filed

and served upon the Entities asserting such Claims as follows: (A) for any and all Claims to which the General Bar Date applies, forty-five (45) days after the Effective Date; (B) for any and all Claims to which the Administrative Claims Bar Date applies, thirty (30) days after the Administrative Claims Bar Date; and (C) for any and all Claims to which the Executory Contracts Bar Date applies, thirty (30) days after the expiration of that Bar Date.

6.      Full Satisfaction.

The distributions to each holder of a Claim or Interest shall be made, and each holder of a Claim or Interest shall receive, any distributions provided for in the Plan in full satisfaction and discharge of such Claim or Interest.

7.      Compliance with Tax Requirements.

Debtor and the Trustee shall comply with all withholding and reporting requirements imposed on them by governmental units, if any, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements.

8.      Setoff, Recoupment and Other Rights.

Notwithstanding anything to the contrary contained in the Plan, the Trust may, but shall not be required to, setoff, recoup, assert counterclaims or withhold against the distributions to be made pursuant to the Plan on account of any claims that the Debtor, the Estates, or the Trust may have against the entity holding an Allowed Claim; provided, however, that neither the failure to effect such a setoff or recoupment, nor the allowance of any Claim against the Debtor nor any partial or full payment during the Case or after the Effective Date in respect of any Allowed Claim, shall constitute a waiver or release by Debtor, the Estates or the Trust of any claim that they may possess against such holder.

9.      Conditions to Effectiveness.

The Plan shall not become binding unless and until it is confirmed and the Effective Date occurs.  The Effective Date is the first Business Day on which all of the following conditions have been satisfied as set forth below or waived:

43

a. The Confirmation Order shall have become a Final Order;

b. No request for revocation of the Confirmation Order under section 1144 of the Bankruptcy Code has been made, or, if made, remains pending;

c. Each exhibit, document or agreement to be executed in connection with the Plan shall be in final form acceptable to the Debtor and the DIP Lender and their respective counsel, and the Trust Agreement shall be in final form acceptable to the foregoing entities;

d. The Trust Agreement shall have been executed and delivered;

e. The Exit Facility shall each be in full force and effect and all conditions therein to the obligations of the parties to such loans shall have been satisfied or waived as set forth in the Exit Facility Documents;

f. All other agreements, writings and undertakings required under the Plan shall be executed and ready for consummation; and

The Trustee shall mail a "Notice of Occurrence of Effective Date" to all creditors and interest holders of record as of the date of entry of the Confirmation Order upon the occurrence of the Effective Date.

10.    Waiver of Conditions.

Except as specified above, the requirement that the conditions to the occurrence of the Effective Date be satisfied may be waived in whole or in part, and the time within which any such conditions must be satisfied may be extended, by the Debtor. The failure to timely satisfy or waive any of such conditions may be asserted by the Debtor regardless of the circumstances giving rise to the failure of such condition to be satisfied, including any action or inaction by the Debtor. The failure of the Debtor to exercise any of the foregoing rights shall not be deemed a waiver of any rights and each such right shall be deemed ongoing and subject to assertion at any time.

11.    Authorization of Entity Action.

Each of the matters provided for under the Plan involving the entity structure of the Debtor or the Reorganized Debtor or any action to be taken by or required of the Debtor shall, as of the Effective Date, be deemed to have occurred and be effective as provided herein, and shall be

authorized, approved and, to the extent taken prior to the Effective Date, ratified in all respects without any requirement of further action by equityholders, creditors, or managers, officers or directors of the Debtor.

E.    Other Plan Provisions

1.    Limitation of Liability and Releases.

None of the Debtor, the Debtor in Possession, the Committee, the Members of Committee nor any of the Released Parties shall have or incur any liability to any Entity for any act taken or omission made in good faith in connection with or related to the Chapter 11 Case or the Estate, including objections to or estimations of claims, disposition of assets or formulating, determining not to solicit acceptances or rejections to or confirming the Plan, or any contract, instrument, release or other document created in connection therewith.

2.    Revocation of Plan/No Admissions.

The Debtor reserves the right to revoke or withdraw the Plan prior to the Confirmation Date. Notwithstanding anything to the contrary in the Plan, if the Plan is not confirmed or the Effective Date does not occur, the Plan will be null and void, and nothing contained in the Plan or the Disclosure Statement will:  (a) be deemed to be an admission by the Debtor with respect to any matter set forth in the Plan, including liability on any Claim or the propriety of any Claim's classification; (b) constitute a waiver, acknowledgment, or release of any Claims against, or any Interests in, the Debtor, or of any claims of the Debtor; or (c) prejudice in any manner the rights of any party in any further proceedings.

