MCDONALD CARANO WILSON LLP
KAARAN E. THOMAS (NV Bar No. 7193)
100 West Liberty Street, 10th Floor
Reno, NV 89505-1670
Telephone: (775) 788-2000
Facsimile: (775) 788-2020
Email: kthomas@mcdonaldcarano.com

*Electronically filed on April 4, 2011*

*Counsel for American Pacific Financial Corporation*

UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEVADA

In re

**AMERICAN PACIFIC FINANCIAL CORPORATION**

           Debtor.

Case No. BK-S-10-27855-BAM

Chapter 11

**DEBTOR'S OMNIBUS OPPOSITION TO MOTION TO APPOINT TRUSTEE [Docket # 233] AND SEC JOINDER [Docket #246]**

Date:    April 18, 2011
Time:    9:30 a.m.

American Pacific Financial Corporation, Debtor and Debtor In Possession ("Debtor" or "APFC") by and through its undersigned counsel, files this Omnibus Opposition to the Acting United States Trustee's Motion for Appointment of a Chapter 11 Trustee Pursuant to 11 U.S.C. §1104(a)(1)(the "Motion") and the "Joinder" filed by the Securities Exchange Commission (the "Joinder"). This Opposition is based upon the Declaration of Larry Polhill (the "Polhill Declaration"), the Declaration and Request for Judicial Notice filed by Kaaran Thomas, Esq. and the exhibits attached thereto and the points and authorities below.

303381

# BACKGROUND[1]

1. The Motion and Joinder allege fraudulent misrepresentations to noteholders by Mr. Polhill, APFC's President, between 1994 and 2008. Based upon the present status of this case and the facts set forth below and in the Declaration of Mr. Polhill, these allegations do not constitute "cause' for appointment of a trustee within the meaning of 11 U.S.C. Section 1104(a)(1). Trustee does not assert that grounds exist for the appointment under 11 U.S.C. Section 1104(a)(2).

**Status of the Case**

2. APFC's Amended Plan [Docket #253] does not propose the issuance of further notes. It is a liquidating plan that transfers all APFC assets to a Trust with an independent trustee selected by the Official Committee of Unsecured Creditors (the "Committee"). Debtor has provided all information requested by the Committee and its accountant and counsel regarding Debtor's assets and Mr. Polhill's alleged misconduct. Mr. Polhill has been examined under oath in a 2004 exam and he and the Debtor have provided all documents requested by the Committee. Debtor has also responded to requests for additional information from the Securities Exchange Commission and has included the substance of the responses in its Amended Disclosure Statement.

3. Assuming the Amended Disclosure Statement is approved on April 18, Debtor will seek the earliest possible confirmation date. Since the Amended Plan is a liquidating plan it need not meet the stricter standards required for a plan of reorganization. The Amended Plan satisfies the absolute priority rule (11 U.S.C. Section 1129 (b)) and gives creditors of this Estate control over all of Debtor's assets, including all causes of action.

---

[1] The factual allegations set forth in this section are supported by the Declaration of Larry Polhill In Support of Opposition to Motion to Appoint Trustee (the "Polhill Declaration") and the Declaration and Request for Judicial Notice of Kaaran Thomas, Esq. filed contemporaneously herewith, and the exhibits attached thereto.

303381                                                                                          2 of 15

**Facts Surrounding Allegations of Fraud and Misconduct**

4. Since Mr. Polhill will no longer control Debtor's assets after the Amended Plan is confirmed, the allegations of "fraud" in both the Motion and Joinder would be material and constitute "cause" (assuming they were true) only if Debtor chose not to proceed to confirmation of its Amended Plan. Furthermore, these allegations are as yet unproven. Indeed, Trustee's allegations are apparently based upon interviews with Mr. Pabon, Hazell and Mudd. To Debtor's knowledge, the Trustee made no attempt to verify these allegations with the Debtor. This Opposition sets forth material facts regarding and controverting these allegations.

5. Debtor does not disagree with Trustee's description of the elements of a fraud claim. A Plaintiff must demonstrate: a false representation made with knowledge or belief that it is false or without a sufficient basis of information, intent to induce reliance, and damage resulting from the reliance. Collins v. Burns, 103 Nev. 394, 741 P.2d 819, 821 (1987).