3.    Modifications of the Plan.

The Plan may be modified at any time before or after confirmation, subject to sections 1125 and 1127 of the Bankruptcy Code.  Provided the proposed modification does not materially and adversely affect either (i) the treatment and recovery by holders of General Unsecured Claims under the Plan or (ii) the prospects for confirming the Plan.

4.    <u>Exemption from Certain Transfer Taxes</u>.

In accordance with Bankruptcy Code section 1146(c), in the event of the issuance, transfer or exchange of a security, or the making or delivery of an instrument of transfer under the Plan may not be taxed under any law imposing a stamp tax or similar tax. The Confirmation Order shall direct all governmental officials and agents to forego the assessment and collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without payment of such tax or other governmental assessment.

5.    <u>Form of Agreements and Documents</u>.

All documents and agreements to be Filed with the Court as part of the Plan or which are to become Exhibits to the Plan or the Disclosure Statement or which are to be executed or delivered in connection with the Plan, and any revisions or amendments thereto prior to the Effective Date, shall be in form and substance acceptable to the Debtor and the Trustee (if one has been appointed) in their sole discretion prior to any Filing, execution, delivery or amendment; and the form and substance of the Trust Agreement.

F.    <u>Effect of Confirmation of the Plan</u>

1.    <u>Injunction</u>.

Holders of Claims against and Equity Interest in the Debtor may not pursue (1) property of the Estate other than through the Claims and Equity Interests allowance process; or (2) the Released Parties.

No holder of a Claim or Equity Interest may receive any payment from or seek recourse against any assets that are distributed or to be distributed under the Plan except for those assets required to be distributed to such holder as expressly provided for in the Plan. As of the Effective Date, all Entities are precluded from asserting against the Estate, the Trust or any assets that are distributed or to be distributed under the Plan any Claims, rights, Causes of Action, liabilities or interests based upon any act or omission , transaction or other activity of any kind or nature that occurred prior to the Effective Date, other than as expressly provided in the Plan or Confirmation Order, regardless of the filing, lack of filing, allowance or disallowance of such a Claim or Equity

interest and regardless of whether such an Entity has voted to accept or reject the Plan. Except as otherwise provided in the Plan or the Confirmation Order, on and after the Effective Date all Entities that have held, currently hold or may hold a debt, Claim, other liability or Interest against or in the Debtor shall be permanently enjoined from taking any of the following actions on account of such debt Claim, liability, Interest or right: (A) commencing or continuing in any manner any action or other proceeding on account of such debt, Claim, liability Interest or right against assets or proceeds thereof that are to be distributed under the Plan, other than to enforce any right to a distribution with respect to such assets or the process thereof as may be provided under the Plan; (B) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order against any assets to be distributed under the Plan, other than as permitted under subparagraph (A) above; and (C) creating, perfecting or enforcing any lien or encumbrance against any assets to be distributed under the Plan, other than as permitted by the Plan, provided that nothing contained herein shall limit the rights of any distributee under the Plan from taking any actions in respect of property distributed or to be distributed to it under the Plan.

   2. <u>Payment of U.S. Trustee Fees</u>.

  The Reorganized Debtor shall pay all U.S. Trustee Fees in accordance with Section XI.Q of the Plan.

   3. <u>Retention of Jurisdiction</u>.

  Notwithstanding the entry of the Confirmation Order or the occurrence of the Effective Date, the Court shall retain jurisdiction over the Case after the Effective Date to the fullest extent provided by law, as more particularly set forth in Section XI.D of the Plan.

**XI.**

**FINANCIAL INFORMATION**

A. <u>Financial Projections and Feasibility</u>

  The Bankruptcy Code provides that a plan may only be confirmed if confirmation is not likely to be followed by the liquidation or the need for further financial reorganization of the debtor, unless such liquidation or reorganization is proposed in the Plan. 11 U.S.C. § 1129(a)(11). This is

referred to as the "feasibility" requirement.

The Disclosure Statement includes, as <u>Exhibit 6</u>, financial projections for the Trust (the "<u>Projections</u>").  However, since the Plan is a liquidating Plan, the Trust is not required to meet these financial projections in order to satisfy the feasibility requirement set forth in Bankruptcy Code section 1129. The projections are for informational purposes only.