6. The majority of the claims involve failure to manage the creditors' collateral after the notes were issued. Possibly the most significant issue is failure to file UCC-1's or mortgages perfecting the creditors' interest in their collateral. The facts, as indicated by Mr. Polhill's Declaration, do not demonstrate an intent to defraud at the time the notes were issued or renewed. Debtor has significant defenses to each of these claims based upon the facts set forth below.[2]

    a.    **Hazell/USPL**

7. The Trustee and the SEC assert that APFC fraudulently misrepresented to Hazell that APFC (and its predecessor AMPAC) pledged equipment of U.S. Plastic Lumber Equipment Financing ("USPL") "worth over $1 million which could be sold to satisfy APFC's obligations under the note." They claim this statement was false because "Unbeknownst to Hazell in July, 2004, USPL had already filed a voluntary petition under Chapter 11 in the Southern District of

---

[2] Debtor responds to these allegations in the order they are raised in the SEC Joinder.

303381

Florida. An affiliate of the Debtor, AMPAC Capital Solutions, made an appearance in the USPL bankruptcy case in August 2004, four months prior to when Hazell signed the promissory note with APFC." [SEC Joinder page 3 lines12].

8. The financing to which Mr. Polhill referred was Debtor In Possession Financing. USPL and its affiliates U.S. Plastic Lumber Ltd., The Eaglebrook Group, Inc., U.S. Plastic Lumber Finance Corporation, U.S. Plastic Lumber IP Corporation filed Chapter 11 cases in the Southern District of Florida on July 23, 2004. The cases were jointly administered under Case No. 04-33579-PGH.

9. The docket is available on the PACER system, as are the pleading attached to the *Declaration and Request for Judicial Notice of Kaaran Thomas, Esq.,* (the "Thomas Declaration"). Certain of the relevant pleadings, including the initial petition and the schedules and the December 10, 2004 *Emergency Motion By Debtor U.S. Plastic Lumber Corp. To (A) Modify and Amend Certain Terms and Provisions of Post Petition Financing From AMPAC Capital Solutions, LLC and (B) Enter Into First Amendment to Credit and Security Agreement Pursuant to 11 USC 364(c) and (d) and FRBP 4001 (Emergency Hearing Requested Pursuant to Local Rule 9075)* are not available on PACER. However, the Supplement to Disclosure Statement describing the terms of the AMPAC financing and the subsequent sale of the USPL collateral to AMPAC is available and is attached to the Thomas Declaration as Exhibit "1".

10. USPL's Chapter 11 proceeding **made possible** the lien on USPL equipment that was described to Hazell, rather than defeat it. AMPAC subsequently acquired the equipment pursuant to the terms (including a credit bid) that are described in Exhibit 1, the USPL *Supplement to Disclosure Statement* attached to the Thomas Declaration. The sale price was far more than One Million Dollars. Mr. Hazell's note was current at the time of the USPL/AMPAC purchase and sale.

303381

11. AMPAC was a wholly owned subsidiary of APFC, which was subsequently dissolved and merged into APFC. APFC advanced the money which AMPAC used to loan to USPL and proceeds from the USPL equipment were paid to APFC until AMPAC was merged into APFC.

          **b.**    **Glen Cove Notes/ Hazell**

12. The Hazell notes were renewed September, 2007 and January 2008. The allegedly false statement in connection with these renewed obligations is that the "Glen Cove property had already been assigned to a third party mortgage lender".

13. The Glen Cove note is attached to the Hazell Declaration as Exhibit "B". The note does not state that the security is a first lien. The existence of liens on the property was readily ascertainable through title searches. In 2008, the Glen Cove property was valued by an independent appraiser (Cushman Wakefield) at Thirty-Five Million Dollars. This amount would have more than covered the senior debt of $21,000,000.00 due to the Reckson Glen Cove Mezz Lender LLC and the Hazell notes if not for the downturn in the economy. A copy of the conclusion pages of the Cushman Wakefield Appraisal is attached as Exhibit 1 to the Polhill Declaration. Debtor's interest in the Glen Cove property is still an asset of the estate (Debtor still owns the interests in Glen Cove LLP and Glen Cove LLP still owns the property). The obligations to the senior lender are in default, but the senior lender has not yet taken the property in foreclosure. The Liquidating Trust will retain the ability to work out an arrangement with the senior lender should it desire to do so.

          **c.**    **William Mudd Overview**

14. A review of Mr. Mudd's account indicates that he has invested $1,567.065.60 with the company and has received $1,714,037.00 in cash or property. A true and correct copy of the account is attached to the Polhill Declaration as Exhibit "2".