B.    <u>Tax Consequences of the Plan</u>

For federal income tax purposes, a transfer of assets to the Trust for the benefit of holders of Allowed Claims is treated as a transfer of assets to such holders to the extent that such holders are beneficiaries of the Trust.  The transfer will be treated as a deemed transfer to such holders followed by a deemed transfer by such holders to the Trust.  Such holders will be treated as the grantors and deemed owners of the Trust.  The Trustee shall determine the valuations of the transferred assets. Such valuations shall be binding on the beneficiaries of the Trust, and must be used for all federal income tax purposes.

**XII.**

**LIQUIDATION ANALYSIS / BEST INTEREST TEST**

Bankruptcy Code section 1129(a)(7) requires that each holder of a Claim or Interest in an impaired Class either (i) vote to accept the Plan, or (ii) receive or retain under the Plan cash or assets of a value, as of the effective date of the Plan, that is not less than the value such holder would receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code.  This is commonly referred to as the "Best Interests Test."

In a chapter 7 case, a trustee or trustees would be elected or appointed to liquidate the debtor's assets and make distributions to creditors in accordance with the priorities set forth in the Bankruptcy Code.  Secured creditors generally are paid from the proceeds of sale of the properties securing their liens.  If any assets are remaining after the satisfaction of secured claims, administrative expenses generally are next to receive payments.  Unsecured claims are paid from any remaining sales proceeds or other estate assets, according to their rights to priority.  Unsecured claims with the same right to priority receive a pro rata distribution based on the amount of their

allowed claim in relation to the total amount of allowed unsecured claims with the same right to priority. Finally, interest holders receive the balance that remains, if any, after all creditors are paid.

Thus, for the Court to confirm the Plan, the Court must find that all creditors and shareholders in impaired Classes who do not accept the Plan will receive at least as much under the Plan as such holders would receive under a hypothetical chapter 7 liquidation.

The Debtor prepared the liquidation analysis, attached hereto as <u>Exhibit 7</u>, reflecting the estimated cash proceeds, net of liquidation-related costs that would be realized if each Debtor were liquidated in accordance with chapter 7 of the Bankruptcy Code. The liquidation analysis projects that, under either a best-case or worst-case scenario, the Plan provides at least as good a recovery as a chapter 7 liquidation. Accordingly, all of the Debtor's creditors and interest holders will receive at least as much under the Plan as they would receive under a chapter 7 liquidation.

THE LIQUIDATION ANALYSIS, INCLUDING THE CLAIMS ESTIMATES, WAS PREPARED SOLELY TO ASSIST THE COURT IN MAKING THE FINDINGS REQUIRED UNDER SECTION 1129(a)(7) OF THE BANKRUPTCY CODE AND MAY NOT BE USED OR RELIED UPON FOR ANY OTHER PURPOSE.

THE DEBTOR BELIEVES THAT ANY ANALYSIS OF A HYPOTHETICAL LIQUIDATION IS NECESSARILY SPECULATIVE. THERE ARE A NUMBER OF ESTIMATES AND ASSUMPTIONS UNDERLYING THE LIQUIDATION ANALYSIS THAT ARE INHERENTLY SUBJECT TO SIGNIFICANT ECONOMIC, COMPETITIVE AND OPERATIONAL UNCERTAINTIES AND CONTINGENCIES BEYOND THE CONTROL OF THE DEBTOR OR A CHAPTER 7 TRUSTEE. NEITHER THE LIQUIDATION ANALYSIS, NOR THE FINANCIAL INFORMATION ON WHICH IT IS BASED, HAS BEEN EXAMINED OR REVIEWED BY INDEPENDENT ACCOUNTANTS IN ACCORDANCE WITH STANDARDS PROMULGATED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS. THERE CAN BE NO ASSURANCE THAT ACTUAL RESULTS WOULD NOT VARY MATERIALLY FROM THE HYPOTHETICAL RESULTS REPRESENTED IN THE LIQUIDATION ANALYSIS.

# XIII.

## RISK FACTORS

The Debtor's ability to perform its obligations under the Plan is subject to various factors and contingencies, some of which are described in this section. The following discussion summarizes only some material risks associated with the Plan and the Reorganized Debtor, and is not exhaustive. Moreover, this section should be read in connection with the Plan and the other disclosures contained in this Disclosure Statement.

PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN, ALL HOLDERS OF CLAIMS THAT ARE IMPAIRED SHOULD, WITH THEIR ADVISORS, READ AND CONSIDER CAREFULLY THE FACTORS SET FORTH HEREIN, AS WELL AS ALL OTHER INFORMATION SET FORTH OR OTHERWISE REFERENCED IN THIS DISCLOSURE STATEMENT AND THE PLAN.