15. Mr. Mudd is owed the interest on his loans. That debt has as now been reduced to judgment, which is recorded against certain of Debtor's parcels of real estate, one of which is otherwise unencumbered (Hesperia Parcel 5). Debtor was not aware of the judgment lien, but was aware of the judgment, which is reflected on Debtor's schedules [Pacer Doc # 26 page 3 filed October 5, 2010].

16. Debtor's Amended Plan lists the Hazell judgment lien as a secured claim in Class 1A [Docket #253]. The Amended Plan provides the following treatment for Class 1A creditors:

> Treatment: Class 1A creditors will retain their liens on the property securing payment of their Allowed Secured Claims. They will have the election to either receive their collateral on the Effective Date or have their collateral assigned to the Trust. If they elect to have their collateral assigned to the Trust, and if the Liquidating Trustee agrees to accept the Collateral, the Trust will manage and sell the collateral. Class 1A creditors will receive the Net Proceeds from sale of their collateral. The secured claimant shall retain its liens until the secured claim is paid in full.

17. Mr. Mudd has not lost the principal amount of his loans to the Debtor. His unsecured claim will be reduced further by the value of the Hesperia properties.

### d. GB&L Note/Mudd

18. In May, 2003 the Mudds invested $360,134 and accepted a Contractual Loan Agreement / Promissory Note ("GBL note") with interest rate of 9% per annum, which paid monthly payments of $2,701, interest only. At the time of this investment, GB & L owed APFC in excess of $2 million. In May, 2003, GB&L was current on its obligations to APFC.

19. The Mudds voluntarily renewed their note in March, 2005. GB&L was current in its payments to Debtor at that time. In November, 2005 a truck driver employed by GB&L caused a multi fatality accident, which resulted in a multi million dollar judgment against the Debtor. The judgment destroyed GB&L's ability to pay its obligations, including its obligations to APFC. APFC continued to pay the Mudds until 2008.

### e. Orange Texas Note/Mudd

20. The alleged false statement regarding the Orange Texas Note is that Mudd's $400,000 note was "purportedly secured by certain real estate located in Orange Texas." Mudd has suffered no damage from his lack of a mortgage. The Orange, Texas property was severely impacted by several hurricanes in the Gulf region and its value was destroyed. In March, 2008, APFC delivered a deed to the Orange, Texas property to Mr. Mudd. He refused to accept the deed. After Mr. Mudd's refusal APFC deeded the property to the original owner.

### f. Pabon/Hesperia Note

21. The allegedly false statement made to Mr. Pabon is that his note was secured by the Hesperia property and that at a point before the last renewal (February 2004) the property was sold. Allegedly, after February 2004, Mr. Pabon continued to receive notes stating they were secured by the Hesperia property. At that time, Mr. Pabon was, and he continues to be, the registered agent for service of process of several APFC subsidiaries in Nevada. He spoke to Mr. Polhill regularly about the Debtor and its business. Mr. Pabon referred many people to APFC (including Mr. Hazell). Mr. Pabon never asked about the Hesperia property and was most likely aware of its status because of his involvement with the Debtor, even if the disposition of the property had not been a matter of public record.

22. Debtor's failure to provide formal notice of the subsequent sale of the Hesperia property may be evidence of negligence but it does not demonstrate that at the time the note was issued or renewed APFC intended to defraud Mr. Pabon; nor is it material misconduct. Mr. Pabon received regular payments of the amounts due on his note until 2008.

23. The status of the Hesperia property was at all relevant times a matter of public record.

24. Mr. Pabon's concern regarding his IRA statement is a result of the difference

between the book value of the notes (which remains the $41,000) and the value reported to the IRA agent, which reflects the decline in the real estate market.

**Other Notes**

25.     Trustee points out the existence of "many other notes" attached to proofs of claim that are filed as secured. Debtor is of the opinion that the same issues arise with many of these claimants.

26.     The fact that the status of much of the noteholders' collateral (and their interest in the collateral) was a matter of public record may refute the "intent to defraud" element of a fraud case, as well as the "justifiable reliance" element. Moreover, APFC paid its creditors until the value of its assets (and its ability to pay creditors) was impaired by events beyond the Debtor's control. Debtor could not anticipate the GB&L accident, hurricanes and the serious downturn in the economy. There is no indication that APFC's representations were materially false at the time they were made. There is no evidence that APFC mismanaged its assets.