A.    Bankruptcy Considerations

1.    Parties in Interest May Object to the Debtor's Classification of Claims and Interests.

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if the claim or equity interest is substantially similar to the other claims or equity interests in that class. The Debtor believes that the classification of holders of claims against and holders of equity interests in the Debtor under the Plan complies with the requirements set forth in the Bankruptcy Code because the classes established under the Plan each encompass claims or interests that are substantially similar to similarly classified claims or interest. Nevertheless, there can be no assurance that the Court will reach the same conclusion.

2.    Failure to Satisfy Voting Requirements.

If the Debtor receives votes in number and amount sufficient to enable the Court to confirm the Plan, the Debtor intends to seek, as promptly as practicable thereafter, to confirm the Plan. In the event the Debtor does not receive sufficient votes, the Debtor may seek to accomplish an alternative chapter 11 plan. There can be no assurance, however, that the terms of any such alternative chapter

11 plan would be similar to, or as favorable to the holders of Allowed Claims as, those proposed in the current proposed Plan.

3. <u>Failure to Secure Confirmation of the Plan.</u>

Bankruptcy Code section 1129 sets forth the requirements for confirmation of a chapter 11 plan, and requires the Court to make a series of specified, independent findings.

Even if the Debtor receives the required votes accepting the Plan, there can be no assurance that the Court will confirm the Plan. A non-accepting holder of an Allowed Claim might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules. Even if the Court determined that this Disclosure Statement, the balloting procedures and voting results were appropriate, the Court could still decline to confirm the Plan if it finds that any of the statutory requirements for confirmation of the Plan are not met, including the requirement that the terms of the Plan do not "unfairly discriminate" and are "fair and equitable" to non-accepting Classes. If the Plan is not confirmed, it is unclear what distributions, if any, holders of Allowed Claims would receive with respect to their Allowed Claims.

The Plan may be modified as necessary for confirmation of the Plan. Any such modifications could result in a less favorable treatment of any non-accepting Class, as well as of any Classes junior to such non-accepting Class, than the treatment currently provided in the Plan. Such a less favorable treatment could include a distribution of assets to the Class affected by the modification of a lesser value than currently provided in the Plan or no distribution of assets whatsoever under the Plan.

4. <u>Non-Consensual Confirmation.</u>

In the event that any impaired class of claims does not accept a chapter 11 plan, a Court may nevertheless confirm the plan under the procedure for non-consensual confirmation described in this Disclosure Statement. The Debtor believes that the Plan would satisfy the requirements for non-consensual confirmation. Nevertheless, there can be no assurance that the Court will reach this conclusion.

5.    Debtor May Object to the Amount or Classification of a Claim.

Except as otherwise provided in the Plan, the Debtor, the Reorganized Debtor and the Trust reserve the right to object to the amount or classification of any Claim. The estimates set forth in this Disclosure Statement cannot be relied on by any holder of a Claim against the Debtor.

6.    The Effective Date Might Not Occur.

Even if the Court confirms the Plan, the Plan shall not become binding until the Effective Date occurs. The Effective Date is the first Business Day (a) that is at least fourteen (14) days after the Confirmation Date; (b) on which no stay of the Confirmation Order is in effect; and (c) on which the conditions set forth in Section IX of the Plan have been satisfied or waived by the Debtor and the DIP Lender. While there can be no assurances as to when exactly the Effective Date will occur, based on the current circumstances of the Cases, the Debtor presently believes that the Effective Date will occur within thirty (30) days following the Confirmation Date.

7.    The Trust May Not be Able to Meet Debt Obligations and Operational Needs.

The Trust's ability to service its debt obligations as they come due and meet operational needs after the Effective Date will depend, in part, on the Trust's future operating performance and market conditions. If the Trust is unable to service its debt obligations and operational needs, this may preclude the Trust from fulfilling its post-reorganization business plan and taking advantage of future opportunities..

8.    The Actual Allowed Amounts of Claims May Differ from the Estimated Claims and Adversely Affect the Percentage Recovery on General Unsecured Claims.

The Claims estimates set forth in this Disclosure Statement are based on various assumptions. The actual allowed Claims amounts may differ significantly from those estimates should one or more of those underlying assumptions prove to be incorrect. Such differences may materially and adversely affect the percentage recovery to holders of such Claims under the Plan.