**Trustee and the SEC Have Not Demonstrated "Cause" To Appoint a Trustee**

27.     The facts set forth above provide the basis for a colorable defense on the part of APFC and Mr. Polhill. These facts do not provide cause for appointment of a trustee, especially in light of Debtor's liquidating plan.

**Mr. Polhill Has Not Benefitted From Any Alleged Misconduct**

28.     There is no proof (and no allegation) that Mr. Polhill was involved in a "Ponzi Scheme"; that he benefitted personally from any of the alleged misrepresentations or investments or did anything other than to protect the Debtor's assets during the downturn.

29.     The Committee's accountant spent a day in Debtor's offices conducting a preliminary review of books and records and attended Mr. Polhill's 2004 examination. The accountant initially concluded that there were "missing funds" based upon an increase in long

term liabilities between 2005 and 2010. At his 2004 examination, Mr. Polhill produced documentation explaining the increase. Mr. Polhill also explained issues relating to the accountant's opinion that APFC was insolvent from 2005. The accountant had valued APFC's assets at book value.

30. Mr. Polhill has not received any salary from the Debtor since 2008. He provided his personal tax returns to the accountant and to counsel for the Committee subject to a confidentiality agreement.

**Securities Issues**

31. The SEC Joinder raises issues regarding possible violation of securities laws. Debtor is not in a position to address these issues; however, Debtor does not propose to issue securities or to remain in business. Debtor would note, however, that many of the proofs of claim contain a Securities notice that the securities have not been registered like the one attached to Claim 9-1. The most effective way to deal with any such issues is to promptly confirm the Amended Plan.

**Costs of Administration**

32. The Debtor's Monthly Operating Report for February [Docket No. 228 attached to the Thomas Declaration] indicates that Debtor has $47,377.96 in its bank account. Debtor has incurred almost $200,000 of professional fees, although those fees have yet to be approved by the Court. The fees are reflected in Debtor's Disclosure Statement). Debtor cannot afford to incur additional administrative expenses. It is using its best efforts to minimize expenses so it will be able to transfer its assets to the trust under its Amended Plan.

**POINTS AND AUTHORITIES**

33. Section 1104(a) of the Bankruptcy Code, 11 U.S.C. § 1104(a), authorizes the appointment of a trustee in a chapter 11 case in two circumstances. Section 1104(a) states:

(a) At any time after the commencement of the case but before confirmation of a plan, on request

of a party in interest or the United States trustee, and after notice and a hearing, the court shall order the appointment of a trustee-

(1) for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause, but not including the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor; or

(2) if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate, without regard to the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor.

11 U.S.C. § 1104(a) (emphasis added).

### Cause Must Be Determined On A Case-By-Case-Basis Based On Established Criteria

34. Trustee and the SEC base their case on alleged incidences of "fraud, dishonesty, incompetence or gross mismanagement of the affairs of the debtor by current management, either before or after commencement of the case, or similar cause…" [11 U.S.C. §1104(a)(1)] ("Section 1104"). Their joint position is that the mere existence of these acts, regardless of how far removed in time and relevance to the current status of a debtor's case, deprive the court of its judicial discretion regarding the appointment of a Trustee. The Motion and Joinder imply that the court should ignore the fact that the actions occurred between 2004 and 2008, two years prior to the date the case was filed, and that Debtor has filed a liquidating plan. Their position, apparently, is that the term "cause" does not require a judicial review and determination of the materiality of the alleged conduct and its relationship to the outcome of the case.

35. This "strict construction" would be counterproductive to the best interests of creditors and flies in the face of existing case law.

36. The determination of "cause" for appointment of a trustee must be made on a case-by-case basis, keeping in mind the general presumption that a debtor-in-possession should be able to remain in possession absent a showing to the contrary. In <u>In re Marvel Entertainment Group, Inc.</u>, 140 F.3d 463, 471 (3d Cir.1998), the court explained:

"It is settled that appointment of a trustee should be the exception, rather than the rule." [citation omitted.] In the usual chapter 11 proceeding, the debtor remains in possession throughout reorganization because "current management is generally best suited to orchestrate the process of rehabilitation for the benefit of creditors and other interests of the estate." Thus, the basis for the strong presumption against appointing an outside trustee is that there is often no need for one: "The debtor-in-possession is a fiduciary of the creditors and as a result, has an obligation to refrain from acting in a manner which could damage the estate, or hinder a successful reorganization." [Citation omitted.] The strong presumption also finds its basis in the debtor-in-possession's usual familiarity with the business it had already been managing at the time of the bankruptcy filing, often making it the best party to conduct operations during the reorganization.