# XIV.

## ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

A.      <u>Liquidation Under Chapter 7</u>

If no plan can be confirmed or the Effective Date does not occur, the Case may be converted to cases under chapter 7 of the Bankruptcy Code, in which case a trustee or trustees would be elected or appointed to liquidate the assets of the Estates for distribution in accordance with the priorities established by the Bankruptcy Code.  A discussion of the effects that a chapter 7 liquidation would have on the recoveries of the holders of Claims and Interests is set forth in Section XII and in the liquidation analysis included in this Disclosure Statement at <u>Exhibit 7</u>.  As noted therein, the Debtor believes that in a liquidation under chapter 7, the value of the Debtor's assets would be reduced based upon the distressed nature of the liquidation and the recovery to holders of Allowed General Unsecured Claims would be reduced.

B.      <u>Alternative Plans</u>

If the Plan is not confirmed or the Effective Date does not occur, the Debtor (or any other party in interest) could attempt to formulate a different plan.  Such a plan could potentially involve a reorganization and continuation of the Debtor's businesses, or an orderly liquidation of the assets of the Estates.  During the Case, the Debtor explored various alternatives in connection with the formulation and development of the Plan described herein.  The Debtor believes that the Plan enables creditors to realize a greater value under the circumstances.  Under Plan filed under chapter 11, the assets of the Estates would likely be sold in an orderly fashion over a more extended time period than a liquidation under chapter 7, possibly resulting in indeterminately greater recoveries than would be obtained in an accelerated liquidation under chapter 7.  However, following either a chapter 11 or chapter 7 liquidation, it is likely that after satisfying senior claims there would be no assets available to distribute to the holders of Allowed General Unsecured Claims.

# XV.

## TAX CONSEQUENCES OF THE PLAN

The following discussion is a summary of certain U.S. federal income tax consequences expected to result from the implementation of the Plan. This discussion is based on the Tax Code, as in effect on the date of this Disclosure Statement and on U.S. Treasury Regulations in effect (or in certain cases, proposed) on the date of this Disclosure Statement, as well as judicial and administrative interpretations thereof available on or before such date. All of the foregoing are subject to change, which change could apply retroactively and could affect the tax consequences described below. There can be no assurance that the Internal Revenue Service (the "IRS") will not take a contrary view with respect to one or more of the issues discussed below, and no opinion of counsel or ruling from the IRS has been or will be sought with respect to any issues which may arise under the Plan.

The following summary is for general information only and discusses certain U.S. federal income tax consequences of the Plan to the Debtor and the "U.S. Holders" of Allowed Claims. For purposes of this summary, a "U.S. Holder" is a beneficial owner of the Allowed Claims that, for U.S. federal income tax purposes, is: (a) an individual who is a citizen or resident of the United States; (b) a corporation (or other business entity treated as a corporation) created or organized in or under the laws of the United States or any state thereof (including the District of Columbia); (c) an estate the income of which is subject to U.S. federal income taxation regardless of its source; or (d) a trust if such trust validly elects to be treated as a United States person for U.S. federal income tax purposes, or if (I) a court within the United States is able to exercise primary supervision over its administration and (II) one or more United States persons have the authority to control all of the substantial decisions of such trust.

This summary does not purport to address all of the U.S. federal income tax consequences that may be applicable to any particular holder. The tax treatment of a U.S. Holder of Allowed Claims may vary depending upon such holder's particular situation. The following discussion does not address state, local or foreign tax considerations that may be applicable to the Debtor and the

U.S. Holders of Allowed Claims.  The following discussion also does not address tax considerations as a result of entering into the Exit Facility.  This summary does not address tax considerations applicable to holders that may be subject to special tax rules, such as financial institutions, insurance companies, real estate investment trusts, regulated investment companies, grantor trusts, dealers or traders in securities or currencies, tax-exempt entities, persons that hold an equity interest or a security in a Debtor as a position in a "straddle" or as part of a "hedging," "conversion" or "integrated" transaction for U.S. federal income tax purposes, persons that have a "functional currency" other than the U.S. dollar, persons who acquired an equity interest or a security in a Debtor in connection with the performance of services and persons who are not U.S. Holders.

If a partnership (or any other entity treated as a partnership for U.S. federal income tax purposes) holds Allowed Claims, the tax treatment of a partner in such partnership generally will depend on the status of the partner and the activities of the partnership.  Any such partner should consult its tax advisor as to its tax consequences.

EACH HOLDER OF AN ALLOWED CLAIM IS URGED TO CONSULT ITS OWN TAX ADVISOR WITH RESPECT TO THE U.S. FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES OF THE IMPLEMENTATION OF THE PLAN.