37. The actions alleged by a person seeking to invoke Section 1104 must be "material". An action is material if it exists "by reason of any direct or indirect relationship to, connection with, or interest in, the debtor ...." 11 U.S.C. § 101(14)(E). See also Black's Law Dictionary 998 (8th ed.2004) (defining "material" as "[h]aving some logical connection with the consequential facts" or being "[o]f such a nature that knowledge of the item would affect a person's decision-making; significant; essential...."). In re AFI Holding, Inc., 530 F.3d 832, 845 (9th Cir., 2008).

38. Neither the Trustee nor the SEC has provided evidence of any "material fact." That would support appointment of a trustee in this case. The alleged conduct relates to the issuance of promissory notes. Debtor has not proposed to issue notes under its plan.

**Appointment of A Trustee Involves Judicial Discretion**

39. It is true that appointment of a trustee is mandatory if "cause" under 11 U.S.C. §1104(a)(1) (hereafter "Section 1104") is found; however, the determination of what constitutes "cause" is subject to the court's discretion.[3] In the Briarwood case, Judge Bowie (echoing the reasoning of G-I Holdings) explained that while appointment of a trustee is mandatory upon a finding of cause under Section 1104(a) (1), a determination of "cause" under subsection (1) is

---

[3] In re G-I Holdings, Inc , 295 B.R. at 507, aff'd 385 F.3d 313, 317 (3d Cir.2004); In re Briarwood Capital, LLC, 2010 WL 2884949 (Bankr.S.D. Cal. 2010). In re Sundale, Ltd. 400 B.R. 890 (Bankr.S.D. Fla. 2009).

303381                                                                                                11 of 15

within the court's discretion. In re G.I. Holdings, Inc., supra, 295 B.R. at 507.

**Trustee and the SEC Have Not Demonstrated "Cause" for the Appointment of a Trustee**

40. Courts have established various factors to be considered in determining whether cause exists under Section 1104(a)(1). The factors include: 1) Materiality of the misconduct; 2) Evenhandedness or lack of same in dealings with insiders or affiliated entities vis-à-vis other creditors or customers; 3) The existence of pre-petition voidable preferences or fraudulent transfers; 4) Unwillingness or inability of management to pursue estate causes of action; 5) Conflicts of interest on the part of management interfering with its ability to fulfill fiduciary duties to the debtor; 6) Self-dealing by management or waste or squandering of corporate assets. In re Intercat, Inc., 247 B.R. 911, 921 (Bankr.S.D.Ga.2000).

41. The court may consider the cumulative or collective impact of the alleged problems or issues (the" totality of the circumstances") in making its decision. In re Cardinal Indus., Inc., 109 B.R. 755 (Bankr.S.D.Ohio 1990). In re Sharon Steel Corp., 871 F.2d 1217, 1228 (3d Cir.1989), In re Sundale Ltd., 400 B.R. 890 (Bankr. S.D. Fla. 2009). It is not merely the actions of a debtor, but the level of the acts that determine "cause". The conduct, failure to act, or gross mismanagement, or the like, must "[rise] to a level sufficient to warrant the appointment of a trustee." Comm. of Dalkon Shield Claimants v. A.H. Robins Co., 828 F.2d 239, 242 (4th Cir.1987) (quoting In re General Oil Distributors, Inc., 42 B.R. 402 (Bankr.E.D.N.Y.1984)).

42. In the Sundale case, supra, Judge Isikoff determined that a number of actions similar to the ones listed by the Trustee including (1) prepetition failure on part of Chapter 11 debtors' principal to observe corporate formalities;(2) failure on part of Chapter 11 debtors-in-possession to pay taxes; and (3) failure to accurately disclose, on statement of financial affairs all their prepetition payments and transfers to insiders did not constitute "cause" for appointment of trustee given the facts of the case. Sundale, supra, 400 B.R. at 903-904.