INTERNAL REVENUE SERVICE CIRCULAR 230 DISCLOSURE

PURSUANT TO INTERNAL REVENUE SERVICE CIRCULAR 230, WE HEREBY INFORM YOU THAT THE DESCRIPTION SET FORTH HEREIN WITH RESPECT TO U.S. FEDERAL TAX ISSUES WAS NOT INTENDED OR WRITTEN TO BE USED, AND SUCH DESCRIPTION CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING ANY PENALTIES THAT MAY BE IMPOSED ON THE TAXPAYER UNDER THE U.S. TAX CODE.  THIS DESCRIPTION IS LIMITED TO THE U.S. FEDERAL TAX ISSUES DESCRIBED HEREIN.  IT IS POSSIBLE THAT ADDITIONAL ISSUES MAY EXIST THAT COULD AFFECT THE U.S. FEDERAL TAX TREATMENT OF THE MATTER THAT IS THE SUBJECT OF THE DESCRIPTION NOTED HEREIN, AND THIS DESCRIPTION DOES NOT CONSIDER OR PROVIDE ANY CONCLUSIONS WITH RESPECT TO ANY SUCH

ADDITIONAL ISSUES.    TAXPAYERS SHOULD SEEK ADVICE BASED ON THE TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

      A.    <u>Certain U.S. Federal Income Tax Consequences to the Holders of Allowed Claims that Are Paid in Cash</u>

A holder who receives cash in exchange for all or a portion of its Allowed Claim pursuant to the Plan, such as holders of claims in Classes 1, 2 and 4, will generally recognize income, gain or loss for U.S. federal income tax purposes in an amount equal to the difference between (i) the amount of cash received in exchange for all or the portion of its Allowed Claim, and (ii) the holder's adjusted tax basis in its Allowed Claim that is treated as exchanged for cash.    Where a holder receives cash and other assets in a fully taxable exchange, the holder should consult its own tax advisor regarding the allocation of tax basis in the Allowed Claim among the various types of consideration received.    The character of such income, gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the holder, the nature of the Allowed Claim in such holder's hands, whether the Allowed Claim constitutes a capital asset in the hands of the holder, whether the Allowed Claim was purchased at a discount, and whether and to what extent the holder has previously claimed a bad debt deduction with respect to its Allowed Claim.    To the extent that any amount received by a holder of an Allowed Claim is attributable to accrued interest not previously included in the holder's income, such amount should be taxable to the holder as interest income.    Conversely, a holder of an Allowed Claim may be able to recognize a deductible loss (or, possibly, a write-off against a reserve for worthless debts) to the extent that any accrued interest on the Allowed Claims was previously included in the holder's gross income but was not paid in full by the Debtor.    Such loss should be ordinary.    To the extent any amounts are paid to a Claim holder in such holder's capacity as an employee and which for U.S. federal income tax purposes constitute wages, such amounts will generally be treated for tax purposes as ordinary income and will be subject to withholding by the Debtor.

56

B.    Certain U.S. Federal Income Tax Consequences to Holders of Allowed Claims that Are Paid Using Consideration Other than Cash

The U.S. federal income tax consequences to holders of Allowed Claims that are paid using consideration other than cash may vary depending upon, among other things: (i) the type of consideration received by the holder in exchange for its Allowed Claim; (ii) the nature of the indebtedness owing to the holder; (iii) whether the holder has previously claimed a bad debt deduction in respect of such holder's Allowed Claim; and (iv) whether such Allowed Claim constitutes a "security" for purposes of the reorganization provisions of the Tax Code (as described below).  Holders of Secured Claims in Class 1 and 3 may be subject to these consequences.

1.    Consequences of the Receipt and of Holding a Beneficial Interest in the Class 3 Trust.

a.    Receipt of a Beneficial Interest in the Class 3 Trust.

The Debtor intends to treat the Trust as a grantor trust for U.S. federal income tax purposes. As a result, holders of Claims and Interests who receive Trust certificates are expected to be treated as receiving a distribution from the Debtor of the Trust Assets and then participating in the Trust.  It is also expected that such holders will be treated as the grantors and deemed owners of the Trust and will each therefore be treated as owning their Pro Rata shares of the Trust Asset.

b.    Deemed Distribution of the Assets of the Class 3 Trust.

A holder of a Claim or Interest who receives a beneficial interest in the Trust should recognize gain or loss in an amount equal to the difference between (i) the fair market value of the assets deemed distributed to the holder, and (ii) the holder's adjusted basis in the portion of the Claim that is treated as exchanged therefore.