43. Trustee acknowledges the factors [in paragraph 37 above] that "have imbued" the term "cause" in Section 1104(a)(1), as discussed in the G.I. Holdings and Briarwood Capital decisions [see Motion paragraph 47]. He asserts, without any supporting facts, that the allegations of Mssrs. Mudd, Hazell and Pabon regarding events of 2004 to 2008 satisfy these factors. Yet he fails to tie these allegations to any of the cited factors. He fails to show that the alleged fraudulent conduct is material given the posture of this case; how Mr. Polhill has been less than evenhanded in dealings with insiders or affiliated entities; the existence of pre-petition voidable preferences or fraudulent transfers; unwillingness or inability of Mr. Polhill to pursue estate causes of action (all causes of action will be transferred to the Trust under the Plan); conflicts of interest on the part of Mr. Polhill that would interfere with his ability to proceed to confirmation with the Amended Plan; self-dealing or waste or squandering of corporate assets. The only other facts given to support the proposed appointment are failure to list the Mudd claim as secured (the claim is secured by the recording of a judgment of which Debtor was unaware) and the failure to obtain general insurance liability on a piece of raw land (Trustee has acknowledged that at the Trustee's request the Debtor obtained the insurance). [4]

44. The materiality of a debtor's conduct must be determined in light of the circumstances of the case. The circumstances of this case do not support the Motion.

**Debtor's Alleged Actions Are Not Material**

45. By inference, Trustee admits that none of the factors other than the alleged misconduct are present in this case; and he fails to demonstrate that the alleged misconduct is . material.

46. In determining whether a Section 1104(a)(1) appointment is warranted or in the best interests of creditors, the bankruptcy court must bear in mind that the appointment of a

---

[4] See Polhill Declaration.

trustee "may impose a substantial financial burden on a hard pressed debtor seeking relief under the Bankruptcy Code," by incurring the expenditure of "substantial administrative expenses" caused by further delay in the bankruptcy proceedings.. In re Plaza de Retiro, Inc.,417 B.R. 632, 640 (Bankr.D.N.M.,2009).

47. In this case appointment of a trustee on the eve of confirmation of a liquidating plan that provides for an independent trustee would require the estate to incur enormous administrative expense to achieve a result that is about to be accomplished by the Amended Plan.

48. The appointment of a Chapter 11 trustee should better serve creditors, shareholders, and the public interest by promoting efficiency, effectiveness and transparency, traits which may have been lost by current management. In re Celeritas Technologies, 2011 WL 899782 *3 (March 14, 2011). Trustee provides no reason why the interests of creditors or the public would be served by such an appointment in this case. Debtor and Mr. Polhill have replied to and complied with every request for information. The administration of this estate has been "transparent". There are no allegations that Debtor has been ineffective or efficient.

**Burden of Proof**

49. Trustee concedes that the only circuit court to determine the issue of burden of proof required the "clear and convincing" standard. [Motion paragraph 49 referring to the Marvel Entertainment Group, Inc. 140 F.3d 463, 471 (3rd Cir. 1998)]. In the Sundale decision[5], Judge Isikoff also considered the burden of proof and determined that court should follow a holding from another circuit court of appeals unless it is convinced that court's decision is erroneous." noting the holding in Owens v. Miller (In re Miller), 276 F.3d 424, 429 (8th Cir.2002) ("a sister circuit's reasoned decision deserves great weight and precedential value"). To the extent the Court considers this issue to be material, the holding in Marvel should be persuasive, not only for the

---

[5] In re Sundale, Ltd., supra, 400 B.R. fn 8.

reasoning of <u>Sundale</u>, but also because the provisions of the amended Section 1104 inserted the word "shall" in its mandate to the Court. This strict result should require the higher burden of proof. Trustee cannot meet this higher burden of proof. Indeed, Trustee has failed to meet his burden of proof regardless of what standard the court chooses to impose.

**Conclusion**

50.     Trustee has failed to demonstrate "cause' for appointment of a Chapter 11 Trustee. The Court should deny the requested relief and take the steps necessary to promptly confirm Debtor's Amended Plan.

DATED: April 4, 2011

                                  McDONALD CARANO WILSON LLP

                                  By  /s/  Kaaran E. Thomas
                                      KAARAN E. THOMAS
                                      100 West Liberty Street, 10th Floor
                                      P.O. Box 2670
                                      Reno, NV 89505-2670
                                      Phone:  (775) 788-2000

                                  *Counsel for American Pacific Financial*
                                  *Corporation, Debtor and Debtor-in-Possession*