To the extent that the holder has realized gain on the exchange, it can either recognize the gain in the taxable year of the distribution, or it can defer the gain based on the application of the installment method (provided that none of the exceptions to installment sale treatment apply) or the open transaction doctrine.  Reporting under either the installment method or the open transaction doctrine would generally result in deferral of tax on such gain until such amounts are actually or constructively received.  However, the open transaction method of reporting is available only if the

fair market value of the holder's share of the assets distributed or deemed distributed to the holder in satisfaction of its claim is not reasonably ascertainable as of the effective date of the chapter 11 plan. The IRS has taken the position that the open transaction method is available only in rare and extraordinary circumstances and, accordingly, could assert that the open transaction treatment is not available.  The rules relating to the availability and the application of the installment method and open transaction doctrine are complex.  Holders should consult with their tax advisors regarding the availability of either of these methods and the application of such methods to their specific situations, including the basis recovery rules and the potential application of an interest charge under the installment sale method.

To the extent that the holder has realized a loss on the exchange, the holder may be precluded from recognizing the loss until the taxable year that the final payment is made.  Holders are urged to consult their tax advisors regarding the limitations on the recognition of losses in these circumstances.

To the extent any amounts are deemed distributed to a Claim holder in such holder's capacity as an employee and which for U.S. federal income tax purposes constitute wages, such amounts will generally be treated for tax purposes as ordinary income and will be subject to withholding by the Debtor.

c.    <u>Consequences of Holding an Interest in the Trust</u>.

As noted above, assuming that the Trust is treated as a grantor trust for U.S. federal income tax purposes, the holders of interests in the Trust will be treated as owning their Pro Rata share of the Trust Assets and will be required to include on their U.S. federal income tax return their Pro Rata share of the income, gains, losses, deductions, and credits of the trust that is reported to them on the Schedule K-1 issued to them by the trust.  The trust is required to file Form 1041, U.S. Income Tax Return for Estates and Trusts, with the IRS, reporting its income, gains, losses, deductions, and credits, as applicable, as well as the allocation of each beneficiary's share of the reported trust items (Schedule K-1).

2.    <u>Accrued but Unpaid Interest</u>.

In general, to the extent a holder of a debt instrument receives cash or assets in satisfaction of interest accrued during the holding period of such instrument, the amount of such cash or the value of such assets will be taxable to the holder as interest income (if not previously included in the holder's gross income).  Conversely, such holder may recognize a deductible loss to the extent that any accrued interest claimed or amortized original issue discount was previously included in its gross income and is not paid.  The extent to which cash or assets received by a holder of a debt instrument will be attributable to accrued but unpaid interest is unclear.  Pursuant to the Plan, all distributions in respect of any Allowed Claim will be allocated first to the principal amount of such Allowed Claim, and thereafter, to the extent permitted under the Bankruptcy Code, to accrued but unpaid interest, if any.  However, it is unclear whether such allocation will be respected for tax purposes.  Certain legislative history indicates that an allocation of consideration between principal and interest provided in a bankruptcy plan of reorganization generally is binding for U.S. federal income tax purposes.  However, regulations issued by the IRS require, in general, that payments made on a debt instrument first be allocated to unpaid interest and original issue discount.

Each holder of an Allowed Claim is urged to consult its tax advisor regarding the inclusion in income of amounts received in satisfaction of accrued but unpaid interest, the allocation of consideration between principal and interest, and the deductibility of previously included unpaid interest for tax purposes.

**XVI.**

**SECURITIES LAW MATTERS**

The securities law considerations detailed below pertain to the issuance of the Trust Certificates under the Plan.  The following discussion relates to certain securities laws that restrict transfers of the Trust Certificates and that may be applicable to transfers of the Trust Certificates subsequent to their issuance under the Plan.

The Trust does not intend to file a registration statement under the Securities Act or any other federal or state securities laws with respect to the issuance or resale of any of the Trust

Certificates.  To the extent set forth herein, the Trust will rely on Bankruptcy Code section 1145(a) to exempt them from registration under the Securities Act and any applicable state securities laws the offer, sale and issuance of the Trust Certificates pursuant to the Plan. Generally, Bankruptcy Code section 1145(a)(1) exempts the offer and sale of securities pursuant to a plan of reorganization from such registration requirements if the following conditions are satisfied:  (i) the securities are issued by a debtor (or its affiliate or successor) under a plan of reorganization, (ii) the recipients of the securities hold a Claim against, an interest in, or a Claim for an administrative expense against, the debtor, and (iii) the securities are issued entirely in exchange for the recipient's Claim against, or interest in, the debtor, or are issued "principally" in such exchange and "partly for cash or property."  Here, pursuant to the Plan, (i) the Trust Certificates and other securities are being issued by the Liquidating Trust under the Plan, (ii) the recipients of these securities hold Claims against the Debtor, and (iii) these securities are being issued entirely in exchange for the recipients' Claims against the Debtor.

There is no public market for the Trust Certificates, and none is expected to develop in the foreseeable future.  Recipients of the Trust Certificates should be prepared to hold the Trust Certificates for an indefinite period of time and must be able to afford the complete loss of their investment.

In principal, *in the event that a public market for the Trust Certificates develops,* the Trust Certificates distributed under the Plan may be eligible for resale by the holders thereof pursuant to an exemption provided under Bankruptcy Code section 1145, except for holders of such certificates that may be deemed to be an "underwriter" (as defined in Bankruptcy Code section 1145(b)(1)) with respect to the Trust Certificates.  Generally, Bankruptcy Code section 1145(b)(1) defines an "underwriter" as any person who (i) purchases a Claim against, or an Interest in, a Debtor with a view toward distribution of any security to be received in exchange for such Claim or interest, (ii) offers to sell securities issued pursuant to a bankruptcy plan for the holders of such securities, (iii) offers to buy securities issued pursuant to a bankruptcy plan from persons receiving such securities, if the offer to buy is made with a view

toward distribution of such securities, or (iv) is an issuer within the meaning of Section 2(11) of the Securities Act. Section 2(11) of the Securities Act provides that the term "issuer" includes all persons who, directly or indirectly, through one or more intermediaries, control, or are controlled by, or are under common control with, an issuer of securities. Under Rule 405 of Regulation C under the Securities Act, the term "control" means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise. Accordingly, the Liquidating Trustee, or any member of the board of advisors of the Liquidating Trust may be deemed to "control" the Trust (and therefore be an underwriter for purposes of Bankruptcy Code section 1145), particularly if such management position is coupled with the ownership of a significant percentage of the Trust's voting securities.

Holders of the Trust Certificates who are deemed to be "underwriters" within the meaning of Bankruptcy Code section 1145(b)(1) or who may otherwise be deemed to be "underwriters" of, or to exercise "control" over, the Liquidating Trust within the meaning of Rule 405 of Regulation C under the Securities Act should, assuming all other conditions of Rule 144A are met, be entitled to avail themselves of the safe harbor resale provisions thereof. Rule 144A, promulgated under the Securities Act, provides a non-exclusive safe harbor exemption from the registration requirements of the Securities Act for resale to certain "qualified institutional buyers" of securities which are not securities of the same class of securities then listed on a national securities exchange (registered as such under Section 6 of the Exchange Act) or quoted in a U.S. automated inter-dealer quotation system (*e.g.*, NASDAQ). Under Rule 144A, a "qualified institutional buyer" is defined to include, among other persons (*e.g.*, "dealers" registered as such pursuant to Section 15 of the Exchange Act and "banks" as defined in Section 3(a)(2) of the Securities Act), any entity which purchases securities for its own account or for the account of another qualified institutional buyer and which (in the aggregate) owns and invests on a discretionary basis at least $100,000,000 in the securities of unaffiliated issuers.

At the Confirmation Hearing, the Debtor will request that the exemption provided under Bankruptcy Code section 1145 from the requirements of Section 5 of the Securities Act, 15 U.S.C. § 77e, and any state or local law requiring registration or qualification for the offer or sale of a security, apply to the issuance by the Liquidating Trust of the Trust Certificates and the distribution of such Trust Certificates pursuant to the Plan.

Because no public market will initially exist for the Trust Certificates and may never be developed, and because of the complex, subjective nature of the question of whether a particular person may be an underwriter, the Debtor makes no representation concerning the ability of any person to dispose of the Trust Certificates. Therefore, a recipient of Trust Certificates should consult with legal counsel concerning the eventual disposition of the Trust Certificates.

## XVII.

## RECOMMENDATION AND CONCLUSION

The Debtor believes that Plan confirmation and implementation are preferable to any feasible alternative. Accordingly, the Debtor urges entities that hold impaired Claims to vote to accept the Plan by checking the box marked "Accept" on their Ballots and then returning the Ballots as directed in the Plan and Disclosure Statement.

DATED: April 1, 2011                    American Pacific Financial Corporation


_____
By: Larry Polhill, President

SUBMITTED BY:


/s/ Kaaran Thomas
_____
Kaaran Thomas, an Attorney with
MCDONALD CARANO WILSON LLP
Reorganization Counsel for
Debtor and Debtor in Possession

LV210671 v7